**ORAL ARGUMENT NOT YET SCHEDULED**

**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | | |
|---|---|---|
| Allegheny Defense Project, et al., | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | Case No. 17-1098 |
| | ) | |
| Federal Energy Regulatory Commission, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |
| | ) | |

---

# MOTION OF MOVANT-INTERVENOR TRANSCONTINENTAL GAS PIPE LINE COMPANY, LLC TO DISMISS THE PETITION FOR REVIEW

---


Elizabeth U. Witmer
(D.C. Circuit Bar No. 55961)
Saul Ewing LLP
1200 Liberty Ridge Drive, Suite 200
Wayne, PA 19087-5569
Phone: (610) 251-5062
Fax: (610) 408-4400
ewitmer@saul.com

John F. Stoviak
(D.C. Circuit Bar No. 54582)
Saul Ewing LLP
Centre Square West,
1500 Market Street, 38th Floor
Philadelphia, PA 19102-2186
Phone: (215) 972-1095
Fax: (215) 972-1921
jstoviak@saul.com

Patrick F. Nugent
(D.C. Circuit Bar No. 55948)
Saul Ewing LLP
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102-2186
Phone: (215) 972-7134
Fax: (215) 972-4157
pnugent@saul.com

Pamela S. Goodwin
(D.C. Circuit Bar No. 54566)
Saul Ewing LLP
650 College Road East, Suite 4000
Princeton, NJ 08540-6603
Phone: (609) 452-3109
Fax: (609) 452-3129
pgoodwin@saul.com

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................1

BACKGROUND AND PROCEDURAL HISTORY ..............................................4

I. MOVANT-INTERVENOR TRANSCO, FERC, AND PETITIONERS ...........................4

II. FERC'S COMPREHENSIVE PROCESS PRECEDING THE ISSUANCE OF THE CERTIFICATE ORDER........................................................................6

III. FERC'S ADMINISTRATIVE PROCESS FOR REHEARING REQUESTS ....................7

ARGUMENT ..........................................................................................9

I. THE PETITION IS INCURABLY PREMATURE AND SHOULD BE DISMISSED..........9

A. Exhaustion of FERC's Administrative Process Is A Prerequisite To Judicial Review of the Certificate Order..........................................10

B. Tolling Orders Under the Natural Gas Act Have Been Consistently Upheld by this Court and Other Courts of Appeals ............................12

C. FERC, Through Its Secretary, Took Action Within 30 Days of Petitioners' Requests for Rehearing and This Action Survived FERC's Loss of Quorum...................................................................14

D. Petitioners' Due Process Rights Have Not Been Violated, And If Petitioners Believe That Their Right to Challenge the Certificate Order Has Been Extinguished, Their Remedy Is Through An All Writs Act Petition ...................................................................18

II. IN THE ALTERNATIVE, THE PETITION SHOULD BE HELD IN ABEYANCE ..........20

CONCLUSION ......................................................................................21

ADDENDUM A: THE WHITE HOUSE OFFICE OF THE PRESS SECRETARY, *Nine Nominations Sent to the Senate Today*, https://www.whitehouse.gov/the-press-office/2017/05/10/nine-nominations-sent-senate-today (May 10, 2017)

ADDENDUM B: Request for Rehearing and Motion for Stay of Allegheny Defense Project, Clean Air Council, Concerned Citizens of Lebanon County, Heartwood, Lancaster Against Pipelines, Lebanon Pipeline Awareness, and Sierra Club (Feb. 10, 2017)

ADDENDUM C: Request for Rehearing and Motion for Stay by Accokeek, Mattawoman, Piscataway Creeks Communities Council, Inc. (Feb. 24, 2017)

ADDENDUM D: Order Granting Rehearings for Further Consideration (Mar. 13, 2017)

ADDENDUM E: Motion for Leave to Answer and Answer of Transcontinental Gas Pipe Line Company, LLC to Requests for Rehearing (Mar. 10, 2017)

ADDENDUM F: Certificate of Parties and Amici Curiae and Disclosure Statement

## TABLE OF AUTHORITIES

**CASES**

*Alaska v. FERC*,
980 F.2d 761 (D.C. Cir. 1992)....20

*Basardh v. Gates*,
545 F.3d 1068 (D.C. Cir. 2008)....20

* *Cal. Co. v. Fed. Power Comm'n*,
411 F.2d 720 (D.C. Cir. 1969)....2, 12

* *Cal. Mun. Utils. Ass'n v. FERC*,
No. 01-1156, 2001 WL 936359 (D.C. Cir. July 31, 2001)....14

* *City of Glendale, Cal. v. FERC*,
No. 03-1261, 2004 WL 180270 (D.C. Cir. Jan. 22, 2004)....13

*Comm. of Blind Vendors of D.C. v. Dist. of Columbia*,
28 F.3d 130 (D.C. Cir. 1994)....11

*Council of & for the Blind of Del. Cty. Valley, Inc. v. Regan*,
709 F.2d 1521 (D.C. Cir. 1983)....19

* *Gen. Am. Oil Co. of Texas v. Fed. Power Comm'n*,
409 F.2d 597 (5th Cir. 1969)....13

* *Kokajko v. F.E.R.C.*,
837 F.2d 524 (1st Cir. 1988)....13

*Laurel Baye Healthcare of Lake Lanier, Inc. v. N.L.R.B.*,
564 F.3d 469 (D.C. Cir. 2009)....16

*League of United Latin Am. Citizens v. Hampton*,
501 F.2d 843 (D.C. Cir. 1974)....10, 11

*Mathews v. Eldridge*,
424 U.S. 319 (1976)....19

* Authorities upon which we chiefly rely are marked with asterisks.

* *Moreau v. FERC*,
982 F.2d 556 (D.C. Cir. 1993)........................................................................13

*Nat'l Treasury Emps. Union v. King*,
961 F.2d 240 (D.C. Cir. 1992)........................................................................10

*Polk v. Kramarsky*,
711 F.2d 505 (2d Cir. 1983) ..........................................................................19

*Reynolds Metal Co. v. FERC*,
777 F.2d 760 (D.C. Cir. 1985)........................................................................19

*Town of Dedham v. FERC*,
No. CV 15-12352-GAO, 2015 WL 4274884 (D. Mass. July 15, 2015) ............20

*Wallace v. Lynn*,
507 F.2d 1186 (D.C. Cir. 1974)......................................................................10

*Williston Basin Interstate Pipeline Co. v. F.E.R.C.*,
475 F.3d 330 (D.C. Cir. 2006)........................................................................12

**STATUTES**

15 U.S.C. § 717f(c) ..........................................................................................1

15 U.S.C. § 717r.........................................................................................9, 19

15 U.S.C. § 717r(a) ..................................................................3, 7, 9, 11, 12

15 U.S.C. § 717r(b)............................................................................................1

28 U.S.C. § 1651(a) .........................................................................................19

42 U.S.C. § 7171(e) .........................................................................................17

## GLOSSARY

| | |
|---|---|
| 1995 Delegation Order | *Delegation of Authority to the Secretary, the Director of the Office of Electric Power Regulation and the General Counsel*, 60 Fed. Reg. 62,326 (Dec. 6. 1995), FERC Stats. & Regs., Reg. Preambles Jan. 1991-June 1996 ¶ 31,030 (1995) (codified in 18 C.F.R. § 375.302(v)) |
| 2017 Delegation Order | *Order Delegating Further Authority to Staff in Absence of Quorum*, dated February 3, 2017 in FERC Dkt. AD17-10-000, 158 FERC ¶ 61,135 |
| AMP Creeks | Petitioner Accokeek, Mattawoman, Piscataway Creeks Communities Council, Inc. |
| Answer | Motion for Leave to Answer and Answer of Transcontinental Gas Pipe Line Company, LLC to Requests for Rehearing (Mar. 10, 2017) |
| Certificate Order | *Transcontinental Gas Pipe Line Company, LLC*, 158 FERC ¶ 61,125 (Feb. 3, 2017) |
| DEIS | Draft Environmental Impact Statement |
| FEIS | Final Environmental Impact Statement |
| FERC | Federal Energy Regulatory Commission |
| FERC Motion to Dismiss | Motion to Dismiss filed by Federal Energy Regulatory Commission dated April 28, 2017 (Dkt. 1673156) |
| Petition | Petition for Review |
| Petitioners | Petitioners Allegheny Defense Project, Clean Air Council, Concerned Citizens of Lebanon County, Heartwood, Lancaster Against Pipelines, Lebanon Pipeline Awareness, Sierra Club, and Accokeek, |

| | |
|---|---|
| | Mattawoman, Piscataway Creeks Communities Council, Inc. |
| Project | Transcontinental Gas Pipe Line Company, LLC's Atlantic Sunrise Project |
| Requests for Rehearing | Request for Rehearing and Motion for Stay of Allegheny Defense Project, Clean Air Council, Concerned Citizens of Lebanon County, Heartwood, Lancaster Against Pipelines, Lebanon Pipeline Awareness, and Sierra Club (Feb. 10, 2017) *and* Request for Rehearing and Motion for Stay by Accokeek, Mattawoman, Piscataway Creeks Communities Council, Inc. (Feb. 24, 2017) |
| Secretary | Kimberly Bose, Secretary of the Federal Energy Regulatory Commission |
| Tolling Order | Order Granting Rehearings for Further Consideration (Mar. 13, 2017) |
| Transco | Movant-Intervenor Transcontinental Gas Pipe Line Company, LLC |

Movant-Intervenor Transcontinental Gas Pipe Line Company, LLC ("Transco") respectfully moves this Court to dismiss for lack of jurisdiction the petition for review ("Petition") filed by Petitioners Allegheny Defense Project, Clean Air Council, Concerned Citizens of Lebanon County, Heartwood, Lancaster Against Pipelines, Lebanon Pipeline Awareness, Sierra Club, and Accokeek, Mattawoman, Piscataway Creeks Communities Council, Inc. ("AMP Creeks") (collectively, "Petitioners").[1]

Movant-Intervenor Transco also joins in the motion to dismiss filed by the Federal Energy Regulatory Commission ("FERC") and submits this motion in further support of FERC's pending motion to dismiss ("FERC Motion to Dismiss"). *See* Dkt. 1673156.

## INTRODUCTION

Pursuant to the Natural Gas Act, 15 U.S.C. § 717r(b), Petitioners, a group of organizations which oppose fossil fuel development, seek to set aside an order of FERC which, after almost three years of review, granted a Certificate of Public Convenience and Necessity pursuant to Section 7(c) of the Natural Gas Act, 15 U.S.C. § 717f(c), to Transco for the $1.8 billion Atlantic Sunrise Project (the

---

[1] Transco filed an unopposed motion to intervene in this action on April 12, 2017. *See* Dkt. 1670753. The Court has not yet ruled on Transco's motion to intervene. Transco files the instant motion to dismiss in accordance with the Court's Order dated March 28, 2017. *See* Dkt. 1668150 (setting May 12, 2017 as deadline for dispositive motions).

"Project"), *Transcontinental Gas Pipe Line Company, LLC*, 158 FERC ¶ 61,125 (Feb. 3, 2017) ("Certificate Order"). Petitioners attempt to use the temporary lack of a quorum of FERC Commissioners[2] as an excuse to cut short FERC's administrative review process, and overturn a FERC practice first affirmed by this Court nearly 50 years ago. *See Cal. Co. v. Fed. Power Comm'n*, 411 F.2d 720 (D.C. Cir. 1969).

Petitioners filed requests for rehearing of the Certificate Order with FERC on February 10, 2017 and February 24, 2017 ("Requests for Rehearing").[3] The Secretary of FERC, Kimberly Bose ("Secretary"), issued an Order Granting Rehearings for Further Consideration ("Tolling Order") on March 13, 2017, which granted Petitioners' Requests for Rehearing for the limited purpose of further consideration.[4] Petitioners contend that this Court has jurisdiction over their Petition because their Requests for Rehearing purportedly were denied by

---

2 On May 10, 2017, President Trump announced that has nominated two individuals to fill the open Commissioner seats at FERC. *See* THE WHITE HOUSE OFFICE OF THE PRESS SECRETARY, *Nine Nominations Sent to the Senate Today*, https://www.whitehouse.gov/the-pressoffice/2017/05/10/nine-nominations-sent-senate-today, attached hereto as Addendum A.

3 *See* FERC Dkt. CP15-138-000, Accession No. 20170210-5182, *Request for Rehearing and Motion for Stay of Allegheny Defense Project, Clean Air Council, Concerned Citizens of Lebanon County, Heartwood, Lancaster Against Pipelines, Lebanon Pipeline Awareness, and Sierra Club* (Feb. 10, 2017), attached hereto as Addendum B *and* FERC Dkt. CP15-138-000, Accession No. 20170224-5106, *Request for Rehearing and Motion for Stay by AMP Creeks*, attached hereto as Addendum C.

4 The Tolling Order is attached hereto as Addendum D.

operation of law under 15 U.S.C. § 717r(a) when FERC issued the Tolling Order, but did not dispose of their Requests for Rehearing on the merits within 30 days.

This Court has no jurisdiction over this appeal, since Petitioners have not exhausted the still-ongoing administrative process established by the Natural Gas Act. This Court cannot review FERC's orders until FERC either denies rehearing or rules on the merits of a granted rehearing request – neither of which has happened here.

This Court, and other federal Courts of Appeals, have rejected the arguments made here by Petitioners and determined that: (1) the Natural Gas Act does not require FERC to finally dispose of the merits of a rehearing request within 30 days; and (2) issuance of a tolling order prevents a rehearing request from being denied by operation of law. Finally, it is irrelevant that FERC temporarily lacks a quorum of Commissioners to adjudicate Petitioners' Requests for Rehearing because FERC is not required to act *on the merits* of a rehearing request within 30 days, and the Tolling Order was issued pursuant to valid and lawfully-delegated authority.

In the alternative, if the Court does not dismiss the Petition at this time, Transco respectfully requests that the Court hold the Petition in abeyance until FERC rules on the merits of Petitioners' Requests for Rehearing and the agency proceedings are completed.

## BACKGROUND AND PROCEDURAL HISTORY

### I. Movant-Intervenor Transco, FERC, and Petitioners

Transco is the Project applicant. The Project represents an investment of an estimated ***$1.839 billion*** by Transco to build and operate critical natural gas infrastructure. *See* Certificate Order ¶ 12. As part of its major financial investment in the Project, Transco has invested considerable resources to undergo the extensive administrative review and approval process necessary to construct and operate the Project. *See generally* Certificate Order. This administrative process is conducted by FERC pursuant to authority that Congress delegated to FERC through the Natural Gas Act. The administrative process began in April 2014 and is ongoing. *See id* ¶ 68; *see also* Requests for Rehearing.

Petitioners, a group of organizations, appear to share a desire to prevent or delay construction of critical energy infrastructure necessary to meet demand for natural gas. Indeed, Petitioners' unequivocal opposition to ***all*** natural gas infrastructure projects is reflected in their mission statements:

- Petitioner Allegheny Defense Project "strives to protect [] wild forests and rivers from . . . oil and gas drilling . . . ."[5]
- Petitioner Clean Air Council believes fossil fuel projects are "dirty energy," and vows to oppose such projects "[u]ntil the day comes that we move beyond this kind of pollution . . . ."[6]

---

5 ALLEGHENY DEF. PROJECT, *The Allegheny Biogregion*, http://www.allegheny defense.org/what-we-do.html.

6 CLEAN AIR COUNCIL, *Dirty Energy*, http://cleanair.org/dirty-energy.

- Petitioner Concerned Citizens of Lebanon County boasts that it "fights to protect local families from the dangers of hazardous materials and natural gas pipelines."[7]

- Petitioner Heartwood characterizes the American natural gas boom as a "tide of destruction" and vows to oppose same.[8]

- Petitioners Lancaster Against Pipelines and Lebanon Pipeline Awareness claim to "oppos[e] the Atlantic Sunrise Project" and the "Pipeline Revolution."[9]

- Petitioner Sierra Club purports to "lead the charge against climate change and polluters" and boasts that it has "launched more than 150 legal actions to challenge the fossil fuel industry's destructive effects on or air, water, and climate."[10]

Petitioners, in essence, are using the court system as a sword in their political crusade against natural gas infrastructure projects. However, Petitioners' zeal to stop interstate natural gas projects does not exempt them from the long-standing administrative law principle which requires exhaustion of the administrative process before judicial relief may be sought.

---

[7] CONCERNED CITIZENS OF LEBANON CTY., *About*, https://www.facebook.com/pg/concernedcitizensoflebanoncounty/about/?ref=page_internal.

[8] HEARTWOOD, *Our Work*, https://heartwood.org/campaigns.

[9] LANCASTER AGAINST PIPELINES, *About*, https://www.facebook.com/pg/lancasteragainstpipelines/about/?ref=page_internal; LEBANON PIPELINE AWARENESS, *About*, https://www.facebook.com/pg/LebanonPipelineAwareness/about/?ref=page_internal.

[10] SIERRA CLUB, *About*, http://content.sierraclub.org/environmentallaw/about.

## II. FERC's Comprehensive Process Preceding the Issuance of the Certificate Order

The Certificate Order that Petitioners seek to challenge was issued following an extensive administrative process conducted by FERC, which lasted ***nearly three years***. ***1,185 written comments, 296 oral comments, and more than 900 letters*** were submitted to FERC addressing various issues regarding the Project. *See* Certificate Order ¶¶ 69, 72, 73.

The pre-filing process for the Project was initiated in April 2014. *Id.* ¶ 68. In July 2014, FERC provided notice of its intent to prepare an environmental impact statement for the Project. *Id.* This notice of intent, published in the Federal Register and mailed to 2,500 "interested parties," described the Project, invited comments, and listed the date and location of public meetings. *Id.* FERC received over 600 comments on the Project. *Id.* ¶ 69.

Transco submitted its application for a certificate order on March 31, 2015. *Id.* ¶ 70. Notice of Transco's application was published in the Federal Register shortly thereafter and comments were solicited from landowners that would be potentially affected by the Project. *Id.* ¶¶ 13, 70.

In the ensuing months, every Petitioner except for Concerned Citizens of Lebanon County moved to intervene in the FERC proceedings. *See id.* at Appendices A and B. Petitioners, including Concerned Citizens of Lebanon

County, submitted dozens of comments and exhibits to FERC that, in the aggregate, totaled in excess of 2,000 pages. *See, e.g.*, *id.* ¶¶ 26, 65, 74, 76-78, 106.

FERC issued its Draft Environmental Impact Statement (the "DEIS") in May 2016. *Id.* ¶ 72. FERC received over 1,000 comments and letters on the DEIS. *Id.* After a seven-month period of considering the myriad issues raised in these comments, FERC issued its Final Environmental Impact Statement (the "FEIS") in December 2016. *Id.* ¶ 75. The FEIS addressed the comments that were submitted in response to the DEIS, including approximately 175 comments submitted by Petitioners.[11] *Id.*

FERC issued the Certificate Order on February 3, 2017. *See id.* at Caption. FERC had a quorum of three Commissioners when it issued the Certificate Order. *See id.*

## III. FERC's Administrative Process For Rehearing Requests

FERC's administrative process did not end when the Certificate Order issued. Within 30 days of the Certificate Order's issuance, several parties to FERC's proceedings, including Petitioners, filed requests for rehearing pursuant to 15 U.S.C. § 717r(a). Petitioners filed their Requests for Rehearing on February 10, 2017 and February 24, 2017. *See* Requests for Rehearing.

---

[11] *See* FEIS, Volume III, DEIS Responses, Parts 1-7, https://www.ferc.gov/industries/gas/enviro/eis/2016/12-30-16-FEIS.asp.

In their Requests for Rehearing, Petitioners, over the course of *39 pages of argument and 50 pages of exhibits*, raised nine broad issues, which were directed toward FERC's administrative expertise in evaluating the public need for the Project and environmental impacts of the Project. *See id.* at 2-4. Petitioners also filed motions for stay, alleging that, absent a stay, they would "be left without an adequate remedy at law to address the irreparable harms inflicted by the construction." *See id.* at 39.

On March 10, 2017, Transco filed a 26-page Answer to the Requests for Rehearing which responded to the various technical issues raised by Petitioners. *See* Transco's Motion for Leave to Answer and Answer to Requests for Rehearing ("Answer"), attached hereto as Addendum E.[12]

On March 13, 2017, FERC's Secretary entered the Tolling Order, pursuant to authority that was (1) previously delegated to her by FERC, and (2) affirmed by FERC just before it temporarily lost its quorum. *See* Tolling Order at 1. This Order tolled the time for FERC to issue an order addressing the matters raised in the Requests for Rehearing. *Id.* ("[T]o afford additional time for consideration of the matters raised or to be raised, rehearing of the Commission's order is hereby granted for the limited purpose of further consideration, and timely-filed rehearing requests will not be deemed denied by operation of law." The Tolling Order did

[12] Transco separately filed an answer to Petitioners' motions for stay on February 23, 2017. *See* Dkt. CP15-138-000, Accession No. 20170223-5209.

not impact Petitioners' motions to stay, as there is no deadline by which FERC must act. *See id.*

*The Requests for Rehearing and Transco's Answer remain pending before FERC, and FERC's consideration of the voluminous issues raised therein remains actively underway*. The motions for stay also remain pending.

## ARGUMENT

### I. The Petition Is Incurably Premature And Should Be Dismissed

This action is incurably premature because it seeks to disrupt FERC's ongoing administrative review process. This administrative review process ***has not been exhausted*** as FERC is ***actively considering*** the Requests for Rehearing in consonance with the review process set forth in the Natural Gas Act. Petitioners nevertheless seek premature judicial review of the Certificate Order.

Petitioners raise three arguments in their attempt to prematurely invoke this Court's jurisdiction under 15 U.S.C. § 717r:

- Their Requests for Rehearing were denied by operation of law pursuant 15 U.S.C. § 717r(a) because FERC did not "act" within 30 days.

- FERC's "staff" lacked authority to act on behalf of FERC because FERC's "staff" lacks authority to issue an order that FERC itself cannot issue.

- The Tolling Order does not constitute an "act" on a request for rehearing under the Natural Gas Act.

In response to these points, Transco incorporates herein all of the arguments set forth in FERC's Motion to Dismiss. Petitioners' arguments also fail for the following reasons, all of which require dismissal of the Petition.

### A. Exhaustion of FERC's Administrative Process Is A Prerequisite To Judicial Review of the Certificate Order

"It is a basic principle of administrative law that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *League of United Latin Am. Citizens v. Hampton*, 501 F.2d 843, 845 (D.C. Cir. 1974) (internal quotations omitted). Two strong public policy rationales justify the exhaustion principle. First, it empowers agencies to reach fully-informed decisions within their spheres of expertise and protects the authority delegated to them by Congress. Second, it conserves judicial resources because many issues and disputes can be resolved by agencies before they make their way to Court. *See Nat'l Treasury Emps. Union v. King*, 961 F.2d 240, 243 (D.C. Cir. 1992) ("The principle of exhaustion rests on the dual purposes of protecting administrative agency authority and promoting the economy of judicial resources."); *Wallace v. Lynn*, 507 F.2d 1186, 1190 (D.C. Cir. 1974) ("[A]dministrative tribunals should generally be given the opportunity to correct their own errors and thereby obviate the need for judicial review.").

The exhaustion principle is equally relevant, and equally important, in situations where petitioners claim that the "administrative remedies available to

them are inadequate and any endeavor to utilize them would be futile." *See id.* Indeed, this Court has emphasized that the "futility exception" to the exhaustion principle is "quite restricted" and will only apply "if the reasons supporting the [exhaustion] doctrine are found inapplicable." *Comm. of Blind Vendors of D.C. v. Dist. of Columbia*, 28 F.3d 130, 133 n. 5 (D.C. Cir. 1994) (quoting *Comm. for GI Rights v. Callaway*, 518 F.2d 466, 474 (D.C. Cir. 1975)).

Here, FERC's mandatory rehearing process (established by the Natural Gas Act[13]) ensures that Petitioners' technical objections to the Certificate Order will be analyzed by the body best equipped to consider them before judicial review occurs. Indeed, if Petitioners are allowed to proceed in this Court before FERC rules on the Requests for Rehearing, then ***this Court will be tasked with reviewing an incomplete agency record without the benefit of FERC's full analysis of the complex issues raised in Petitioners' pending Requests for Rehearing.*** *See League of United Latin Am. Citizens*, 501 F.2d at 847 ("[B]y requiring the appellants to exhaust their administrative remedies, a court will be in a much better position to review and comprehend the issues, should it be required to do so . . . .").

---

13 *See* 15 U.S.C. § 717r(a) ("Any person . . . aggrieved by an order issued by the Commission in a proceeding under this chapter to which such person, State, municipality, or State commission is a party may apply for a rehearing within thirty days after the issuance of such order. . . . *No proceeding to review any order of the Commission shall be brought by any person unless such person shall have made application to the Commission for a rehearing thereon*.") (emphasis added).

The policies underlying the exhaustion principle should take priority over Petitioners' lack of quorum argument, which looks to be a short-term issue in light of President Trump's two nominations for Commissioners of FERC.[14] Given the applicability of the exhaustion principle to the instant proceeding, all of the jurisdictional arguments advanced by Petitioners are meritless and the Petition should be dismissed. *See, e.g., Williston Basin Interstate Pipeline Co. v. F.E.R.C.*, 475 F.3d 330, 336 (D.C. Cir. 2006) ("There is no doubt that the time requirements of 15 U.S.C. § 717r(a), (b) of the NGA establish ***jurisdictional requirements***.") (emphasis added).

### B. Tolling Orders Under the Natural Gas Act Have Been Consistently Upheld by this Court and Other Courts of Appeals

The Tolling Order's validity is a matter of statutory construction, and this Court provided the necessary analysis ***nearly 50 years ago***, when it determined that the issuance of a tolling order constitutes an "act" under the Section 19(a) of the Natural Gas Act, 15 U.S.C. § 717r(a). *See Cal. Co.*, 411 F.2d at 721; *see also* FERC Motion to Dismiss at 6.

Numerous courts have considered the 30-day timeline set forth in 15 U.S.C. § 717r(a) the Natural Gas Act, and all of them have concluded that this section does not require a decision on the merits of a request for rehearing within this timeframe. *See Cal. Co.*, 411 F.2d at 722 ("We are reluctant to impute to Congress

---

14 *See* footnote 2, *supra*.

a purpose to limit the Commission to 30 days' consideration of applications for rehearing, irrespective of the complexity of the issues involved, with jurisdiction then passing to the courts to review a decision which at that moment would profitably remain under active reconsideration by the agency. . . . We hold that the applications for reconsideration are validly under consideration by the Commission past the 30-day period . . . .); *see also Moreau v. FERC*, 982 F.2d 556, 564 (D.C. Cir. 1993) ("[W]e hold that section 717r(a) denies us jurisdiction to review matters . . . raised in rehearing petitions before FERC until FERC denies the petition or until FERC rules on the merits of a granted petition for rehearing."); *Kokajko v. F.E.R.C.*, 837 F.2d 524, 525 (1st Cir. 1988) ("The statutory language . . . does not state, as the petitioner would have it, that FERC must 'act on the merits' within that time lest the application is deemed denied."); *Gen. Am. Oil Co. of Texas v. Fed. Power Comm'n*, 409 F.2d 597, 599 (5th Cir. 1969) ("[W]e must construe § 19(a) of the Natural Gas Act . . . . We . . . hold that the FPC has 'acted' for purposes of § 19(a) by granting the rehearing. This construction has been adopted in the Third, Ninth, Tenth, and D.C. Circuits sub silentio by order.").

More recently, this Court has issued *per curiam* Orders rejecting premature petitions for review. See *City of Glendale, Cal. v. FERC*, No. 03-1261, 2004 WL 180270, at *1 (D.C. Cir. Jan. 22, 2004) (dismissing petition for review as "incurably premature" and rejecting petitioner's "contention that this court should

treat FERC's orders tolling the period for resolving petitioner's requests for agency rehearing as effectively denying rehearing; the tolling orders do not resolve the rehearing requests but simply extend the time to consider them"); *see also Cal. Mun. Utils. Ass'n v. FERC*, No. 01-1156, 2001 WL 936359, at *1 (D.C. Cir. July 31, 2001) (determining that petitions for review were "incurably premature" and dismissing same "[i]n light of the agency's tolling order" because it was "clear petitioners' rehearing requests are still under consideration by [FERC]").

As these cases demonstrate, the Petition is "incurably premature" because a Tolling Order was timely issued and FERC has not yet ruled on the merits of the Requests for Rehearing.

### C. FERC, Through Its Secretary, Took Action Within 30 Days of Petitioners' Requests for Rehearing and This Action Survived FERC's Loss of Quorum

Petitioners' claim that their Requests for Rehearing were "denied by operation of law . . . because the Commission did not act on the request[s] within 30 days" is refuted by the fact that FERC, through its Secretary, acted on the Requests for Rehearing within 30 days of their filing by issuing the Tolling Order. Courts have long considered tolling orders to constitute an "act" under the Natural Gas Act. *See* FERC Motion to Dismiss at 6-7. Petitioners' attempts to circumvent the binding, well-established case law cited in FERC's Motion to Dismiss fail.

1. <u>The Secretary Has Been Vested With Authority to Issue Tolling Orders Since 1995 – Authority That Was Reaffirmed by FERC Before It Lost Its Quorum, And That Was Validly Exercised Here</u>

Petitioners' argument that the Secretary was not able to "act" on behalf of FERC ignores FERC's long-standing practice of delegating certain procedural functions, including the issuance of tolling orders, to the Secretary. ***FERC first delegated authority to the Secretary to issue tolling orders in 1995.*** *See* FERC Motion to Dismiss at 8; *see also Delegation of Authority to the Secretary, the Director of the Office of Electric Power Regulation and the General Counsel*, 60 Fed. Reg. 62,326 (Dec. 6. 1995), FERC Stats. & Regs., Reg. Preambles Jan. 1991-June 1996 ¶ 31,030 (1995) (codified in 18 C.F.R. § 375.302(v)) (the "1995 Delegation Order") ("The Secretary . . . will be authorized to toll the time for action on rehearings of Commission action under all of the Commission's statutes . . . ."). In the ***nearly 22 years*** this delegation order has been in effect, it has never been deemed improper, let alone unlawful. Yet that is precisely what Petitioners ask the Court to do here. *See* Petition at 2.

To the extent the 1995 Delegation Order was ambiguous as to its effect in the event that FERC lost its quorum, FERC *reaffirmed* this Order in February 2017, while it still had a quorum. *See Order Delegating Further Authority to Staff in Absence of Quorum*, dated February 3, 2017 in FERC Dkt. AD17-10-000, 158 FERC ¶ 61,135, n. 5 (the "2017 Delegation Order") ("All pre-existing delegations

of authority by the Commission to its staff continue to be effective. . . . This includes the authority of the Secretary to toll the time for action on requests for rehearing.") (internal citations omitted).

Confronted with FERC's longstanding delegation practice and the fact that any potential uncertainty regarding this practice in the absence of a quorum was resolved by FERC before it lost its quorum, Petitioners point to inapposite case law and ask the Court to engage in an artificially narrow reading of a decades-old Federal Register paragraph that has never been interpreted by any court. Both of Petitioners' tactics are unavailing.

a. <u>Petitioners Rely On Inapposite Case Law Interpreting A Different Statutory Scheme</u>

In their response to FERC's Motion to Dismiss, Petitioners rely on *Laurel Baye Healthcare of Lake Lanier, Inc. v. N.L.R.B.*, 564 F.3d 469 (D.C. Cir. 2009), in an attempt to argue that FERC's decision to delegate the authority to issue tolling orders to the Secretary was improper. *See* Dkt. 1674354. *Laurel Baye*, however, is easily distinguishable and Petitioners' reliance on it is misplaced because this case involved the National Labor Relation Board's quorum requirements, which, in relevant part, included a provision that the Board's quorum requirement must be satisfied "at all times." *See Laurel Baye*, 564 F.3d at 472 (quoting 29 U.S.C. § 153(b)). Here, on the other hand, the operative statute states only that a "a quorum for the transaction of business shall consist of at least three

members present." 42 U.S.C. § 7171(e). As FERC explained, when it delegated authority to the Secretary, it had three commissioners, and, thus, was able to transact business, including, but not limited to, delegating certain procedural authority to the Secretary. *See* FERC Motion to Dismiss at 10.

b. <u>The Secretary's Authority to Issue the Tolling Order Is Not Nullified By Filing Requests for Rehearing Alongside Motions To Stay</u>

Claiming that FERC "explicitly defined the scope of the tolling order that it intended to delegate" in the "preamble to 18 C.F.R. § 375.302(v)," Petitioners contend that because they filed their Requests for Rehearing together with motions for stay, FERC's Tolling Order was improper. *See* Petitioners' Response to FERC Motion to Dismiss at 15. This argument fails for two reasons.

First, the Secretary did not act in any way with respect to Petitioners' motions for stay. These motions remain pending before FERC and FERC will respond to them when it regains its quorum, which as noted above, will likely be soon. Unlike a request for rehearing, there is no statutory deadline for FERC to respond to a stay request. By not acting on Petitioners' motions for stay, FERC followed its "current procedures" as contemplated by 60 Fed. Reg. 62,326.

Second, Petitioners' construction this Federal Register paragraph elevates form over substance and would create an exception that, in practice, would swallow the rule. In essence, Petitioners assert that a party to a FERC proceeding

may evade the Secretary's authority to issue tolling orders simply by pairing a rehearing request with a motion, which would undermine the Secretary's authority to issue tolling orders under both the 1995 Delegation Order and the 2017 Delegation Order. This Court should not credit Petitioners' novel, unsupported argument, especially when doing so would be starkly at odds with the plain purpose of these Delegation Orders.

#### 2. FERC's Lack of A Quorum Is Irrelevant

FERC's current lack of a quorum does not affect FERC's process in addressing requests for rehearing because, as explained in FERC's Motion to Dismiss, FERC is not required to act on the merits of a rehearing request within 30 days when a tolling order is issued. *See* FERC Motion to Dismiss at 8-9. As discussed above, tolling orders may be issued by the Secretary pursuant to her lawfully-delegated authority.

### D. Petitioners' Due Process Rights Have Not Been Violated, And If Petitioners Believe That Their Right to Challenge the Certificate Order Has Been Extinguished, Their Remedy Is Through An All Writs Act Petition

Petitioners claim that they have been deprived of due process because FERC is "paralyzed for want of a quorum" and their Requests for Rehearing are stuck in "administrative purgatory" and "administrative limbo." *See* Petitioners' Response to FERC Motion to Dismiss at 4, 8, 9, 11, 12. Petitioners' claims ring hollow. First, no deprivation of a protectable due process interest has occurred. Second, if

in fact all other statutory remedies to bring suit are foreclosed, Petitioners may bring suit under the All Writs Act, which provides a mechanism that allows Petitioners to bring their concerns to the appropriate federal court of appeals, in accordance with the Natural Gas Act's jurisdictional provisions. 15 U.S.C. § 717r.

Petitioners cannot explain how the Tolling Order deprived them of a protectable due process interest of life, liberty, or property. Without such a predicate interest, they are not entitled to due process protections. *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). Mere delays in the adjudication of a claim do not amount to a deprivation of property. *See Council of & for the Blind of Del. Cty. Valley, Inc. v. Regan*, 709 F.2d 1521, 1533-34 (D.C. Cir. 1983); *Polk v. Kramarsky*, 711 F.2d 505, 509 (2d Cir. 1983). The Tolling Order delays, rather than extinguishes, Petitioners' challenges to the Certificate Order. As such, Petitioners have not been deprived of any protected property interest.

Petitioners' claim that all avenues of potential relief are closed is contradicted by the All Writs Act, which provides a mechanism that allows Petitioners to bring their concerns to an appropriate federal court of appeals when statutory remedies are inadequate. *See* 28 U.S.C. § 1651(a) (empowering federal courts to issue writs as necessary to protect their prospective jurisdiction); *Reynolds Metal Co. v. FERC*, 777 F.2d 760, 762 (D.C. Cir. 1985). Thus, if in fact their statutory remedies are inadequate, Petitioners may file an All Writs Act

petition with an appropriate federal court of appeals. *See Town of Dedham v. FERC*, No. CV 15-12352-GAO, 2015 WL 4274884, at *2 (D. Mass. July 15, 2015) ("While full review of [FERC's] action is not yet available under § 717r pending the outcome of the reconsideration process, Dedham is not without an avenue to the immediate relief it seeks. Under the All Writs Act, Dedham may apply to the Court of Appeals for, and that Court may grant, ancillary relief in aid of its future jurisdiction.").

Therefore, Petitioners' claim that they have no means to "obtain judicial review at a meaningful time," *see* Petitioners' Response to FERC Motion to Dismiss at 11, is not true and does not allow this Court to circumvent the Natural Gas Act's jurisdictional framework.

## II. In the Alternative, the Petition Should Be Held in Abeyance

If the Court determines not to dismiss the Petition, the Court should hold it in abeyance until FERC rules on the merits of the Requests for Rehearing and FERC's administrative proceedings conclude. This Court "often . . . issue[s] . . . orders [to hold a petition for review in abeyance] in light of other pending proceedings that may affect the outcome of the case before [it]." *Basardh v. Gates*, 545 F.3d 1068, 1069 (D.C. Cir. 2008)); *see also Alaska v. FERC*, 980 F.2d 761, 764 (D.C. Cir. 1992) (it is "usually preferable to require the parties to wait for

appellate review until the [proceeding] is ultimately resolved – to insist on the standard of one case, one appeal").

## CONCLUSION

The Petition is incurably premature and should be dismissed for lack of jurisdiction, or in the alternative, held in abeyance pending completion of the agency proceedings.

Respectfully submitted this 12th day of May, 2017.

By: *__/s/ John F. Stoviak__________*

John F. Stoviak
(D.C. Circuit Bar No. 54582)
Saul Ewing LLP
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA  19102-2186
Phone:  (215) 972-1095
Fax:  (215) 972-1921
jstoviak@saul.com

Elizabeth U. Witmer
(D.C. Circuit Bar No. 55961)
Saul Ewing LLP
1200 Liberty Ridge Drive, Suite 200
Wayne, PA  19087-5569
Phone:  (610) 251-5062
Fax:  (610) 408-4400
ewitmer@saul.com

Pamela S. Goodwin
(D.C. Circuit Bar No. 54566)
Saul Ewing LLP
650 College Road East, Suite 4000
Princeton, NJ  08540-6603
Phone:  (609) 452-3109
Fax:  (609) 452-3129
pgoodwin@saul.com

Patrick F. Nugent
(D.C. Circuit Bar No. 55948)
Saul Ewing LLP
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA  19102-2186
Phone:  (215) 972-7134
Fax:  (215) 972-4157
pnugent@saul.com

*Counsel for Movant-Intervenor Transcontinental Gas Pipe Line Company, LLC*

# ADDENDUM A

**THE WHITE HOUSE OFFICE OF THE PRESS SECRETARY, *Nine Nominations Sent to the Senate Today*, https://www.whitehouse.gov/the-press-office/2017/05/10/nine-nominations-sent-senate-today (May 10, 2017)**

**The White House**
Office of the Press Secretary

For Immediate Release May 10, 2017

# Nine Nominations Sent to the Senate Today

NOMINATIONS SENT TO THE SENATE:

Neil Chatterjee, of Kentucky, to be a Member of the Federal Energy Regulatory Commission for the term expiring June 30, 2021, vice Anthony T. Clark, resigned.

J. Christopher Giancarlo, of New Jersey, to be Chairman of the Commodity Futures Trading Commission, vice Timothy G. Massad, resigned.

Mark Andrew Green, of Wisconsin, to be Administrator of the United States Agency for International Development, vice Gayle Smith.

Andrew K. Maloney, of Virginia, to be a Deputy Under Secretary of the Treasury, vice Anne Elizabeth Wall.

Jay Patrick Murray, of Virginia, to be Alternate Representative of the United States of America for Special Political Affairs in the United Nations, with the rank of Ambassador.

Jay Patrick Murray, of Virginia, to be an Alternate Representative of the United States of America to the Sessions of the General Assembly of the United Nations, during his tenure of service as Alternate Representative of the United States of America for Special Political Affairs in the United Nations.

Robert F. Powelson, of Pennsylvania, to be a Member of the Federal Energy Regulatory Commission for the term expiring June 30, 2020, vice Philip D. Moeller, resigned.

Adam J. Sullivan, of Iowa, to be an Assistant Secretary of Transportation, vice Dana G. Gresham.

Robert L. Sumwalt III, of South Carolina, to be a Member of the National Transportation Safety Board for a term expiring December 31, 2021.(Reappointment)

# ADDENDUM B

## Request for Rehearing and Motion for Stay of Allegheny Defense Project, Clean Air Council, Concerned Citizens of Lebanon County, Heartwood, Lancaster Against Pipelines, Lebanon Pipeline Awareness, and Sierra Club (Feb. 10, 2017)

20170210-5182 FERC PDF (Unofficial) 2/10/2017 4:51:49 PM

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

Transcontinental Gas Pipe Line Company, LLC Docket No. CP15-138-000

**REQUEST FOR REHEARING AND MOTION FOR STAY OF ALLEGHENY DEFENSE PROJECT, CLEAN AIR COUNCIL, CONCERNED CITIZENS OF LEBANON COUNTY, HEARTWOOD, LANCASTER AGAINST PIPELINES, LEBANON PIPELINE AWARENESS, AND SIERRA CLUB**

Pursuant to section 19(a) of the Natural Gas Act ("NGA"), 15 U.S.C. §717r(a) and Rule 713 of the Federal Regulatory Energy Commission's ("FERC") Rules of Practice and Procedure, 18 C.F.R. § 385.713, the Allegheny Defense Project, Clean Air Council, Concerned Citizens of Lebanon County, Heartwood, Lancaster Against Pipelines, Lebanon Pipeline Awareness, and Sierra Club (collectively, "Intervenors") hereby request rehearing of FERC's "Order Issuing Certificate," issued February 3, 2017, in the above-captioned proceeding ("Certificate Order"). *See Transcontinental Gas Pipe Line Company, LLC*, 158 FERC ¶ 61,125 (Feb. 3, 2017). FERC granted the Intervenors' respective motions to intervene in this proceeding. *See id*. at P 13. Thus, the Intervenors are "parties" to this proceeding, 18 C.F.R. § 385.214(c), and have standing to file this request for rehearing. *See* 15 U.S.C. § 717r(a); 18 C.F.R. § 385.713(b).

We request that the Certificate Order and deficient final environmental impact statement ("FEIS") be withdrawn and the environmental analysis and public convenience and necessity analysis be redone in a manner that complies with FERC's obligations pursuant to the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, and the Natural Gas Act ("NGA"), 15 U.S.C. § 717 *et seq*. All communications regarding this request should be addressed to and served upon:

Ryan Talbott
Executive Director

Allegheny Defense Project
117 West Wood Lane
Kane, PA 16735
(503) 329-9162
rtalbott@alleghenydefense.org

## I. STATEMENT OF ISSUES

Pursuant to Section 713(c) of FERC's Rules of Practice and Procedure, Intervenors provide a statement of issues and alleged errors in the Certificate Order:

1. Transco improperly segmented its expansion projects and evaded a complete, rigorous environmental studies under the NEPA. "Under applicable NEPA regulations, FERC is required to include 'connected actions,' 'cumulative actions,' and 'similar actions' in a project EA. 'Connected actions' include actions that are 'interdependent parts of a larger action and dependent on the larger action for their justification.'" *Delaware Riverkeeper Network v. FERC*, 753 F.3d 1304, 1308 (D.C. Cir. 2014) (citing 40 C.F.R. § 1508.25(a)) (holding that since there was a "clear physical, functional, and temporal nexus between the projects," they should have been considered together under NEPA).

2. FERC violated NEPA by failing to ensure that "environmental information is available to public officials and citizens before decisions are made and before actions are taken." 40 C.F.R. § 1500.1(b); *see also* 18 C.F.R. § 380.11(a) (environmental considerations must be addressed "at appropriate major decision points"). "In proceedings involving a party or parties and not set for trial-type hearing, major decision points are the approval or denial of proposals by the Commission or its designees." 18 C.F.R. § 380.11(a)(1). By rushing to issue the Certificate Order before Transco submitted information critical to FERC's decision and by ignoring comments on the FEIS, FERC failed to ensure that it has adequately "considered environmental concerns in its decisionmaking process." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989); *see also California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982).

3. FERC violated NEPA by failing to properly evaluate the purpose and need for the Atlantic Sunrise Project during its NEPA review. 40 C.F.R. § 1502.13. In particular, with regard to this critically important portion of its review, FERC failed to "exercise a degree of skepticism in dealing with self-serving statements from a prime beneficiary of the project." *Simmons v. U.S. Army Corps of Eng's*, 120 F.3d 664, 669 (7th Cir. 1997) (quoting *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 209 (D.C. Cir. 1991) (Buckley, J., dissenting)).

4. FERC violated NEPA by failing to rigorously explore and objectively evaluate all reasonable alternatives, including reasonable alternatives not within its jurisdiction. 40 C.F.R. § 1502.14; *WildEarth Guardians v. Nat'l Park Serv.*, 703 F.3d 1178, 1184 (10th Cir. 2013); *Milwaukee Inner-City Congregations Allied for Hope v. Gottlieb*, 944 F.Supp.2d 656, 670 (W.D. Wis., 2013); *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 235 F.Supp.2d 1143, 1154 (W.D. Wash., 2002). Instead, FERC defined a narrow

range of alternatives that it determined it could "legitimately consider." FEIS, Vol. III, PM-93. This improperly restricted FERC's alternatives analysis to those "alternative means by which a particular applicant can reach his goals." *Simmons*, 120 F.3d at 669 (quoting *Van Abbema v. Fornell*, 807 F.2d 633, 638 (7th Cir. 1986); *see also Nat'l Parks & Cons. Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1072 (9th Cir. 2009).

5. FERC violated NEPA by failing to take a hard look at the direct and indirect effects of the Atlantic Sunrise Project on water resources, including high-quality and exceptional value streams and wetlands. *See* 40 C.F.R. § 1508.8; *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). FERC failed to support with substantial evidence its conclusion that proposed mitigation measures would protect water resources during construction of the Atlantic Sunrise Project. *See New York v. U.S. Nuclear Reg. Comm'n*, 589 F.3d 551, 555 (2d Cir. 2009). Insufficient mitigation measures, even when longstanding in their use, are still insufficient. *See Summit Petroleum Corp. v. U.S. E.P.A.*, 690 F.3d 733, 746 (6th Cir. 2012).

6. FERC violated NEPA by failing to take a hard look at the indirect effects of additional shale gas development that would be induced by the Atlantic Sunrise Project. *See* 40 C.F.R. § 1508.8(b). The Atlantic Sunrise Project and upstream shale gas development are "two links of a single chain." *Sylvester v. U.S. Army Corps of Engineers*, 884 F.2d 394, 400 (9th Cir 1989). Shale gas development is also reasonably foreseeable and "a person of ordinary prudence would take it into account" before making a decision. *Sierra Club v. Marsh*, 976 F.2d 763, 767 (1st Cir. 1992). FERC is aware of the nature of the effects of shale gas development and cannot simply ignore those effects. *See Mid States Coalition for Progress v. Surface Transportation Board*, 345 F.3d 520, 549 (8th Cir. 2003); *Habitat Education Center v. U.S. Forest Service*, 609 F.3d 897, 902 (7th Cir. 2010). FERC is required to engage in "[r]easonable forecasting" because "speculation is . . . implicit in NEPA." *Delaware Riverkeeper*, 753 F.3d at 1310; *Northern Plains Resource Council v. Surface Transportation Board*, 668 F.3d 1067, 1079 (9th Cir. 2011). FERC's failure to make any attempt to assess the indirect effects of shale gas development "require[s] the public, rather than the agency" to ascertain the effects of the Project. *Te-Moak Tribe of Western Shoshone of Nevada v. U.S. Department of the Interior*, 608 F.3d 592, 605 (9th Cir. 2010). "Such a requirement would thwart one of the 'twin aims' of NEPA – to 'ensure[ ] that the *agency* will inform the *public* that it has indeed considered environmental concerns in its decision making process.'" *Id.* (*quoting Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 97, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983)) (emphasis added by Ninth Circuit).

7. FERC violated NEPA by failing to take a hard look at the cumulative impacts of the Atlantic Sunrise Project. *See* 40 C.F.R. § 1508.7; *Delaware Riverkeeper*, 753 F.3d at 1319-20. This violation stemmed from FERC ignoring thousands of existing and reasonably foreseeable shale gas developments. FERC also refused to investigate that fact that even "minor" or "temporary" Project impacts on natural resources can be cumulatively significant when combined with the other, related developments. *See* 40 C.F.R. §§ 1508.7, 1508.27(b)(7); Council on Environmental Quality ("CEQ"), Considering Cumulative Effects Under the National Environmental Policy Act (1997) (hereinafter "1997 Guidance"); *Klamath-Siskiyou*, 387 F.3d at 993-97. Likewise, FERC's

selection of a "region of influence" for forested lands and air quality was unreasonably restrictive and appears to have been based on the Endangered Species Act's more restrictive definition of "cumulative effects." *See Conservation Congress v. U.S. Forest Service*, 720 F.3d 1048, 1055 (9th Cir. 2013). FERC must consider the "inter-regional" cumulative effects that the Atlantic Sunrise Project will have, including past, present, and reasonably foreseeable shale gas extraction in the Marcellus and Utica Shale formations. *See Natural Resources Defense Council v. Hodel*, 865 F.2d 288, 299 (D.C. Cir. 1988).

8. FERC's application of the Certificate Policy Statement was arbitrary because it was based on a deficient FEIS. *See Certification of New Interstate Natural Gas Pipeline Facilities*, 88 FERC ¶ 61,227 (1999), order clarified, 90 FERC ¶ 61,128, order further clarified, 92 FERC ¶ 61,094 (2000); *South Coast Air Quality Management District v. FERC*, 621 F.3d 1085, 1099 (9th Cir. 2010).

9. FERC's failure to adequately and independently evaluate the public need for the Atlantic Sunrise Project renders arbitrary its determination under Section 7 of the Natural Gas Act, that the project is "required by the present or future public convenience and necessity." *See* 15 U.S.C. § 717f(e).

## II. BACKGROUND

Transco wants to overhaul its massive pipeline system. The Project is a massive link in a chain of related projects aimed at achieving this overhaul. The Project itself is designed to reconfigure Transco's mainline, which has historically shipped gas from the Gulf Coast to the Northeast, so that it can function bi-directionally and transport Marcellus and Utica shale gas from northern Pennsylvania to the Southeast and Gulf Coast regions. To get the shale gas to its mainline, Transco claims it must construct nearly 200 miles of large diameter pipeline and loops. Thus, the Project's express purpose is to provide gas companies operating in northern Pennsylvania new or dramatically increased access to export facilities at Cove Point, Maryland, and along the Gulf Coast, as well as domestic markets.

Instead of performing the detailed analysis required for such a major action, FERC published significantly flawed draft and final environmental impact statements that omitted substantial information related to the Project's environmental impacts. These flaws were pointed out not only by Intervenors and other commenters, but also by co-regulators, including the U.S.

Environmental Protection Agency, the U.S. Department of the Interior, and the Pennsylvania Department of Environmental Protection. Instead of taking the necessary time to fully cure the deficiencies in its environmental review documents, FERC instead rushed to issue the Certificate Order in response to Transco's desired construction schedule. When it became clear on January 26, 2017, that FERC would lose its quorum upon Commissioner Bay's resignation on February 3, 2017, FERC unlawfully issued the Certificate Order even through there were nearly two months remaining in the 90-day federal authorization window and that Transco had yet to make prerequisite information submittals.[1]

## III. ARGUMENT FOR REHEARING

### A. FERC improperly segmented Atlantic Sunrise from other closely related and interdependent projects.

Transco improperly segmented its expansion projects and evaded a complete, rigorous environmental studies under the NEPA. For example, along with the Project, Transco announced the Rock Springs Expansion project, which is a proposed 11.17 mile expansion from Lancaster County to the Wildcat Point facility, about five miles from Rising Sun, Maryland. *See* Rock Springs Expansion Project, Williams Transco Pipeline Expansion Projects, http://rocksprings.wpengine.com/. Transco also proposes to submit a 7(c) application in March 2017 for its Northeast Supply Enhancement Project, which is an expansion project that will run from York County, Pennsylvania (where Atlantic Sunrise ends) to the Rockaway Transfer Point, which is an existing interconnection between the Lower New York Bay Lateral and the Rockaway Delivery Lateral in New York State waters. *See* Letter from Transcontinental Gas Pipe Line Company, LLC to Kimberly Bose, Secretary, FERC (May 9, 2016). Atlantic

[1] FERC also issued orders approving the Rover Pipeline Project, Orion Project, and Northern Access 2016 Project. *See Rover Pipeline LLC*, 158 FERC ¶ 61,109 (Feb. 2, 2017); *Tennessee Gas Pipeline Co., L.L.C.*, 158 FERC ¶ 61,110 (Feb. 2, 2017); *National Fuel Gas Supply Corp.*, 158 FERC ¶ 61,145 (Feb. 3, 2017).

Sunrise appears to be part of this series of projects to expand Transco's system. *See* 149 FERC ¶ 61,258, No. CP13-551-000 (Dec. 18, 2014).

Additional related and interdependent projects, including the Southeast Market Pipelines Project (which includes Transco's Hillabee Expansion) and Magnolia Extension project, were highlighted in Intervenors' request for a revised or supplemental EIS. *See* Intervenors' Comments Requesting Revised or Supplemental DEIS at 4-6. These related and interdependent projects should not be viewed as individual projects under NEPA. "Under applicable NEPA regulations, FERC is required to include 'connected actions,' 'cumulative actions,' and 'similar actions' in a project EA. 'Connected actions' include actions that are 'interdependent parts of a larger action and dependent on the larger action for their justification.'" *Delaware Riverkeeper Network v. FERC*, 753 F.3d 1304, 1308 (D.C. Cir. 2014) (citing 40 C.F.R. § 1508.25(a)) (holding that since there was a "clear physical, functional, and temporal nexus between the projects," they should have been considered together under NEPA). There is a "clear physical, functional, and temporal nexus" between these projects. For example, the three Transco projects on the East Coast connect to each other physically, either directly or through nearby existing pipelines. Functionally, the projects work to bring gas from the Marcellus Shale gas development throughout the East Coast and beyond. Moreover, the three new East Coast projects are scheduled to begin construction from 2017 to 2019, with the goal of completion in order to meet the "increasing demand for natural gas in the northeastern United States for the 2019/2020 winter heating season." Northeast Supply Enhancement, Williams, http://co.williams.com/expansionprojects/northeast-supply-enhancement/. FERC must consider these connected and cumulative actions projects and disclose their environmental impacts together in its environmental review of Atlantic Sunrise.

### B. FERC failed to ensure that substantial environmental information was available before authorizing the Atlantic Sunrise Project.

FERC failed to ensure that its decision to approve the Atlantic Sunrise Project was based on complete and accurate information about the environmental consequences of the project. Agencies must ensure that "environmental information is available to public officials and citizens before decisions are made and before actions are taken." 40 C.F.R. § 1500.1(b). FERC's NEPA regulations require that environmental considerations be addressed "at appropriate major decision points." 18 C.F.R. § 380.11(a). "In proceedings involving a party or parties and not set for trial-type hearing, major decision points are the approval or denial of proposals by the Commission or its designees." *Id*. § 380.11(a)(1).

FERC issued the Certificate Order even though Transco has not submitted substantial, specifically-requested information related to environmental consequences of the project. *See* Certificate Order, Environmental Conditions 13-42, 44-45, 47-50, 52. The lack of information on has been a persistent problem throughout this proceeding. *See* Intervenors' DEIS Comments at 5-8 (Accession No. 20160627-5296); EPA's DEIS Comments at 2 (Accession No. 20160706-0052); Intervenors' Comments Requesting a Revised or Supplemental DEIS at 3-9 (Accession No. 20161011-5075); *and* Intervenors' FEIS Comments at 10-16. Instead of requiring Transco to submit the missing information and allowing the public an opportunity to review that information, FERC rushed to issue the Certificate Order before it lost its quorum on February 3, 2017.[2] FERC's decision to prioritize industry timelines over the public interest underscores the arbitrary and capricious nature of its decisionmaking.

By rushing to issue the Certificate Order, FERC failed to ensure that it "has indeed considered environmental concerns in its decisionmaking process." *Robertson v. Methow Valley*

[2] The email confirming FERC's issuance of the Certificate Order was received at 4:46 p.m. (Eastern) on February 3, 2017, just fourteen minutes before the end of FERC's business day.

*Citizens Council*, 490 U.S. 332, 349 (1989); *see also California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982). As explained in comments on the FEIS, despite the six months that elapsed between the end of the DEIS comment period and the publication of the FEIS, there was still a substantial amount of information missing in the FEIS. *See* Intervenors' FEIS Comments at 10-16. Much of this information is still missing. *See* Certificate Order, Environmental Conditions 13-42, 44-45, 47-50, 52.

This missing information concerns significant environmental matters. For example, FERC identified three active underground fires in coal mines within three miles of the Project. *See* Certificate Order at P 84. One of the mine fires "is about 0.4 mile west of the project in Northumberland County, Pennsylvania." *Id*. As a result of this obvious threat to the environment and human health and safety, FERC is requiring Transco to submit an "Abandoned Mine Investigation and Mitigation Plan" that identifies the depth and extent of coal seams that could pose a risk to project facilities, and mitigation measures that would be implemented to protect the integrity of the pipeline from underground mine fires during the life of the project. *Id*. The specifics of that plan are critical to the assessment of potential environmental impacts that is mandated by the NEPA review process. FERC, however, only required Transco to submit the Abandoned Mine Investigation and Mitigation Plan when it submits its implementation plan, *i.e.*, after issuance of the Certificate Order, thereby circumventing the NEPA process. *See id.*, EC 21 and EC 23.

FERC therefore failed to ensure that "environmental information [was] available to public officials and citizens before decisions are made and before actions are taken." 40 C.F.R. § 1500.1(b). By issuing the Certificate Order without the Abandoned Mine Investigation and Mitigation Plan, FERC acted at a "major decision point" without fully considering significant environmental and human health and safety concerns. 18 C.F.R. § 380.11(a)(1). The same

rationale applies to the other missing information, including missing information that FERC has identified. *See* Certificate Order, Environmental Conditions 13-42, 44-45, 47-50, 52. FERC's failure to ensure that this information was submitted and publicly available during the NEPA review process renders FERC's Certificate Order invalid. FERC should rescind the Certificate Order and prepare a supplemental FEIS after Transco has submitted all of the missing information that FERC identified.

**C. FERC failed to specify the purpose and need and evaluate a reasonable range of alternatives.**

FERC failed to properly identify, disclose, and evaluate the purpose and need for the Atlantic Sunrise Project in the FEIS. NEPA regulations require FERC to "specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action." 40 C.F.R. § 1502.13. FERC must "exercise a degree of skepticism in dealing with self-serving statements from a prime beneficiary of the project." *Simmons v. U.S. Army Corps of Eng's*, 120 F.3d 664, 669 (7th Cir. 1997) (quoting *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 209 (D.C. Cir. 1991) (Buckley, J., dissenting)).

Instead of specifying the need for the Atlantic Sunrise Project or exercising any degree of skepticism with regard to Transco's statements, FERC flatly stated that "it will not determine whether the need for the Project exists" as part of the NEPA process. FEIS at 1-2. Instead, FERC said "[t]he determination of whether there is a 'need' for the proposed facilities . . . will be made in the subsequent Commission Order granting or denying Transco's request for certificate authorization[.]" FEIS, Vol. III, PM-93. This violates the plain language of 40 C.F.R. § 1502.13. The fact that FERC considers need as part of its certification review under the Natural Gas Act does not relieve the agency of its obligation to specify the need for the Project during the NEPA process when the public has the opportunity to comment and potentially influence FERC's

decision. The failure to specify and assess the need for the Atlantic Sunrise Project during the NEPA process renders the FEIS invalid. FERC should rescind the Certificate Order and prepare a supplemental FEIS that fully vets the purpose and need for the Project.

CEQ's regulations also require agencies to "[r]igorously explore and objectively evaluate all reasonable alternatives," including "reasonable alternatives not within the jurisdiction of the lead agency." 40 C.F.R. § 1502.14(a); (c). FERC, however, stated in the response to comment on the FEIS that it defined a range of alternatives that it could "legitimately consider." FEIS, Vol. III, PM-93. This improper approach appears designed to narrow the range of reasonable alternatives, particularly by excluding alternative that include elements that are not within FERC's jurisdiction. For example, FERC acknowledges that it:

> received numerous comments suggesting that electricity generated from renewable energy sources could eliminate the need for the Project and that the use of these energy sources as well as gains realized from increased energy efficiency and conservation should be considered as alternatives to the Project.

FEIS at 3-2. FERC continues, however, that:

> The generation of electricity from renewable energy sources is a reasonable alternative *for a review of power generating facilities*. The siting, construction, and operation of power generating facilities are *regulated by state agencies*. Authorization related to how customers in Transco's service area will meet demands for electricity are not part of the application before the Commission and their consideration is outside the scope of this EIS. Therefore, because the *purpose of the Project is to transport natural gas*, and the generation of electricity from renewable energy sources or the gains realized from increased energy efficiency and conservation are *not transportation alternatives*, they are not considered or evaluated further in this analysis.

*See* FEIS at 3-2 (emphasis added). In other words, in addition to uncritically adopting Transco's stated purpose, FERC used the fact that other agencies and states would have jurisdiction over power generating facilities to impermissibly narrow the range of reasonable alternatives, in direct contravention of 40 C.F.R. § 1502.14(c).

It is well-established that Section 1502.14(c) is "intended to prompt agencies to consider otherwise appropriate alternatives that the agency lacks jurisdiction to authorize." *WildEarth Guardians v. Nat'l Park Serv.*, 703 F.3d 1178, 1184 (10th Cir. 2013). The fact that an alternative is not within the agency's jurisdiction "should not prevent [an] agenc[y] from proposing it or attempting to persuade the appropriate agencies or units of government to get involved in the project[.]" *Milwaukee Inner-City Congregations Allied for Hope v. Gottlieb*, 944 F.Supp.2d 656, 670 (W.D. Wis., 2013). "An agency's refusal to consider an alternative that would require some action beyond that of its congressional authorization is counter to NEPA's intent to provide options for both agencies and Congress." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 235 F.Supp.2d 1143, 1154 (W.D. Wash., 2002); *see also Gottlieb*, 944 F.Supp.2d at 670 ("agencies cannot simply assume that incorporating some form of [non-jurisdictional action] into the project to avoid or minimize adverse social and economic harm is out of the question").

Instead of considering all reasonable alternatives, FERC insisted that renewable energy and conservation alternatives are somehow "outside the scope of this EIS." FEIS at 3-2. That is simply wrong under the authoritative CEQ regulation and case law. Moreover, FERC's position is also inconsistent with its own prior practice of including such alternatives in environmental reviews.

In the FEIS for the Constitution Pipeline, for example, FERC analyzed multiple alternatives that did not involve the transport of natural gas. This included energy conservation and energy efficiency alternatives as well as renewable energy alternatives. *See* Constitution Pipeline FEIS at 3-4 – 3-13 (Docket No. CP13-499-000, Accession No. 20141024-4001). FERC has not explained why such alternatives were within the scope of the Constitution Pipeline FEIS but outside the scope of the Atlantic Sunrise Pipeline FEIS. The failure to consider any renewable energy and energy conservation/efficiency alternatives in the Atlantic Sunrise Pipeline

FEIS was arbitrary and capricious. FERC should prepare a supplemental FEIS that analyzes both the need for the Project and alternatives to determine whether some of all of the purported need for the Project can be met without building new fossil fuel infrastructure. 40 C.F.R. § 1502.9(c)(1).

Finally, it is becoming readily apparent that a major driver of Atlantic Sunrise may be the exportation of northern Pennsylvania shale gas to foreign countries. FERC acknowledges that "the international marketplace represents a potential destination" for gas made available to export terminals through Atlantic Sunrise. FEIS at 1-10. FERC further acknowledges that Cabot Oil & Gas ("Cabot"), the largest shipper on the Project with approximately half of the subscribed capacity, "has publicly announced that it has contracted to sell gas supply to a party that is also a shipper (Sumitomo) in the Cove Point [Export] Terminal." *Id*. FERC, however, appears to take Transco at its word when the company claims that it "anticipates that the vast majority of natural gas transported through the firm capacity under the Project would be consumed domestically in markets along the East Coast[.]" *Id*. The fact that the largest subscriber on Atlantic Sunrise has announced an agreement with a shipper at the nearest export terminal at Cove Point casts doubt on these claims. FERC cites no additional evidence for its statements others than Transco's unsupported claims.

In addition, the reversal of the Transco longhaul pipeline to the Southeast would allow northern Pennsylvania shale gas to reach Gulf Coast export terminals. For example, Kinder Morgan's Elba Island export terminal was approved and is currently under construction. *See* Elba Island LNG Update: Non-FTA Exports Approved, Marcellus Drilling News, Dec. 2016, *available at* http://marcellusdrilling.com/2016/12/elba-island-lng-update-non-fta-exports-approved-dump-truck-city/. Kinder Morgan also "owns and operates the 200-mile Elba Express pipeline, which connects the LNG facility to the Transco [pipeline]." *Id*. Transco's parent

company, Williams, "has been on a mission to send Marcellus gas south – including to Georgia[.]" *Id*. "Marcellus Shale gas will, via the Transco [pipeline], be at least some of, *if not the primary*, source for gas exported from the Elba Island facility." *Id*. (emphasis added).

In January 2017, Cabot said that the "anticipated pricing" for gas transported on facilities made available by Atlantic Sunrise will be based on two market areas: the D.C. market area (where Cove Point is located) and the Gulf Coast market area (where multiple export facilities are located). *See* Cabot, Investor Presentation at 20, Jan. 2017 (Ex. 1). Thus, Cabot anticipates selling its gas based on prices for exporting. As explained above, Cabot has subscribed to approximately half of the capacity on Atlantic Sunrise. Therefore, FERC's assumption that the "vast majority of natural gas transported through the firm capacity under the Project would be consumed domestically" is not supported by the available evidence and is not rational. FEIS at 1-10.

Intervenors raised these issues regarding Cabot in comments on the FEIS. *See* FEIS Comments at 8-10. Nevertheless, FERC issued the Certificate Order without addressing any of these concerns. FERC's refusal to seriously assess whether gas transported by the Atlantic Sunrise pipeline is intended primarily for export is a critical issue going to the heart of the purpose and need for the Project and the alternatives analysis. This is especially important in proceedings such as this where Transco could seize people's land through eminent domain so the gas industry can profit by selling gas to foreign countries. Had Transco announced that Atlantic Sunrise was intended to export northern Pennsylvania shale gas through terminals at Cove Point and along the Gulf Coast, the Project likely would have received greater scrutiny from the public and elected officials. FERC's failure to make any investigation into the true public need for the project renders its EIS deficient and seriously undermines its conclusion pursuant to Section 7 of

the Natural Gas Act that the Atlantic Sunrise Project is "required by the present or future public convenience and necessity."

**D. FERC violated NEPA by failing to take a hard look at the direct and indirect effects of the Atlantic Sunrise Project on waterbodies and wetlands.**

FERC failed to take a "hard look" at the direct and indirect effects of the Atlantic Sunrise Project on waterbodies and wetlands. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). Direct effects "are caused by the action and occur at the same time and place." 40 C.F.R. § 1508.8(a). Indirect effects "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id*. § 1508.8(b).

FERC acknowledges that it received a number of comments regarding potential effects on waterbodies and exceptional value wetlands as a result of construction and operation of the Atlantic Sunrise Project. *See* Certificate Order at PP 86, 89; *see also* Intervenors' DEIS Comments at 9-14. Nonetheless, FERC asserts that implementation of mitigation measures will result in no long-term adverse impacts on surface water resources and will reduce impacts on exceptional value wetlands to less than significant levels. *See* Certificate Order at PP 87, 91. Past experience demonstrates, however, that inclusion of such measures is insufficient to prevent significant adverse impacts to water resources.

FERC must support with substantial evidence its conclusion that proposed mitigation measures would protect water resources during construction and operation of the Atlantic Sunrise Project. *See New York v. U.S. Nuclear Reg. Comm'n*, 589 F.3d 551, 555 (2d Cir. 2009). Insufficient mitigation measures, even if longstanding in their use, are still insufficient. *See Summit Petroleum Corp. v. U.S. E.P.A.*, 690 F.3d 733, 746 (6th Cir. 2012). "[T]o ensure that environmental effects of a proposed action are fairly assessed, the probability of the mitigation measures being implemented must also be discussed." CEQ, Forty Most Asked Questions

Concerning CEQ's National Environmental Policy Act Regulations, 19b (1981), *available at* https://energy.gov/sites/prod/files/G-CEQ-40Questions.pdf. Both the EIS and Record of Decision should indicate "the likelihood that such measures will be adopted or enforced by the responsible agencies." *Id*. "If there is a history of nonenforcement or opposition to such measures, the EIS and Record of Decision should acknowledge such opposition or nonenforcement." *Id*. FERC has failed to satisfy these requirements.

FERC has a history of nonenforcement of mitigation measures in Pennsylvania. For example, in December 2014, the Pennsylvania Department of Environmental Protection ("DEP") announced that it had reached an $800,000 settlement agreement with Tennessee Gas Pipeline Company, LLC for "multiple violations of the [Pennsylvania] Clean Streams Law during the construction of [the 300 Line Project] in 2011 and 2012 through four counties in northeast and north-central Pennsylvania." *See* Allegheny Defense Project's April 29, 2015 Comments, Attachment 1 (Accession No. 20150429-5518). According to DEP's press release:

> During 73 inspections of the "300 Line Project," inspectors with the Potter, Susquehanna, Wayne and Pike County Conservation Districts discovered violations including the discharge of sediment pollution into the waters of the commonwealth, some of which are protected as "High Quality" or "Exceptional Value Waters," and failure to implement required construction best management practices to protect water quality.

*Id*.

FERC has acknowledged that in constructing the 300 Line Project, Tennessee Gas Pipeline Company "violated state clean water laws even through [its] EA had previously determined that the company's environmental construction plan and assurances made in the application would protect the environment during and following construction." *Tennessee Gas Pipeline Co., L.L.C.*, 156 FERC ¶ 61,156, P 74 (2016). FERC insisted, however, that "the fact that issues arose during construction of [the 300 Line Project] is not indicative of a generic

weakness in our general mitigation requirements." *Id*. at P 78. FERC offered no reasoning or evidence to support that conclusion. Moreover, FERC did not address the issue of likelihood of enforcement of its mitigation measures, whether the applicant is Tennessee Gas or Transco.

At no point in the construction of the 300 Line Project did FERC issue a stop work order. *See* Docket No. CP09-444-000. If county conservation districts are issuing notices of violation for impacts to high-quality and exceptional value waterways, it should be apparent that either the approved mitigation measures are insufficient or that FERC is not adequately enforcing mitigation measures (or both). This history of nonenforcement underscores the need for FERC to fully detail proposed mitigation measures and assess the likelihood of success of those measures – and how they will be enforced in a manner that is substantially improved from what occurred during construction of the 300 Line Project. FERC has failed to do so. FERC should rescind the Certificate Order and prepare a revised EIS.

**E. FERC violated NEPA by failing to consider the indirect effects of induced gas production.**

FERC violated NEPA by failing to take a hard look at the indirect effects of the Atlantic Sunrise Project, including induced gas drilling in the Marcellus and Utica shale formations in northern Pennsylvania. FERC claims that:

> [T]he environmental effects resulting from natural gas production are generally neither sufficiently causally related to specific natural gas infrastructure projects nor are the potential impacts from gas production reasonably foreseeable such that the Commission could undertake a meaningful analysis that would aid our determination.

Certificate Order at P 130 (citing *Central New York Oil and Gas Co., LLC*, 137 FERC ¶ 61,121, at PP 81-101 (2011), *order on reh'g*, 138 FERC ¶ 61,104, at PP 33-49 (2012), *petition for review dismissed sub nom. Coalition for Responsible Growth v. FERC*, 485 Fed. Appx. 472, 474-75 (2012) (unpublished opinion)). Contrary to FERC's assertions, the indirect effects of shale gas

development in the Marcellus and Utica shale formations are sufficiently causally related to the Atlantic Sunrise Project and reasonably foreseeable, such that FERC should have taken those impacts into consideration in the FEIS. FERC's failure to do so renders the FEIS invalid.

**1. There is a sufficient causal relationship between the Atlantic Sunrise Project and induced shale gas extraction in the Marcellus and Utica shale formations.**

FERC claims that "the environmental effects resulting from natural gas production" are not "sufficiently causally related to specific natural gas infrastructure projects" such as the Atlantic Sunrise Project. Certificate Order at P 130. Although FERC admits "that natural gas . . . transportation facilities are . . . required to bring domestic natural gas to market[,]" FERC nonetheless insists that this "does not mean, however, that [its] approval of this particular pipeline project will cause or induce the effect of additional or further shale gas production." *Id.* at P 133. FERC relies, in large part, on the Second Circuit's unpublished summary order in *Coalition for Responsible Growth*. *See id.* at PP 130, 134. Under the Local Rules of Civil Procedure from the Second Circuit, such an order has no precedential effect. 2nd Cir. L.R. 32.1.1. Unsurprisingly, for a summary order, that decision offered no independent analysis but merely accepted FERC's rationale on the specific case at issue. *See* 485 Fed. Appx. 472, 2012 WL 1596341 (2d Cir. 2012); *see also Central New York Oil and Gas Co., LLC*, 137 FERC § 61,121, at PP 81-101 (2011), *order on reh'g*, 138 FERC ¶ 61,104, at PP 33-49 (2012).

An examination of the case law reveals why FERC acted arbitrarily when it failed to consider Marcellus and Utica shale gas extraction activities as an indirect effect of the Atlantic Sunrise Project. FERC relies on both *Metropolitan Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766 (1983) and *Department of Transportation v. Public Citizen*, 541 U.S. 752 (2004) in its decision, *see* Certificate Order at P 127, but neither case supports for FERC's position that the Atlantic Sunrise Project and shale gas development are not "sufficiently

causally related." *Metropolitan Edison* was the first case in which the U.S. Supreme Court used the term "reasonably close causal relationship" in the context of NEPA. 460 U.S. 766 (1983). In that case, citizens argued that the Nuclear Regulatory Commission had impermissibly permitted renewed operation at the Three Mile Island Nuclear facility because the agency failed to consider the psychological impact of its action. The Court, however, said that "NEPA addresses *environmental* effects of federal actions," *id*. at 778 (emphasis added), and that the psychological effect from the risk of a nuclear accident "is not an effect on the physical environment." *Id*. at 775. In other words, the Court concluded that threat of psychological harm is outside the zone of interests that NEPA was intended to address. Unlike the psychological harm resulting from the risk of a nuclear accident in *Metropolitan Edison*, the impacts related to reasonably foreseeable Marcellus and Utica shale gas drilling involve harms to the environment.

The Court relied on *Metropolitan Edison* in its decision in *Public Citizen*. *See* 541 U.S. 752, 767. *Public Citizen* involved a challenge to rules promulgated by the Federal Motor Carrier and Safety Administration ("FMCSA"). The plaintiffs claimed that FMCSA failed to consider the increased emissions that would result from the lifting of a presidential moratorium on the cross-border operation of Mexican motor carriers. The Court, however, noted that FMCSA had no discretion to deny registration of motor carriers that met the requirements of 49 U.S.C. § 13902(a)(1), none of which addressed environmental impacts. *Id*. at 779 (agency "ha[d] no ability to prevent a certain effect due to its limited statutory authority"). *See Florida Wildlife Federation v. U.S. Army Corps of Engineers*, 401 F.Supp.2d 1298, 1324-25 (S.D. Fla. 2005). In other words, since Congress mandated that FMCSA register motor carriers that satisfied the requirements of 49 U.S.C. § 13902(a)(1), there was no "reasonably close causal relationship" between FMCSA's actions and increased emissions. *Id*. at 768 (because agency "ha[d] no ability categorically to prevent the cross-border operations of Mexican motor carriers, the

environmental impact of the cross-border operations would have [had] no effect on [agency's] decisionmaking – [and agency] simply lack[ed] the power to act on whatever information might be contained in the EIS"). Here, unlike the agency involved in *Public Citizen*, FERC has discretion and can act on the information regarding these impacts. FERC can attach conditions to a certificate, or deny an application if is not required by the public convenience and necessity, which includes environmental considerations. *See* 15 U.S.C. § 717f(e). Because FERC has statutory authority to deny the certificates or set conditions on them, it is a legally relevant cause of the downstream impacts. *Ctr. for Biological Diversity*, 538 F.3d at 1213 (distinguishing *Department of Transportation v. Public Citizen*, 541 U.S. 752 (2004)). When an agency has authority to prevent the relevant effects, as FERC does here, "*Public Citizen*'s limitation on NEPA does not apply." *Or. Natural Res. Council Fund v. Brong*, 492 F.3d 1120, 1134 n. 20 (9th Cir. 2007).

The Ninth Circuit has said that an agency must consider something as an indirect effect if the agency action and the effect are "two links of a single chain." *Sylvester v. U.S. Army Corps of Engineers*, 884 F.2d 394, 400 (9th Cir. 1989). The Atlantic Sunrise Project and gas extraction in the Marcellus and Utica shale formations are two such links of a single chain. FERC admits as much in the Certificate Order, acknowledging that "[t]he fact that natural gas production and transportation facilities are all components of the general supply chain required to bring domestic natural gas to market is not in dispute." Certificate Order at P 133. Moreover, FERC recently stated that "the availability of pipeline and storage capacity *determines which supply basins are used and the amount of gas that can be transported from producers to consumers*." FERC, Energy Primer, p. 6 (Nov. 2015) (emphasis added), *available at* https://www.ferc.gov/market-oversight/guide/energy-primer.pdf. Similarly, a recent report by Morningstar stated:

> As long as producers are financing this pipeline build-out and paying for the firm service, *it is likely that pipeline expansions out of the Marcellus will be met with increased production.* Producers are paying for the firm services with incremental revenue from new production.

Morningstar, Marcellus Takeaway Capacity and Utilization Outlook, at 2 (Oct. 1, 2015) (emphasis added), *available at* http://www.morningstarcommodity.com/Research/MarcellusTakeawayUpdatetm_.pdf.

A recent EIS prepared by the Surface Transportation Board ("Board") demonstrates why FERC's logic is incompatible with NEPA. In April 2015, the Board published a DEIS for the Tongue River Railroad Company's ("TRRC") proposal to build a railroad to transport coal to market. *See* Board, Tongue River Railroad DEIS, *available at* https://www.stb.gov/decisions/readingroom.nsf/fc695db5bc7ebe2c852572b80040c45f/e7de39d1f6fd4a9a85257e2a0049104d?OpenDocument. According to the Board, the proposed railroad would "transport low-sulfur, subbituminous coal from proposed mine sites yet to be developed in Rosebud and Powder River Counties, Montana." FEIS Comments, Ex. 2 at C.1-2. The Board continued that, "[b]ecause the Tongue River region contains additional quantities of coal, future rail traffic could also include shipments of coal from other mines whose development could be induced by the availability of a nearby rail line." *Id*. As a result, the Board prepared an analysis of various coal production scenarios in southeastern Montana should the Board approve the railroad. The Board's analysis included consideration of domestic and export markets, coal production costs, transportation routes, and emissions forecasts. The results of the analysis revealed that approval of the railroad was likely to induce the development of at least two additional coal mines in southeastern Montana. *Id*. at C.3-1.

The Board's decision to consider induced coal production in its review of TRRC's proposed railroad is important because, just as FERC has no jurisdiction over gas production, the

Board has no jurisdiction over coal production. Nevertheless, the Board did not completely ignore its obligation under NEPA to consider indirect effects. Rather, it prepared a review of likely coal production scenarios that could occur should it approve TRRC's project.

Here, four of the shippers financing the Atlantic Sunrise Project are gas exploration and production companies.[3] *See* Certificate Order at P 11. These four companies represent over 87% of the Project's subscribed capacity. *Id*. FERC states that "producers who subscribe to firm capacity on a proposed project on a long-term basis presumably have made a positive assessment of the potential for selling gas to end-use consumers and have made a business decision to subscribe to the capacity on the basis of that assessment." *Id*. at P 29. In order to sell that gas, it must first be produced, which requires drilling new wells – and therefore impacting more and more land, water, and air on a routine basis. According to FERC, at the median 30-day initial gas production rate, "about 340 gas wells would be required to provide the 1.7 MMDth of gas required for the Atlantic Sunrise Project." FEIS at 4-283. Due to well production declines over time, however, "the actual number of wells necessary to supply the Atlantic Sunrise Project over many years would be much higher." *Id*. Intervenors highlighted where such production is likely to occur in previous comments. *See* Intervenors' DEIS Comments at 25-27; Intervenors' Comments on Need for Revised or Supplemental DEIS at 12-14. FERC ignored these comments.

FERC relies on the Ninth Circuit's decision in *Morongo Band of Mission Indians v. FAA*, 161 F.3d 569 (9th Cir. 1998), to support its non-compliance with NEPA. *See* Certificate Order at P 130. In that case, the court considered whether the FAA's proposed rerouting of certain flight paths would have "growth-inducing" impacts. 161 F.3d 569, 580. The court likened the case to a previous decision involving similar facts where it emphasized that a plan to reroute flight paths

[3] The four exploration and production companies are Cabot Oil & Gas Corporation, Chief Oil & Gas LLC, Inflection Energy LLC, and Seneca Resources Corporation (a subsidiary of National Fuel Gas Corporation). *See* Certificate Order at P 11.

was focused on "existing air traffic." *Morongo Band*, 161 F.3d 569, at 580 (citing *Seattle Community Council Fed'n v. FAA*, 961 F.2d 829, 835 (9th Cir. 1992)). In other words, the rerouting of flight paths at the airport did not "induce" growth but simply rearranged "existing air traffic." Thus, the "increased" air traffic was not considered to be a growth-inducing effect. *Id*. Here, as explained above, the Atlantic Sunrise and associated projects are not simply a "rearranging" of existing gas production, but a direct stepping stone to further gas development.

FERC also relies on two recent D.C. Circuit decisions in support of its refusal to consider shale gas development as an indirect effect. *See* FEIS at 4-281, n. 41 (citing *Sierra Club and Galveston Baykeeper v. FERC*, No. 14-1275, slip op., at 16 (D.C. Cir. June 28, 2016); *Sierra Club v. FERC*, No. 14-1249, slip op., at 13-14 (D.C. Cir. June 28, 2016)). These cases are inapposite. *Sierra Club and Galveston Baykeeper* involved a unique statutory scheme governing the review and approval of liquefied natural gas export terminals. The Department of Energy ("DOE") has statutory authority over the export of natural gas. 42 U.S.C. § 7151(b). DOE delegated authority to FERC to approve or deny the construction and operation of particular export facilities, but the court found that export decisions remained "squarely and exclusively within the [DOE's] wheelhouse." *See Sierra Club and Galveston Baykeeper*, No. 14-1275, slip op., at 14 (D.C. Cir. June 28, 2016). "[O]bjections concerning the environmental consequences stemming from the actual export of natural gas…, including increased emissions and induced production, [were] raised in [a] parallel challenge to the [DOE's] order authorizing" exports, and the court concluded that "any such challenges to the environmental analysis of the export activities themselves must be raised in a petition for review from [DOE's] decision to authorize exports." *Id.* Here, on the other hand, it is FERC's decision alone whether to approve construction and operation of the Atlantic Sunrise Project for its intended purpose of increasing capacity to transport additional volumes of shale gas. The NGA does not place any portion of

that decision in the "wheelhouse" of any other agency. Because FERC possesses the power to act on whatever information might be contained in this EIS, it must consider these impacts. *Ctr. for Biological Diversity*, 538 F.3d at 1216-17. Moreover, no other agency is in a position to conduct NEPA review of the environmental consequences of these effects. If FERC is relieved of its obligation to evaluate upstream impacts, those impacts will remain unevaluated.

The court rested on similar reasoning to support its decision in *Sierra Club*. *See Sierra Club v. FERC*, No. 14-1249, slip op., at 13-14 (June 28, 2016). Adopting FERC's reading of these cases would eviscerate NEPA's requirement agencies evaluate a project's indirect effects, *see* 40 C.F.R. § 1508.8(b). Finally, FERC argues that other factors "such as domestic natural gas prices and production costs drive new drilling." Order at P 136. The fact that other factors may influence drilling does not mean that additional pipeline capacity does not drive additional shale gas development. *See* Energy Information Administration, Spread between Henry Hub, Marcellus natural gas prices narrows as pipeline capacity grows (Jan. 27, 2016), *available at* http://www.eia.gov/todayinenergy/detail.cfm?id=24712 (shale gas production contingent on price, available infrastructure).

Thus, the Atlantic Sunrise Project and gas drilling in the Marcellus and Utica shale formations are "two links of a single chain." *Sylvester*, 884 F.2d 394, 400 (9th Cir. 1989). Even though 87% of the capacity of Atlantic Sunrise has been subscribed by gas producers, FERC completely ignored indirect effects of induced gas drilling. Because this failure renders FERC's NEPA analysis deficient, FERC should rescind its Certificate Order and prepare a revised EIS.

**2. Induced gas drilling in the Marcellus and Utica shale formations is reasonably foreseeable.**

FERC further violated NEPA by refusing to consider the reasonably foreseeable indirect effects of induced shale gas drilling as reasonably foreseeable. An indirect effect is "reasonably

foreseeable" if it is "sufficiently likely to occur that a person of ordinary prudence would take it into account in reaching a decision." *Sierra Club v. Marsh*, 976 F.2d 763, 767 (1st Cir. 1992). "[W]hen the *nature* of the effect is reasonably foreseeable but its *extent* is not, [an] agency may not simply ignore the effect." *Mid States Coalition for Progress v. Surface Transp. Bd.*, 345 F.3d at 549 (emphasis in original); *see also Habitat Educ. Center v. U.S. Forest Serv.*, 609 F.3d 897, 902 (7th Cir. 2010). Reasonable forecasting and speculation is "implicit in NEPA, and we must reject any attempt by agencies to shirk their responsibilities under NEPA by labeling any and all discussion of future environmental effects as 'crystal ball inquiry.'" *Delaware Riverkeeper*, 753 F.3d at 1310 (quoting *Scientists' Inst. for Pub. Info. v. Atomic Energy Comm'n*, 481 F.2d 1079, 1092 (D.C. Cir. 1973)); *see also Northern Plains Resource Council v. Surface Transp. Bd.*, 668 F.3d 1067, 1078-79 (9th Cir. 2011).

Here, a person of ordinary prudence would take Marcellus and Utica shale gas drilling into account before reaching a decision about whether to approve the Atlantic Sunrise Project. Moreover, FERC is well aware of the nature of the effects of shale gas development and may not simply ignore the effect because it does not know the precise location and timing of future development. Yet, that is precisely what FERC did in the FEIS and Certificate Order.

According to FERC, "even if a causal relationship between our action here and additional production were presumed, the scope of the impacts from any such induced production in this case is not reasonably foreseeable." Certificate Order at P 137. Even if FERC knows "the identity of a producer of gas to be shipped on a pipeline, and the general area where that producer's existing wells are located," FERC claims that "does not alter the fact that the number and location of any additional wells cannot be identified in this proceeding." *Id*. As noted above, however, such reasonable forecasting is implicit in NEPA. *Delaware Riverkeeper*, 753 F.3d at

1310; *Northern Plains*, 668 F.3d at 1078-79 (9th Cir. 2011). And FERC can certainly predict the nature of such effects even if it cannot precisely anticipate their magnitude.[4]

FERC's failure to assess these impacts "require[s] the public, rather than the agency" to ascertain the effects of the Project. *Te-Moak Tribe of Western Shoshone of Nevada v. U.S. Dep't of the Interior*, 608 F.3d 592, 605 (9th Cir. 2010). This "thwart[s] one of the 'twin aims' of NEPA – to 'ensure[ ] that the *agency* will inform the *public* that it has indeed considered environmental concerns in its decision making process.'" *Id*. (*quoting Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983)) (emphasis added by Ninth Circuit). Compliance with NEPA "is a primary duty of every federal agency; fulfillment of this vital responsibility should not depend on the vigilance and limited resources of environmental plaintiffs." *City of Carmel-by-the-Sea v. U.S. Dept. of Transp.*, 123 F.3d 1142, 1161 (9th Cir. 1997) (*quoting City of Davis v. Coleman*, 521 F.2d 661, 671 (9th Cir. 1975). *See also Center for Biological Diversity v. U.S. Forest Serv.*, 349 F.3d 1157, 1166 (9th Cir. 2003) ("The procedures prescribed both in NEPA and the implementing regulations are to be strictly interpreted 'to the fullest extent possible' in accord with the policies embodied in the Act….'[g]rudging, pro forma compliance will not do.'") (citations omitted)).

Finally, FERC should consider former Commissioner Norman Bay's recent statements on the need for FERC to consider the environmental impacts of shale gas development. Commissioner Bay noted that "[d]espite the growing importance of Marcellus and Utica gas production . . . the Commission has never conducted a comprehensive study of the environmental consequences of increased production from that region." *National Fuel Gas Supply Corp.*, 158 FERC ¶ 61,145 at 4-5 (Feb. 3, 2017) (Bay, Commissioner, Separate

---

[4] Moreover, FERC is aware of the capacity of the pipeline and should be able to make an informed prediction about the number of wells that would produce that amount of gas.

Statement). Commissioner Bay continued that "in light of the heightened public interest and in the interests of good government, I believe the Commission should analyze the environmental impacts of increased regional gas production from the Marcellus and Utica." *Id.* at 5. Commissioner Bay also stated that "the Commission should also be open to analyzing the downstream impacts of the use of natural gas and to performing a life-cycle greenhouse gas emissions study[.]" *Id.* Such information "may be of use to the Commission, the public, and industry in examining the broader issues raised in certification proceedings." *Id.*

Intervenors respectfully request that FERC heed the advice of its most recent Chairman. There is a clear causal relationship between the Atlantic Sunrise Project and shale gas development and that development is reasonably foreseeable. The FEIS failed to consider gas drilling in the Marcellus and Utica shale formations as an indirect effect of the Project and, therefore, violates 40 C.F.R. § 1508.8(b). FERC should withdraw the Certificate Order and prepare a revised EIS that provides an analysis of "the environmental impacts of increased regional gas production from the Marcellus and Utica." *National Fuel Gas Supply Corp.*, 158 FERC ¶ 61,145 at 5 (Feb. 3, 2017) (Bay, Commissioner, Separate Statement).

**F. FERC violated NEPA by failing to take a hard look at the cumulative impacts of the Atlantic Sunrise Project and other past, present, and reasonably foreseeable future actions, including shale gas development.**

FERC violated NEPA by failing to take a hard look at the cumulative impacts of the Atlantic Sunrise Project in conjunction with other past, present, and reasonably foreseeable future actions, including shale gas development in the Marcellus and Utica shale formations. A cumulative impact is the:

> impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions **regardless of what agency (Federal or non-Federal) or person undertakes such other actions**. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7 (emphasis added). "Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts." 40 C.F.R. § 1508.27(b)(7). Cumulative impact analyses that contain "cursory statements" and "conclusory terms" are insufficient. *See Delaware Riverkeeper*, 753 F.3d at 1319-20; *see also Natural Resources Defense Council v. Hodel*, 865 F.2d 288, 298 (D.C. Cir. 1988) (although "FEIS contains sections headed 'Cumulative Impacts,' in truth, nothing in the FEIS provides the requisite analysis," which, at best, contained only "conclusory remarks").

Commenters explained at length in their comments on the DEIS that FERC's cumulative impacts analysis was substantially flawed. *See* DEIS Comments at 41-69. In response, FERC claimed that its cumulative impacts analysis is "consistent with the methodology set forth in relevant guidance (CEQ, 1997b, 2005; EPA, 1999)." FEIS at 4-274. FERC's analysis, however, is anything but consistent with the guidance that FERC cites. In the Certificate Order, FERC addressed cumulative impacts in just two paragraphs about climate change and safety. *See* Certificate Order at PP 147-48. Nowhere in its decision did FERC address cumulative impacts on water resources, vegetation and wildlife, fisheries, land use, or air quality. FERC did not take a "hard look" at the cumulative impacts of the Atlantic Sunrise Project.

Moreover, FERC's cumulative impacts analysis is flawed because it imprperly limited the analysis area. FERC states that "[f]or the most part, the area of potential cumulative impact is limited to the area directly affected by the Project and areas surrounding the Project." FEIS at 4-274. Based on this limited analysis area, FERC concluded that, "as a whole, minimal cumulative effects are anticipated when the impacts of the [Atlantic Sunrise] Project are added to the identified ongoing actions *in the immediate area*." *Id*. at 4-320 (emphasis added). Such a limited

cumulative impacts analysis is inconsistent with both the Council on Environmental Quality's ("CEQ") and Environmental Protection Agency's ("EPA") guidance on cumulative impacts.

The CEQ guidance recommends significantly expanding the cumulative impacts analysis area beyond the "immediate area of the proposed action" that is often used for the "project-specific analysis" related to direct and indirect effects:

> For a project-specific analysis, it is often sufficient to analyze effects within the immediate area of the proposed action. When analyzing the contribution of this proposed action to cumulative effects, however, the geographic boundaries of the analysis *almost always should be expanded*. These expanded boundaries can be thought of as differences in hierarchy or scale. Project-specific analyses are usually conducted on the scale of counties, forest management units, or installation boundaries, *whereas cumulative effects analysis should be conducted on the scale of human communities, landscapes, watersheds, or airsheds*.

CEQ, Considering Cumulative Effects under the National Environmental Policy Act, p. 12 (1997) (emphasis added). *See Andrus v. Sierra Club*, 442 U.S. 347, 357-58 (1979) (CEQ entitled to substantial deference in interpreting NEPA). CEQ further says that it may be necessary to look at cumulative effects at the "ecosystem" level for vegetative resources and resident wildlife, the "total range of affected population units" for migratory wildlife, an entire "state" or "region" for land use, and the "global atmosphere" for air quality. *Id*. at 15. FERC's selected regions of influence for forested lands, forested and scrub-shrub wetlands, and air quality are not consistent with the requirements of NEPA.

EPA's guidance states that "[s]patial and temporal boundaries should not be overly restrictive in cumulative impact analysis." EPA, Consideration of Cumulative Impacts in EPA Review of NEPA Documents, p. 8 (1999). EPA specifically cautions agencies to not "limit the scope of their analyses to those areas over which they have direct authority or to the boundary of the relevant management area or project area." *Id*. Rather, agencies "should delineate appropriate geographic areas including *natural ecological boundaries*" such as ecoregions or watersheds. *Id*.

(emphasis added). Therefore, FERC's assertion that, "for the most part, the area of potential cumulative impact is limited to the area directly affected by the Project and areas surrounding the Project," is plainly inconsistent with NEPA's requirement to analyze cumulative impacts. As a result, the cumulative impacts analysis is fatally flawed and cannot support FERC's conclusion that there will be "minimal cumulative effects" associated with construction and operation of the Atlantic Sunrise Project.

There are also unexplained inconsistencies between the DEIS and FEIS in FERC's evaluation of natural gas development. In the DEIS, FERC stated that its cumulative impacts analysis included "natural gas well permitting and development projects . . . within 10 miles of the Atlantic Sunrise Project." DEIS at 4-259. In the FEIS, however, FERC removed this language and instead pointed the reader to Appendix Q, where other "major actions" were listed in a 35-page table. While at first glance it seems that FERC used the same 10-mile region of influence for natural gas development projects, FERC added a footnote pointing the reader to Appendix I for further information about these projects. Appendix I indicates that FERC only considered natural gas wells and facilities within 0.25 mile of the Atlantic Sunrise Project, a significant reduction from the (already truncated) 10-mile region of influence in the DEIS. As a result, FERC only included 47 "oil/gas wells" in its cumulative impacts analysis. *See* FEIS, App. I.

This does not constitute a "hard look" at the cumulative environmental impacts of past, present, and reasonably foreseeable natural gas development. The counties[5] in which the CPL North, the northern portion of the CPL South, and the Unity and Chapman Loops would be

[5] The CPL North would be located in Susquehanna, Wyoming, Luzerne, and Columbia Counties. The northern portion of the CPL South would be located in Columbia County. The Unity Loop would be located in Lycoming County. The Chapman Loop would be located in Clinton County. *See* FEIS at 2-6.

20170210-5182 FERC PDF (Unofficial) 2/10/2017 4:51:49 PM

located have experienced extensive natural gas development activities over the past decade. Since 2007, gas companies have drilled at least 2,637 unconventional shale gas wells in Susquehanna, Wyoming, Luzerne, Columbia, Lycoming, and Clinton counties. *See* Intervenors' FEIS Comments, Ex. 5. Despite the fact that these counties and the proposed project facilities within them are located within the Susquehanna River watershed, there is no analysis of the cumulative impacts of natural gas development at a watershed, or even subwatershed, level (beyond FERC's arbitrary 0.25-mile region of influence).

FERC claimed elsewhere in the FEIS that it took a broader view of natural gas development in Susquehanna County. *See* FEIS at 4-277. The FEIS contains a map allegedly showing "natural gas development near the Atlantic Sunrise Project in Susquehanna County." *Id*. While this map shows some aspects of Williams' midstream facilities, the map does not identify any gas wells. This is a major oversight considering that at least 1,338 shale gas wells have been drilled in Susquehanna County since 2007. *See* Intervenors' FEIS Comments, Ex. 5; DEIS Comments at 45, Figure 1 (map showing the large number of shale gas wells drilled in Susquehanna County). Nor does the map identify all of the access roads that have been constructed to access these wells.

The construction of new roads and over 1,300 well sites in the same watershed as the Project is highly likely to cumulatively impact the water resources of the watershed. Nevertheless, FERC stated that "impacts from shale gas development outside of the geographic scope of cumulative impacts assessed for the Project [i.e., 0.25-mile], including those related to water quality and tree clearing, are not within the purview of the analysis for the Project." FEIS, Vol. III, CO-82. Thus, FERC failed to take a hard look at the cumulative impacts of the Project and past, present, and reasonably foreseeable shale gas development on the impacted watershed.

FERC also substantially understated the cumulative impacts of the Atlantic Sunrise Project and gas development on wildlife and interior forests. For example, FERC identified "157 migratory bird species [that] are regular breeders in project counties" in Pennsylvania. FEIS at 4-96. According to Transco, the pipeline would cross 44 interior forests along CPL North and South and one interior forest associated with Chapman Loop, affecting over 262 acres of interior forest habitat during construction. *Id*. at 4-83. Of this acreage, over 118 acres of interior forest would be permanently eliminated and converted to forest edge habitat as part of the pipeline right-of-way. *Id*.

Despite these impacts, neither Transco nor FERC have obtained a Migratory Bird Treaty Act ("MBTA") permit from the U.S. Fish & Wildlife Service ("USFWS"). The MBTA prohibits persons, entities or, in some cases, agencies, from pursuing, hunting, taking, capturing, or killing "any migratory bird, . . . nest, or egg of any such bird" without a permit or other exemption. *See* 16 U.S.C. § 703(a). FERC's authorization of Atlantic Sunrise would allow Transco to clear hundreds of acres of interior forests. FERC acknowledged that "[h]abitat removal and/or modification of existing habitats during construction and the long-term or permanent conversion of habitats associated with tree clearing and the maintenance of rights-of-way" will impact migratory birds. FEIS at 4-98. Nevertheless, FERC issued a certificate before either FERC or Transco obtained the proper MBTA permit from the USFWS. Unless Transco acquires a MBTA permit, it would be arbitrary and capricious for FERC to issue a notice to proceed upon a finding Transco acquired all necessary permits.

FERC acknowledged that "Marcellus shale development would also contribute to the cumulative vegetation and wildlife impacts," *see* FEIS at 4-300, but the subsequent analysis falls well short of NEPA's hard look requirement. For example, while FERC estimated that 3,060 acres of land (much of it probably forested) could be cleared in a year as shale gas wells are

constructed to supply Atlantic Sunrise, there is no analysis of past and present cumulative impacts of shale gas development. As stated above, FERC only included 47 oil/gas wells within 0.25-mile of the Project area. *See* FEIS, App. I. This ignores thousands of existing shale gas wells that have been drilled in northern Pennsylvania since 2007. *See* Intervenors' FEIS Comments, Ex. 5. Without a proper baseline of how shale gas development has already impacted interior forest habitat in this region, FERC cannot properly gauge the severity of impacts to these forests and the wildlife that depends on them, such as migratory birds.

FERC also relied on outdated and incomplete data to mischaracterize the current condition of interior forests. For example, FERC cites to a 2013 Forest Service inventory of Pennsylvania's forests to claim that forest losses in the Southern Tier of Pennsylvania "have been offset by gains resulting from agriculture declines in the Northern Tier counties (U.S. Forest Service, 2013)." FEIS at 4-85. While this report was published in 2013, the data range used in the report was from 2004-2009. *See* Intervenors' FEIS Comments, Ex. 6. This is significant because the report did not include the impacts of shale gas development between 2009 and the present, a time period in which thousands of new wells have been drilled in Pennsylvania's Northern Tier. The 2013 Forest Service report, in fact, acknowledged the growing threat that gas development posed to interior forests:

> Forest fragmentation and increased urbanization can create conduits for the introduction and spread of invasive species. Pennsylvania contains abundant roads and other fragmenting features. The exception occurs in the north-central reaches of the State where large blocks of public forests are common. Marcellus shale gas development is contributing to forest fragmentation and could potentially threaten interior forest of this region[.]

FEIS Comments, Ex. 6 at 12. The report, however, contained no analysis of the impacts of shale gas development on these interior forests in northern Pennsylvania. Thus, it was improper for FERC to rely on this report to claim that forest losses in Pennsylvania's Southern Tier "have

been offset by gains resulting from agriculture declines in the Northern Tier counties" because the report on which that claim is based is outdated and contradicted by more recent evidence. Whatever forest gains have resulted from agriculture declines in the Northern Tier counties are themselves being offset by forest clearing for road construction and development of well pads, wastewater pits, pipelines, gathering lines, compressor stations, and other infrastructure associated with gas development. The FEIS, however, contained no analysis of these impacts on interior forests or wildlife, including migratory birds. Therefore, FERC failed to take a hard look at the cumulative impacts of the Project and past, present, and reasonably foreseeable gas development on these resources.

FERC also failed to adequately consider cumulative impacts on land use, recreation, special interest areas, and visual resources. The FEIS addressed cumulative impacts on these resources in just four paragraphs. *See* FEIS at 4-303 – 4-304. While FERC purports to include the "ongoing Marcellus shale development in Susquehanna County," FEIS at 4-304, it did not address that ongoing development in any meaningful way. Nor did FERC include other counties in the Project area where shale gas development is occurring.

As Intervenors explained in their comments on the DEIS, Seneca has specifically identified the areas where it plans to drill wells if the Atlantic Sunrise Project comes online. *See* DEIS Comments at 25-26, 32, 61, 64-65. Seneca's leases are directly connected to Transco's Leidy Line (which would be expanded with the Chapman and Unity Loops). *See* FEIS Comments, Ex. 4 at p. 16. Because Seneca's lease areas are more than 0.25 mile from the Project area, they were not included in the cumulative impacts analysis. This was arbitrary and capricious.

Finally, FERC failed to adequately consider the Project's downstream impacts on greenhouse gas ("GHG") emissions and climate change. According to FERC, "[a]ssuming that

all of the natural gas being transported is used for combustion, downstream end-use would result in about 32.9 million metric tons of $CO_2$ per year." FEIS at 4-318. FERC neither provides a satisfactory explanation for how it arrived at this number nor adequately analyzes the climate change impact of emitting millions of metric tons of carbon dioxide. Instead, FERC maintains that "increased production and distribution of natural gas would likely displace *some* use of higher carbon emitting fuels" such as fuel oil and coal, which "would result in a *potential* reduction in regional GHG emissions." *Id*. (emphasis added). FERC makes no attempt to quantify the potential emission offset. Nor does the agency offer legal authority suggesting that NEPA allows an agency to avoid an in-depth analysis of a reasonably foreseeable effect because it may be partially offset to an unknown degree. *See also* 40 C.F.R. § 1508.27(b)(1) (NEPA requires the agency to take a hard look at all environmental impacts, including beneficial impacts). Moreover, FERC fails to assess whether the gas carried on the Atlantic Sunrise would offset new renewable energy production, thus skewing its analysis in favor of the project. The possibility that *some* emissions *may* be offset to some degree does not excuse FERC's failure to thoroughly analyze downstream greenhouse gas emissions and climate change impacts. FERC's conclusory assertion that "neither construction nor operation of the Project would significantly contribute to GHG cumulative effects or climate change" is unsupported and must be remedied in a revised or supplemental EIS.

FERC's cumulative impact analysis is fatally flawed in its geographic scope and for all but ignoring the substantial impacts of Marcellus and Utica shale gas development and climate change. FERC should withdraw the Certificate Order and prepare a revised EIS that complies with NEPA.

**G. FERC improperly relied on the deficient FEIS to conclude that construction of the Atlantic Sunrise Project will "avoid unnecessary disruptions of the environment."**

FERC violated its Certificate Policy Statement by relying on the deficient FEIS to conclude that construction of the Atlantic Sunrise Project will "avoid unnecessary disruptions of the environment." *See* Certificate Order at PP 20, 33. In implementing the Certificate Policy Statement, FERC balances public benefits against adverse consequences, including consideration of the enhancement of competitive transportation alternatives, the possibility of overbuilding, subsidization by existing customers, the applicant's responsibility for unsubscribed capacity, the avoidance of unnecessary disruptions to the environment, and the unneeded exercise of eminent domain. *See id*. at P 20 (citing *Certification of New Interstate Natural Gas Pipeline Facilities*, 88 FERC ¶ 61,227 (1999), order clarified, 90 FERC ¶ 61,128, order further clarified, 92 FERC ¶ 61,094 (2000)).

FERC's factual determinations under the NGA may be upheld if they are supported by "substantial evidence," which is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *South Coast Air Quality Management District v. FERC*, 621 F.3d 1085, 1099 (9th Cir. 2010) (quoting *Bear Lake Watch, Inc. v. FERC*, 324 F.3d 1071, 1076 (9th Cir. 2003)). As explained above, FERC ignored the indirect and cumulative effects of shale gas development despite the fact that thousands of shale gas wells have been drilled in the area where the Atlantic Sunrise Project is located. Thus, there is insufficient evidence for a reasonable mind to conclude that FERC's authorization of the Atlantic Sunrise Project avoids unnecessary impacts on the environment.

**H. FERC failed to adequately and independently evaluate public need.**

FERC failed to adequately and independently evaluate the public need for the Atlantic Sunrise Project. This renders arbitrary its decision, under Section 7 of the Natural Gas Act, that the project is "required by the present or future public convenience and necessity." *See* 15 U.S.C.

§ 717f(e). FERC should withdraw the Certificate Order and perform a transparent and independent evaluation of public need for the Atlantic Sunrise Project.

Former Commissioner Bay recently explained that FERC's policy for evaluating need in certificate proceedings is outdated and lacking. According to Mr. Bay, while the policy "lists a litany of factors for the Commission to consider in evaluating need . . . in practice, the Commission has largely relied on the extent to which potential shippers have signed precedent agreements for capacity on the proposed pipeline." *National Fuel Gas Supply Corp.*, 158 FERC ¶ 61,145 at 3 (Feb. 3, 2017) (Bay, Commissioner, Separate Statement). By fixating on precedent agreements, Mr. Bay says FERC:

> [M]ay not take into account a variety of other considerations, including, among others: whether the capacity is needed to ensure deliverability to new or existing natural gas-fired generators, whether there is a significant reliability or resiliency benefit; whether the additional capacity promotes competitive markets; whether the precedent agreements are largely signed by affiliates; or whether there is any concern that anticipated markets may fail to materialize.

*Id*. Mr. Bay further warns FERC against aiding industry "boom-and-bust cycles" and overbuilding pipelines, which could leave ratepayers subject to increased costs. *Id*.

These concerns are relevant here. While FERC says it "considers all evidence submitted reflecting on the need for the project," the fact is that FERC "found that long-term commitments serve as 'significant evidence of demand for the project.'" Certificate Order at P 28 (citation omitted). FERC then points to nine project shippers that have "executed binding precedent agreements for firm service using 100 percent of the design capacity of the proposed project" as the overarching demonstration of need for the Project. *Id*.

The only destinations identified for gas to be transported on Atlantic Sunrise facilities are the "Mid-Atlantic and southeastern markets." *Id*. at P 29. The reversal of the Transco longhaul pipeline to the southeast will allow northern Pennsylvania shale gas to reach Gulf Coast export

terminals. For example, Kinder Morgan's Elba Island export terminal was approved and is currently under construction. *See* Elba Island LNG Update: Non-FTA Exports Approved, Marcellus Drilling News, Dec. 2016, *available at* http://marcellusdrilling.com/2016/12/elba-island-lng-update-non-fta-exports-approved-dump-truck-city/. Kinder Morgan also "owns and operates the 200-mile Elba Express pipeline, which connects the LNG facility to the Transco [pipeline]." *Id*. Transco's parent company, Williams, "has been on a mission to send Marcellus gas south – including to Georgia[.]" *Id*. "Marcellus Shale gas will, via the Transco [pipeline], be at least some of, *if not the primary*, source for gas exported from the Elba Island facility." *Id*. (emphasis added).

In January 2017, Cabot said that the "anticipated pricing" for gas transported on facilities made available by Atlantic Sunrise will be based on two market areas: the D.C. market area (where Cove Point is located) and the Gulf Coast market area (where multiple export facilities are located). *See* Intervenors' FEIS Comments, Ex. 1. In other words, Cabot is anticipating to sell its gas based on prices for exporting. As explained above, Cabot has subscribed to approximately half of the capacity on Atlantic Sunrise. Therefore, FERC's assumption in the FEIS that the "*vast majority* of natural gas transported through the firm capacity under the Project would be *consumed domestically* in markets along the East Coast" does not appear to be accurate. *See* FEIS at 1-10.

FERC's refusal to seriously question whether gas transported by the Atlantic Sunrise pipeline is intended primarily for export is a significant issue going to the heart of the public need for the Project. Had Transco announced that Atlantic Sunrise was intended to export northern Pennsylvania shale gas through terminals at Cove Point and along the Gulf Coast, the Project likely would have received greater scrutiny from the public and elected officials. The fact that 87% of the Project's capacity is subscribed to by four gas production companies that, upon

completion of the Project, will have direct access to export facilities, raises serious concerns that the main driver behind the Project is to provide these companies with access to higher priced markets overseas. Thus, it was improper for FERC to place significant weight on the precedent agreements as evidence of a public need for the Atlantic Sunrise Project.

## IV. FERC'S ISSUANCE OF AN ORDER GRANTING REHEARING FOR FURTHER CONSIDERATION WILL BE DEEMED A DENIAL OF INTERVENORS' REQUEST FOR REHEARING

Under the NGA, unless FERC "acts upon" a request for rehearing "within thirty days after it is filed," the request for rehearing "may be deemed to have been denied." 15 U.S.C. § 717r(a). Congress expressly defined the "acts" that FERC may take upon a request for rehearing – FERC "shall have power to grant or deny rehearing or to abrogate or modify its order without further hearing." *Id*. If FERC does not take one of these enumerated actions upon a request for rehearing within 30 days, an aggrieved party may file a petition for review in the appropriate Court of Appeals. *See* 15 U.S.C. § 717r(b).

Instead of "act[ing] upon" a request for rehearing as Congress intended, FERC often issues an "order granting rehearing for further consideration," commonly referred to as a tolling order. Although tolling orders purportedly "grant" rehearing, no such rehearing is actually granted. Rather, tolling orders simply "afford [FERC] additional time" to consider requests for rehearing beyond the statute's 30-day time period. *See e.g.*, *National Fuel Gas Supply Corp.*, Order Granting Rehearing For Further Consideration (Docket No. CP14-70-000, Accession No. 20150416-3002). FERC's use of tolling orders in NGA certificate proceedings has allowed project proponents to engage in extensive construction activities (and in some cases place facilities into service) before FERC addresses the issues raised in timely filed rehearing requests, thus effectively depriving parties of judicial review. *See* Ex. 2.

The issuance of a tolling order in response to Intervenors' request for rehearing in this proceeding will be considered a denial of rehearing. Intervenors' members will suffer irreparable harm from implementation of the Atlantic Sunrise Project. Intervenors must have an opportunity for judicial review of FERC's Certificate Order in a timely manner, as Congress intended. Therefore, if FERC issues a tolling order in response to Intervenors' request for rehearing, it will be deemed a denial of rehearing and intervenors will seek immediate review of the Certificate Order in the Court of Appeals.

## V. Motion for Stay of Certificate and Construction Pending Decision on the Merits

The standard that the Commission uses for granting a stay is whether "justice so requires." 5 U.S.C. § 705. Here, the interests of justice require that the Certificate and any potential construction be stayed pending the Commission's decision on this request for rehearing.

In addressing a motion for stay, the Commission considers "(1) whether the moving party will suffer irreparable injury without the stay; (2) whether issuing the stay will substantially harm other parties; and (3) whether the stay is in the public interest." 98 FERC ¶ 61,086. Furthermore, "[t]he key element in the inquiry is irreparable injury to the moving party." *Id*. Courts also take into account the availability of a legal remedy for the harm caused, as well as the likelihood of success on the merits.

Here, justice requires the granting of Intervenors' request for a stay. Absent such a stay, Intervenors will be left without an adequate remedy at law to address the irreparable harms inflicted by the construction. In addition, the public will permanently lose important environmental resources. If Intervenors prevail on rehearing, or prevail on judicial review, they will have already suffered irreversible harms relating to construction if such activities are

permitted to proceed. Thus, absent a stay by the Commission, meaningful judicial review could be hindered if not foreclosed.

**A. A stay is necessary to avoid irreparable injury**

Absent a stay, and if construction of the project is allowed to move forward, this will cause immediate and irreparable injury to Intervenors and their members, including harm to streams, wetland systems, and forests they use, as well as other environmental impacts associated with constructing the pipelines. These environmental harms, and subsequent harms to the recreational and aesthetic interests of Intervenors' members, warrant the requested relief because they are imminent, certain, and irreparable. An injury is "irreparable" if damages are not adequate to compensate the injury. *Greater Yellowstone Coalition v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003); "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Amoco Production Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987); *see also Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 25 (D.D.C. 2009) ("[E]nvironmental and aesthetic injuries are irreparable.")

**1. The project impacts would cause irreparable injury**

As set forth in the FEIS, there would be permanent, irreparable environmental harm from construction in the right-of-way ("ROW"). *See* FEIS at 2-8 (stating that Transco would maintain a 50-foot-wide permanent ROW along non-collocated greenfield segments of CPL North and CPL South). Clearing the ROW would involve removing topsoil, trees, shrubs, brush, roots, and large rocks, and then removing or blasting additional soil and bedrock to create a trench for the pipeline. Following construction, a permanent ROW would be maintained along the length of the Project. This Project would impact over 3,740 acres temporarily during construction as well as over 1,200 acres permanently throughout operation. *Id.* at 2-8. This easily meets the Supreme

Court's standard for irreparable harm. *Amoco Production Co.*, 480 U.S. at 545 (discussing how environmental harms are "permanent or at least of long duration, *i.e*. irreparable.").

The Project will also contribute significantly to air pollution during both construction and operation. *See* FEIS at 4-218 – 4-233. Operation of the compressor stations is also expected to emit additional tons of air pollutants over the life of the Project. *See id*. at 4-221 – 4-223. These cumulative emissions would have a long-term and therefore irreparable impact on air quality.

**2. Absent a Stay, Intervenors and Their Members Will Suffer Irreparable Injury.**

Intervenors have members who live, work and recreate along the proposed pipeline route. Intervenors members' have also been active in community meetings and protests against the pipeline. Given the nature of this project as set forth in the EIS, Intervenors' injury would be "likely" to occur. *See, e.g., Moussa I. Kourouma d/b/a Quntum Energy,* LLC, 137 FERC ¶ 61,205, 62,142 (Nov. 16, 2011); *see also Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).

**B. A stay will not substantially harm other parties.**

The injury to Intervenors, the public, and the environment outweighs any harm that a stay may cause the applicants or the Commission. If Intervenors' Request is granted, and the Certificate is revoked, applicants obviously could not possibly suffer any harm by a stay pending a final decision in this matter. And to the extent that Intervenors' Request is granted, but construction is merely delayed until applicants comply with all environmental laws and other Commission requirements, any injury from such delay would not be "damages" in a legal sense.

Economic harm is not irreparable and does not provide an adequate basis for denying a stay. *See e.g., Sampson v. Murray*, 415 U.S. 61, 90 (1974) (potential monetary injury is not irreparable). To the extent that pipeline construction is allowed once compliance with all

environmental laws has been achieved, any delays in pipeline operations would be purely temporary economic harms while the undisputed environmental harms in this case are permanent and irreversible. *See, e.g.*, *OVEC v. U.S. Army Corps of Eng's*, 528 F. Supp. 2d 625, 632 (S.D. W. Va., 2007) ("Money can be earned, lost, and earned again; a valley once filled is gone."); *San Louis Valley Ecosystem Council v. U.S. Fish & Wildlife Serv.*, 657 F. Supp. 2d 1233, 1242 (D. Colo. 2009) ("delay in drilling the exploratory wells is not irreparable. . . ."); *Alaska Center for the Env't v. West*, 31 F. Supp. 2d 714, 723 (D. Alaska 1998) (longer permit processing time was "not of consequence sufficient to outweigh irreversible harm to the environment"); *Citizen's Alert Regarding the Env't v. U.S. Dep't of Justice*, 1995 WL 748246, *11 (D.D.C. Apr. 15, 1995) (potential loss of revenue, jobs, and monetary investment that would be caused by project delay did not outweigh "permanent destruction of environmental values that, once lost, may never again be replicated.")

In any event, any injury to applicants due to prematurely proceeding with construction would be "self-inflicted" because they assumed the risk that Intervenors' request for rehearing might be granted. Such self-inflicted harm caused by "jump[ing] the gun" or "anticipat[ing] a pro forma result" in permitting applications makes the pipeline companies "largely responsible for their own harm." *Sierra Club v. U.S. Army Corps of Engineers*, 645 F.3d 978, 997 (8th Cir. 2011); *see also Davis v. Mineta*, 302 F.3d 1104, 1116 (10th Cir. 2002). Under such circumstances, the pipeline companies' assumption of the risk weighs heavily against any harm they might claim based on the issuance of a stay. *Id.*

Thus, in contrast to the irreparable injury that Intervenors and their members would suffer in the absence of a stay, any potential harm to the applicants from delaying construction to ensure compliance with the law is minimal. Granting a stay that prohibits the construction

activities authorized by the Notices to Proceed[6] would only serve to preserve the *status quo* until the parties have fully resolved their claims.

**C. A stay is in the public interest.**

Because Intervenors seek to compel compliance with federal laws designed by Congress to protect the environment, and because a stay would prevent permanent environmental damage, the public interest weighs heavily in favor of granting a stay. The public interest is protected by preventing irreparable harm to the environment that will result from the construction activities. *See Nat'l Wildlife Fed'n v. Burford*, 676 F. Supp. 271, 279 (D.D.C. 1985) ("a preliminary injunction would serve the public by protecting the environment from any threat of permanent damage"). Moreover, the public interest is served by ensuring that federal agencies scrupulously comply with their statutory duties. *See Fund for Animals v. Espy*, 814 F. Supp. at 152 (finding "meticulous compliance with the law by public officials" as relevant to the public interest); *Citizen's Alert,* 1995 WL 748246, *11 (compliance with law "is especially appropriate in light of the strong public policy expressed in the nation's environmental laws" (citation omitted)). The public "has a strong interest in maintaining the balance Congress sought to establish between economic gain and environmental protection." *OVEC*, 528 F. Supp. 2d at 633.

For example, there is a strong public interest in avoiding unnecessary destruction of wetlands. *See, e.g., Utahns For Better Transp. v. U.S. Dept. of Transp.*, 2001 WL 1739458 (10th Cir. Nov. 16, 2001) ("The concern for wetlands expressed by the Clean Water Act and its implementing regulations demonstrates a strong public interest in their preservation and

[6] On February 8, 2017, Transco filed a Request for Partial Notice to Proceed "to fell trees prior to March 31, 2017 within 0.25-mile of a known northern long-eared bat hibernaculum in Northumberland County." *See* Request for Partial Notice to Proceed at 1 (Accession No. 20170209-5131). Transco's requests that the Director of the Office of Energy Projects approve its request no later than March 3, 2016. *Id*. at 4. Intervenors intend to supplement its motion for stay upon further requests for notices to proceed.

maintenance…. [and] the public has an interest in ensuring that all alternatives to the destruction of wetlands have been considered and that unavoidable impacts on such areas are minimized."); *Rapanos v. United States*, 547 U.S. 715, 777 (2006) ("Important public interests are served by the [CWA]… and by the protection of wetlands in particular."); 33 C.F.R. § 320.4(b)(1) ("Most wetlands constitute a productive and valuable public resource, the unnecessary alteration or destruction of which should be discouraged as contrary to the public interest.").

Additionally, the Project will cause or contribute to increased upstream fracking and infrastructure development, including all adverse environmental impacts associated therewith, and result in major adverse downstream environmental impacts from combustion of the natural gas. NEPA requires the Commission to consider those adverse impacts, including the effects of burning gas that will produce tons of greenhouse gas emissions ("GHGs"), $NO_x$, VOCs, and HAPs. The pollutants emitted from those plants as a result of burning natural gas are known to cause serious adverse health effects. Thus, there is a strong interest in protecting the public from those effects.

The importance of the Commission properly considering the direct and indirect adverse downstream effects of GHGs is supported by the Council on Environmental Quality's ("CEQ") recent "Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National Environmental Policy Act Reviews" ("Guidance").[7] The Guidance provides that federal agencies should consider the extent to which a proposed action would contribute to climate change through GHG emissions and that agencies should quantify both the reasonably foreseeable direct and indirect GHG emissions from the proposed project. Guidance at 9, 11, 16.

Finally, the Guidance confirms that a wide variety of tools exist to quantify GHG

---

[7] The guidance document is available at: https://goo.gl/8QUK94.

emissions including emissions from fossil fuel combustion: "Quantification tools are widely available, and are already in broad use in the Federal and private sectors, by state and local governments, and globally. . . . These tools can provide estimates of GHG emissions, including emissions from fossil fuel combustion . . . ." *Id.* at 12. As such, quantification of the GHG emissions from the plants and their effects can and should be determined.

Given the high stakes, a stay of the Certificate and construction pending a final decision on the merits is clearly in the public interest. A stay will help ensure that that a full and complete analysis of the impacts, and potential mitigation, occurs before alternatives are foreclosed by the construction. Furthermore, given the level of interest demonstrated by the public in this controversial pipeline project, the public interest lies in maintaining the *status quo* until the pending request is considered fully on the merits. *See San Luis Valley Ecosystem Council v. U.S. Fish & Wildlife Serv*., 657 F. Supp. 2d 1233, 1242 (D. Colo. 2009) (large volume of public comments submitted indicates a public interest in maintaining the *status quo* pending proper review).

**D. Justice requires that the Certificate and Construction be stayed pending rehearing and judicial review.**

Consideration of the elements described above strongly favors the granting of a stay. Furthermore, where, as here, the parties requesting a stay are likely to succeed on the merits, justice requires granting a stay. The Commission has noted in previous orders that the factors it examines when considering whether to grant a stay do not include the likelihood of success on the merits. However, this inquiry is intertwined with the inquiry regarding whether justice requires a stay. If the party requesting a stay is likely to prevail, this tips the balance in favor of granting the stay. It would be unjust to allow the project proponents to move forward with construction activities that would cause irreversible environmental harm even though Intervenors

are likely to succeed on the merits. *See Found. on Econ. Trends v. Heckler*, 756 F.2d 143, 157 (D.C. Cir. 1985) ("If plaintiffs succeed on the merits, then the lack of an adequate environmental consideration looms as a serious, immediate, and irreparable injury.").

## V. CONCLUSION

For the reasons stated above, FERC should grant Intervenors' request for rehearing and withdraw its February 3, 2017 Certificate Order and determination that the Atlantic Sunrise Project is an "environmentally acceptable action" that is "required by the present or future public convenience and necessity." FERC should also withdraw the deficient FEIS and prepare a revised EIS that fully considers the direct, indirect, and cumulative impacts of the Atlantic Sunrise Project.

Dated: February 10, 2016 Respectfully submitted,

*/s/ Ryan Talbott*
Ryan Talbott
Executive Director
Allegheny Defense Project
117 West Wood Lane
Kane, PA 16735
(503) 329-9162
rtalbott@alleghenydefense.org

*/s/ Elly Benson*
Elly Benson
Staff Attorney
Sierra Club
2101 Webster Street, 1300
Oakland, CA 94612
(415) 977-5723
elly.benson@sierraclub.org

*/s/ Pam Bishop & Doug Lorenz*
Pam Bishop & Doug Lorenz
Principals
Concerned Citizens of Lebanon County

P.O. Box 275
Mt. Gretna, PA 17064
Concernedcitizenslebco@gmail.com

*/s/ Ann Pinca*
Ann Pinca
President
Lebanon Pipeline Awareness
1594 Cumberland St. Ste. 194
Lebanon, PA 17042-4532
(717) 274-0814
lebanonpipeline@gmail.com

*/s/ Joseph Otis Minott*
Joseph Otis Minott
Executive Director & Chief Counsel
Clean Air Counsel
135 South 19th Street, Suite 300
Philadelphia, PA 19103
(215) 567-4004
joe_minott@cleanair.org

*/s/ Ernest Q. Reed Jr.*
Ernest Q. Reed Jr.
President
Heartwood
971 Rainbow Ridge Road
Faber, VA 22938
lec@wildvirginia.org

*/s/ Malinda Clatterbuck*
Malinda Clatterbuch
Lancaster Against Pipelines
(717) 284-4940
lancasteragainstpipelines@gmail.com

**CERTIFICATE OF SERVICE**

Pursuant to Rule 2010 of FERC's Rules of Practice and Procedure, 18 C.F.R. § 385.2010, I hereby certify that I have this day served the foregoing document upon each person designated on this official list compiled by the Secretary in this proceeding.

Dated: February 10, 2016

Respectfully submitted,

*/s/ Ryan Talbott*

Ryan Talbott
Executive Director
Allegheny Defense Project
117 West Wood Lane
Kane, PA 16735
(503) 329-9162
rtalbott@alleghenydefense.org

# Investor Presentation
January 2017

CABOT OIL & GAS CORPORATION

# FORWARD-LOOKING STATEMENTS AND OTHER DISCLAIMERS

This presentation includes forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. The statements regarding future financial and operating performance and results, strategic pursuits and goals, market prices, future hedging and risk management activities, and other statements that are not historical facts contained in this report are forward-looking statements. The words "expect", "project", "estimate", "believe", "anticipate", "intend", "budget", "plan", "forecast", "predict", "may", "should", "could", "will" and similar expressions are also intended to identify forward-looking statements. Such statements involve risks and uncertainties, including, but not limited to, market factors, market prices (including geographic basis differentials) of natural gas and crude oil, results of future drilling and marketing activity, future production and costs, legislative and regulatory initiatives, electronic, cyber or physical security breaches and other factors detailed herein and in our other Securities and Exchange Commission (SEC) filings. See "Risk Factors" in Item 1A of the Form 10-K and subsequent public filings for additional information about these risks and uncertainties. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, actual outcomes may vary materially from those indicated. Any forward-looking statement speaks only as of the date on which such statement is made, and Cabot Oil & Gas (the "Company" or "Cabot") does not undertake any obligation to correct or update any forward-looking statement, whether as the result of new information, future events or otherwise, except as required by applicable law.

This presentation may contain certain terms, such as resource potential, risked or unrisked resources, potential locations, risked or unrisked locations, EUR (estimated ultimate recovery) and other similar terms that describe estimates of potentially recoverable hydrocarbons that the SEC rules prohibit from being included in filings with the SEC. These estimates are by their nature more speculative than estimates of proved, probable and possible reserves and may not constitute "reserves" within the meaning of SEC rules and accordingly, are subject to substantially greater risk of being actually realized. These estimates are based on the Company's existing models and internal estimates. Actual locations drilled and quantities that may be ultimately recovered from the Company's interests could differ substantially. Factors affecting ultimate recovery include the scope of the Company's ongoing drilling program, which will be directly affected by the availability of capital, drilling and production costs, availably of drilling services and equipment, drilling results, lease expirations, transportation constraints, regulatory approvals, actual drilling results, including geological and mechanical factors affecting recovery rates, and other factors. These estimates may change significantly as development of the Company's assets provide additional data. Investors are urged to consider carefully the disclosures and risk factors about Cabot's reserves in the Form 10-K and other reports on file with the SEC.

This presentation also refers to Discretionary Cash Flow, EBITDAX, Net Income (Loss) Excluding Selected Items and Net Debt calculations and ratios. These non-GAAP financial measures are not alternatives to GAAP measures, and should not be considered in isolation or as an alternative for analysis of the Company's results as reported under GAAP. For additional disclosure regarding such non-GAAP measures, including definitions of these terms and reconciliations to the most directly comparable GAAP measures, please refer to Cabot's most recent earnings release at www.cabotog.com and the Company's related 8-K on file with the SEC.

# CABOT OIL & GAS OVERVIEW

**2015 Year-End Proved Reserves: 8.2 Tcfe**

**2016E Net D&C Activity: 40 wells drilled / 80 wells completed**

**2016E Production Growth: 3% - 4%**

**2017E Net D&C Activity: 70 wells drilled / 75 wells completed**

**2017E Production Growth: 5% - 10%**



**Eagle Ford Shale**
**~85,500 net acres**
**~1,300 locations**
**2016E Net D&C Activity: 10 wells drilled / 13 wells completed**
**2017E Net D&C Activity: 15 wells drilled / 25 wells completed**

**Marcellus Shale**
**~200,000 net acres**
**~3,450 locations**
**2016E Net D&C Activity: 30 wells drilled / 67 wells completed**
**2017E Net D&C Activity: 55 wells drilled / 50 wells completed**

# CONTINUED IMPROVEMENTS IN CABOT'S COST STRUCTURE RESULTING FROM EFFICIENCY GAINS

Drilling Costs per Foot | Completion Costs per Stage | Direct LOE ($/Mcfe)

## Marcellus










## Eagle Ford









# INDUSTRY-LEADING COST STRUCTURE ALLOWS CABOT TO SUCCESSFULLY NAVIGATE THROUGH ALL COMMODITY CYCLES




| | 2011 | 2012 | 2013 | 2014 | 2015 | Q3 2016 |
|---|---|---|---|---|---|---|
| *3-Year F&D Costs: Total Company ($/Mcfe)* | *$1.30* | *$1.02* | *$0.76* | *$0.68* | *$0.62* | |
| *3-Year F&D Costs: Marcellus Only ($/Mcfe)* | *$0.65* | *$0.56* | *$0.48* | *$0.43* | *$0.39* | |

*[1] Includes all demand charges and gathering fees*
*[2] Excludes stock-based compensation*
*[3] Excludes dry hole cost*

# 2017 CAPITAL BUDGET AND OPERATING PLAN

## *INCLUDES INCREMENTAL CAPITAL FOR THE IMPLEMENTATION OF THE 4TH GENERATION COMPLETION DESIGN ACROSS THE ENTIRE MARCELLUS PROGRAM*

**2017E Production Growth: 5% - 10%**

**2017E Total Program Spending:**
**$625 mm**
**(includes $50 mm of equity pipeline investments)**




**2017E D&C Capital[1]:**
**$535 mm**
**(Marcellus 79% / Eagle Ford 21%)**













[1] Includes facilities and pumping units

# 2017 INVESTMENT PROGRAM: FOCUSED ON GENERATING HIGH-RETURN GROWTH




| | Marcellus | Eagle Ford |
|---|---|---|
| Lateral Length (Ft.) | 8,000’ | 9,000’ |
| Number of Stages | 53 | 36 |
| Well Cost ($mm)[1] | $7.9 | $5.5 |
| 2017E Wells Drilled | ~55 | ~15 |

[1] Includes facilities and pumping units. Assumes inflationary increases in service costs.

# RETURNS-FOCUSED GROWTH WITHIN CASH FLOW

***BASED ON CURRENT STRIP PRICES[1] AND CURRENT TARGET IN-SERVICE DATES FOR NEW TAKEAWAY PROJECTS***




| | 2016E | 2017E | 2018E |
|---|---|---|---|
| Free Cash Flow Positive Investment Program | ☑ | ☑ | ☑ |
| YE Net Debt / EBITDAX | ~2.0x | ~1.0x | <1.0x |
| FY Cash Unit Costs ($/Mcfe) | ~$1.18 | ~$1.15 | ~$1.10 |

[1] Forward quotes for benchmark indices and basis differentials as of October 20, 2016

# TOP-TIER CAPITAL YIELDS DRIVEN BY A LOW COST STRUCTURE AND AN IMPROVING OUTLOOK FOR PRICE REALIZATIONS

## 2017E Capital Yield (Cash Recycle Ratio)




## 2018E Capital Yield (Cash Recycle Ratio)




*Source: KLR Group Note: Capital yield is defined as operating cash margin divided by cash capital intensity (before capital spending carries). 2017 benchmark price assumptions: $67.50 oil / $3.75 gas; 2018 benchmark price assumptions: $82.00 oil / $4.00 gas. Peers include: APA, APC, AR, AREX, BBG, CHK, CLR, CNX, CPE, CRZO, CXO, DNR, DVN, ECA, EGN, EOG, EPE, EQT, FANG, GPOR, LPI, MRO, MTDR, NBL, NFX, OAS, PDCE, PE, PXD, QEP, REXX, RICE, RRC, RSPP, SGY, SM, SN, SWN, SYRG, UNT, WLL, WPX, WTI, and XEC*

# CABOT'S STRONG FINANCIAL POSITION AND RISK MANAGEMENT PROFILE

## FY 2017 Natural Gas Price Exposure By Index




## Debt Maturity Schedule ($mm) (Including Weighted Average Coupon Rate)




## 2017 Hedge Position

| | |
|---|---|
| **Natural Gas (NYMEX) Swaps** | |
| Total Volume (Bcf) | 35.5 |
| Average Price per Mcf | $3.12 |
| **Natural Gas (NYMEX) Collars** | |
| Total Volume (Bcf) | 35.5 |
| Average Floor Price per Mcf | $3.09 |
| Average Cap Price per Mcf | $3.43 |
| **Oil (WTI) Collars** | |
| Total Volume (Mmbbls) | 1.8 |
| Average Floor Price per Bbl | $50.00 |
| Average Cap Price per Bbl | $56.39 |

## Capitalization / Liquidity

| As of 9/30/2016 | $bn |
|---|---|
| Cash and Cash Equivalents | $0.5 |
| Debt | $1.5 |
| Net Debt | $1.0 |
| Net Capitalization | $3.9 |
| Liquidity | $2.2 |
| Net Debt / Capitalization | 26.2% |
| Net Debt / LTM EBITDAX | 1.9x |



# EAGLE FORD SHALE

CABOT OIL & GAS CORPORATION

# IMPLEMENTATION OF DIVERSION TECHNOLOGY IN RECENT EAGLE FORD COMPLETIONS HAS GENERATED PROMISING RESULTS




Note: Cumulative production shown on the graphs above has been normalized for a 9,000' lateral

# CABOT'S EAGLE FORD DRILLING EFFICIENCIES

- Continual BHA optimization, effective geosteering, use of made-for-purpose rigs, and general process improvements have all contributed to drilling more lateral in less time
- Drilled a record lateral of 12,249 feet in Q3 2016
- Drilling costs per lateral foot have decreased 64% since 2013
- 49% increase in lateral lengths (2016 YTD vs. 2015) with only a 3% increase in drilling capital per well

## Drilling Days vs. Depth - Spud to Rig Release




## Drilling Cost vs. Depth - Spud to Rig Release



# CABOT'S EAGLE FORD LEASE OPERATING EXPENSE COST REDUCTIONS

## Eagle Ford Gross Lifting Costs ($/Bbl)




## Eagle Ford Lease Operating Expense By Category




## LOE Cost Savings Initiatives

- Top 4 categories account for 75% of field OPEX:
  - Power & Fuel → Electrification Project
  - Disposal – Trade → Water Gathering System
  - Treating → Chemical Optimization Initiative
  - Surface Equipment – Lease → Central Facility Initiative
- Optimize operations with automation and high-speed mesh network



MARCELLUS SHALE

CABOT OIL & GAS CORPORATION

# CABOT'S 4TH GENERATION MARCELLUS COMPLETION DESIGN IS SIGNIFICANTLY OUTPERFORMING

## *CABOT'S ENTIRE 2017 MARCELLUS PROGRAM WILL UTILIZE THE 4TH GENERATION COMPLETION DESIGN*













***Gen 4 completions result in a >30% increase in PV-10 per well relative to Gen 3***

Note: Cumulative production shown on the graphs above has been normalized per lateral foot

# CABOT'S MARCELLUS DRILLING EFFICIENCIES

## Drilling Days vs. Depth - Spud to Rig Release




## Drilling Cost Per Foot Drilled




***Upgraded rigs, lower negotiated day rates and continued efficiency gains should lead to further improvements in drilling costs in 2017***

# CABOT'S MARCELLUS COMPLETIONS EFFICIENCIES

## Marcellus Completion Operations Evolution

**2010**: Daylight operations, single well pads

**2012** : 24-hour operations, multi-well pads, modified zipper operations

**2014**: 24-hour operations, multi-well pads, simultaneous zipper operations

**2016**: 12-hour operations, multi-well pads, simultaneous zipper operations, 5-stage "daylight ops"

## Marcellus Completions Efficiencies

- One crew running "daylight ops" in 2016 completes an equivalent number of stages as a 24-hour crew in 2014
  - Reduction of standby/downtime/demurrage losses – allowance for "night" maintenance of all equipment
  - Maximum 96 hours between pads (25-28 working day target per month per crew in 2016 vs. 18-23 days in 2014)
  - Longer laterals and more wells per pad resulting in less move time





## MARKETING & INFRASTRUCTURE

CABOT OIL & GAS CORPORATION

# INFRASTRUCTURE UPDATE: 2018 IS AN INFLECTION YEAR FOR CABOT

## TGP Orion

- Received Final Environmental Assessment in August 2016
- Target construction start: January 2017
- Target in-service: June 2018
- Total project size: 135 Mmcf/d (COG is the sole supplier)
- Anticipated pricing: Expected to be accretive to in-basin pricing

## Moxie Freedom Power Plant

- Currently under construction
- Target in-service: June 2018
- Total project size: 165 Mmcf/d (COG is the sole supplier)
- No associated firm transportation costs
- Anticipated pricing: Based on power netbacks; expected to be accretive to in-basin pricing

## Lackawanna Power Plant

- Currently under construction
- Target in-service: Phases-in from June to December 2018
- Total project size: 240 Mmcf/d (COG is the sole supplier)
- No associated firm transportation costs
- Anticipated pricing: Based on power netbacks; expected to be accretive to in-basin pricing

## Atlantic Sunrise

- **Received Final Environmental Impact Statement on December 30, 2016**
- Target in-service: Mid-2018
- Total project size: 1.7 Bcf/d
- **COG exposure (FT / FS): 1.0 Bcf/d (850 Mmcf/d on COG's long-term capacity; 150 Mmcf/d of firm sales on 3rd party capacity for first three years of service)**
- Anticipated pricing: D.C. Market Area / Gulf Coast

## PennEast

- Final Environmental Impact Statement expected on February 17, 2017
- Target in-service: 2H 2018
- Total project size: 1.0 Bcf/d
- COG exposure (FT / FS): 150 Mmcf/d
- Anticipated pricing: Expected to be accretive to in-basin pricing

## Constitution

- Appeal of NY DEC permit denial filed in May; briefs / responses submitted in September; oral arguments took place on November 16, 2016
- Target in-service: As early as 2H 2018
- Total project size: 650 Mmcf/d
- COG exposure (FT): 500 Mmcf/d
- Anticipated pricing: Premium Northeast markets

Note: COG firm transport capacity / firm sales are stated on a gross basis before royalties

# CABOT HAS THE ABILITY TO DOUBLE ITS MARCELLUS PRODUCTION OVER TIME BASED ON ITS PREVIOUSLY ANNOUNCED FIRM TRANSPORT AND FIRM SALES ADDITIONS




Note: COG firm transport capacity / firm sales are stated on a gross basis before royalties

# NEW INFRASTRUCTURE CAPACITY WILL ALLOW CABOT TO ACCESS MORE FAVORABLE MARKETS, RESULTING IN SIGNIFICANT MARGIN ENHANCEMENTS




- ***Assuming no change to NYMEX or regional basis differentials between Q4 2016 and Q4 2018, the addition of COG's new takeaway capacity would improve realized prices by >$0.50/Mcf during this period***
- ***However, with the addition of new large-scale projects in NE PA like Atlantic Sunrise, we anticipate improved in-basin pricing resulting in an even further uplift in realized prices***

Note: For the purpose of this analysis, Constitution Pipeline was not assumed to be in-service by Q4 2018; however, the project could be in-service as early as 2H 2018 depending on the outcome of the current appeal process.

# KEY INVESTMENT HIGHLIGHTS

**Extensive Inventory of Low-Risk, High-Quality Drilling Opportunities**

**Disciplined, Returns-Focused Capital Allocation Driving Production and Reserve Growth**

**Low Cost Structure**

**Potential to Double Marcellus Production Volumes While Expanding Cash Margins Via New Takeaway Capacity**

**Focused on Maintaining a Strong Financial Position**



# APPENDIX

CABOT OIL & GAS CORPORATION

# 2016 GUIDANCE

- Full-year 2016 total company production growth: 3% - 4%
- 2016 E&P capital budget: $380 million
  - Implementation of the Company's fourth-generation Marcellus completion design across the program beginning in Q4 2016, coupled with an additional 8 net wells to be drilled and completed in Q4 2016 due to drilling and completion efficiencies, have resulted in an incremental $35 million of capital for the year
  - 95% of E&P capital budget allocated to drilling, completion and facilities
  - Drilling, completion and facilities capital by operating area: 73% Marcellus Shale / 27% Eagle Ford Shale
- 2016 equity pipeline investments: $30 million
- 2016 drilling and completion activity guidance:
  - 40 net wells drilled (30 Marcellus / 10 Eagle Ford)
  - 80 net wells completed (67 Marcellus / 13 Eagle Ford)
- 2016 income tax rate guidance: 36%

| Q4 2016 Net Production Guidance | |
|---|---|
| Natural Gas (Mmcf/d) | 1,650 - 1,725 |
| Oil (Bbls/d) | 8,500 - 9,000 |
| Natural Gas Liquids (Bbls/d) | 1,000 - 1,050 |
| **Q4 2016 Natural Gas Price Exposure By Index** | |
| Fixed Price (~$2.15) | 30% |
| Leidy Line | 23% |
| TGP Zone 4 – 300 Leg | 19% |
| NYMEX | 12% |
| Dominion | 6% |
| Millennium East | 4% |
| Columbia | 3% |
| Other | 3% |
| **FY 2016 Cost Assumptions ($/Mcfe, unless otherwise noted)** | |
| Direct operations | $0.16 - $0.17 |
| Transportation and gathering | $0.70 - $0.71 |
| Taxes other than income | $0.05 - $0.06 |
| Depreciation, depletion and amortization | $0.94 - $0.96 |
| Interest expense | $0.14 - $0.15 |
| General and administrative ($mm)[1] | $55 - $60 |
| Exploration ($mm) | $18 - $20 |

(1) G&A excludes stock-based compensation

# 2017 GUIDANCE

- Full-year 2017 total company production growth: 5% - 10%
- 2017 total program spending (including equity pipeline investments): $625 million
  - 2017 E&P capital budget: $575 million
    - 93% of E&P capital budget allocated to drilling, completion and facilities
    - Drilling, completion and facilities capital by operating area: 79% Marcellus Shale / 21% Eagle Ford Shale
    - ~$225 million of the drilling, completion and facilities capital is earmarked as "maintenance capital" required to hold Cabot's anticipated 2016 exit production rate flat and meet obligatory leasehold drilling commitments
  - 2017 equity pipeline investments: $50 million
- 2017 drilling and completion activity guidance:
  - 70 net wells drilled (55 Marcellus / 15 Eagle Ford)
  - 75 net wells completed (50 Marcellus / 25 Eagle Ford)
- 2017 income tax rate guidance: 37%

| FY 2017 Natural Gas Price Exposure By Index | |
|---|---|
| Leidy Line | 24% |
| Fixed Price (~$2.15) | 21% |
| TGP Zone 4 – 300 Leg | 21% |
| NYMEX | 12% |
| Dominion | 9% |
| Millennium East | 6% |
| Columbia | 4% |
| Other | 3% |

| FY 2017 Cost Assumptions ($/Mcfe, unless otherwise noted) | |
|---|---|
| Direct operations | $0.15 - $0.16 |
| Transportation and gathering | $0.70 - $0.71 |
| Taxes other than income | $0.05 - $0.06 |
| Depreciation, depletion and amortization | $0.85 - $0.95 |
| Interest expense | $0.13 - $0.14 |
| General and administrative ($mm)[1] | $55 - $60 |
| Exploration ($mm) | $18 - $20 |

(1) G&A excludes stock-based compensation

# NET INCOME (LOSS) EXCLUDING SELECTED ITEMS AND DISCRETIONARY CASH FLOW RECONCILIATIONS

**Selected Item Review and Reconciliation of Net Income and Earnings Per Share**
(In thousands, except per share amounts)

| | Quarter Ended September 30, 2016 | Quarter Ended September 30, 2015 | Nine Months Ended September 30, 2016 | Nine Months Ended September 30, 2015 |
|---|---|---|---|---|
| As reported - net income (loss) | $ (10,260) | $ (15,514) | $ (124,364) | $ (2,767) |
| Reversal of selected items: | | | | |
| (Gain) loss on sale of assets | 1,245 | (3,756) | 768 | (3,814) |
| (Gain) loss on derivative instruments [1] | (15,005) | 27,733 | 4,490 | 89,159 |
| Loss on debt extinguishment | — | — | 4,709 | — |
| Drilling rig termination fees | (1,532) | — | 1,655 | 5,095 |
| Stock-based compensation expense | 5,109 | (2,913) | 23,016 | 11,622 |
| Tax effect on selected items | 3,696 | (7,725) | (12,572) | (36,841) |
| Net income (loss) excluding selected items | $ (16,747) | $ (2,175) | $ (102,298) | $ 62,454 |
| As reported - earnings (loss) per share | $ (0.02) | $ (0.04) | $ (0.27) | $ (0.01) |
| Per share impact of reversing selected items | (0.02) | 0.03 | 0.04 | 0.16 |
| Earnings (loss) per share including reversal of selected items | $ (0.04) | $ (0.01) | $ (0.23) | $ 0.15 |
| Weighted average common shares outstanding | 465,149 | 413,846 | 454,060 | 413,636 |

[1] This amount represents the non-cash mark-to-market changes of our commodity derivative instruments recorded in gain (loss) on derivative instruments in the Condensed Consolidated Statement of Operations.

**Discretionary Cash Flow Calculation and Reconciliation**
(In thousands)

| | Quarter Ended September 30, 2016 | Quarter Ended September 30, 2015 | Nine Months Ended September 30, 2016 | Nine Months Ended September 30, 2015 |
|---|---|---|---|---|
| Net income (loss) | $ (10,260) | $ (15,514) | $ (124,364) | $ (2,767) |
| Plus (less): | | | | |
| Deferred income tax expense (benefit) | 4,880 | 1,066 | (59,413) | 8,226 |
| (Gain) loss on sale of assets | 1,245 | (3,756) | 768 | (3,814) |
| Exploratory dry hole cost | — | 6 | 18 | 184 |
| (Gain) loss on derivative instruments | (6,904) | (17,364) | 1,286 | (44,668) |
| Net cash received (paid) in settlement of derivative instruments | (8,101) | 45,097 | 3,204 | 133,827 |
| Income charges not requiring cash | 147,502 | 140,823 | 475,641 | 482,771 |
| Discretionary cash flow | 128,362 | 150,358 | 297,140 | 573,759 |
| Changes in assets and liabilities | (22,957) | (3,996) | (44,491) | 11,195 |
| Net cash provided by operating activities | $ 105,405 | $ 146,362 | $ 252,649 | $ 584,954 |

# EBITDAX AND NET DEBT RECONCILIATIONS

**EBITDAX Calculation and Reconciliation**
(In thousands)

| | Quarter Ended September 30, 2016 | Quarter Ended September 30, 2015 | Nine Months Ended September 30, 2016 | Nine Months Ended September 30, 2015 |
|---|---|---|---|---|
| Net income (loss) | $ (10,260) | $ (15,514) | $ (124,364) | $ (2,767) |
| Plus (less): | | | | |
| Loss on debt extinguishment | — | — | 4,709 | — |
| Interest expense | 21,483 | 24,510 | 67,821 | 72,244 |
| Income tax expense (benefit) | (8,027) | (10,020) | (71,243) | (2,169) |
| Depreciation, depletion and amortization | 139,490 | 144,326 | 448,910 | 472,335 |
| Exploration | 2,988 | 4,930 | 13,109 | 18,960 |
| (Gain) loss on sale of assets | 1,245 | (3,756) | 768 | (3,814) |
| Non-cash (gain) loss on derivative instruments | (15,005) | 27,733 | 4,490 | 89,159 |
| (Earnings) loss on equity method investments | 1,727 | (1,648) | (208) | (4,581) |
| Stock-based compensation | 5,109 | (2,913) | 23,016 | 11,622 |
| EBITDAX | $ 138,750 | $ 167,648 | $ 367,008 | $ 650,989 |

**Net Debt Reconciliation**
(In thousands)

| | September 30, 2016 | December 31, 2015 |
|---|---|---|
| Current portion of long-term debt | $ — | $ 20,000 |
| Long-term debt, net | 1,520,190 | 1,996,139 |
| Total debt | $ 1,520,190 | $ 2,016,139 |
| Stockholders' equity | 2,863,250 | 2,009,188 |
| Total capitalization | $ 4,383,440 | $ 4,025,327 |
| | | |
| Total debt | $ 1,520,190 | $ 2,016,139 |
| Less: Cash and cash equivalents | (501,193) | (514) |
| Net debt | $ 1,018,997 | $ 2,015,625 |
| | | |
| Net debt | $ 1,018,997 | $ 2,015,625 |
| Stockholders' equity | 2,863,250 | 2,009,188 |
| Total adjusted capitalization | $ 3,882,247 | $ 4,024,813 |
| | | |
| Total debt to total capitalization ratio | 34.7% | 50.1% |
| Less: Impact of cash and cash equivalents | 8.5% | —% |
| Net debt to adjusted capitalization ratio | 26.2% | 50.1% |

| Project | Docket Number | Certificate Issued | Request for Rehearing Filed | Tolling Order Issued |
|---|---|---|---|---|
| East Side Expansion | CP14-17-000 | *Columbia Gas Transmission, LLC* , 149 FERC ¶ 61,255 (Dec. 18, 2014) | 1/20/2015 | 2/18/2015 |

| | | | | |
|---|---|---|---|---|
| Leidy Southeast | CP13-551-000 | *Transcontinental Pipe Line Co., LLC* , 149 FERC ¶ 61,258 (Dec. 18, 2014) | 1/16/2015 | 2/18/2015 |
| Niagara Expansion | CP14-88-000 | *Tennessee Gas Pipeline Co., L.L.C., National Fuel Gas Supply Corp.* , 150 FERC ¶ 61,160 (Feb. 27, 2015) | 3/17/2015 | 4/16/2015 |
| Northern Access 2015 | CP14-100-000 | *Tennessee Gas Pipeline Co., L.L.C., National Fuel Gas Supply Corp.* , 150 FERC ¶ 61,160 (Feb. 27, 2015) | 3/17/2015 | 4/16/2015 |
| Zone 3 East-to-West | CP14-498-000 | *Rockies Express Pipeline LLC* , 150 FERC ¶ 61,161 (Feb. 27, 2015) | 3/27/2015 | 4/27/2015 |
| West Side Expansion | CP14-70-000 | *National Fuel Gas Supply Corp.* , 150 FERC ¶ 61,162 (Mar. 2, 2015) | 3/17/2015 | 4/16/2015 |

| | | | | |
|---|---|---|---|---|
| AIM | CP14-96-000 | *Algonquin Gas Transmission, LLC* , 150 FERC ¶ 61,163 (Mar. 3, 2015) | 4/1/2015 | 5/1/2015 |
| Tuscarora Lateral | CP14-112-000 | *Empire Pipeline, Inc., National Fuel Gas Supply Corp.* , 150 FERC ¶ 61,181 (Mar. 10, 2015) | 3/17/2015 | 4/16/2015 |
| Lebanon West II | CP14-555-000 | *Dominion Transmission, Inc.* , 153 FERC ¶ 61,203 (Nov. 19, 2015) | 12/22/2015 | 1/19/2016 |
| Ohio-Louisiana Access | CP14-553-000 | *Texas Gas Transmission, LLC* , 152 FERC ¶ 61,160 (Aug. 28, 2015) | 9/28/2015 | 10/27/2015 |
| Northeast Upgrade | CP11-161-000 | *Tennessee Gas Pipeline Co., L.L.C.* , 139 FERC ¶ 61,161 (May 29, 2012) | 6/12/2012 | 7/9/2012 |

| | | | | |
|---|---|---|---|---|
| Ruby Pipeline | CP09-54-000 | *Ruby Pipeline, L.L.C.* , 131 FERC ¶ 61,007 (Apr. 5, 2010) | 5/5/2010 | 6/2/2010 |
| Florida Southeast Connector | CP14-554-000 | *Florida Southeast Connection, LLC* , 154 FERC ¶ 61,080 (Feb. 2, 2016) | 3/3/2016 | 3/30/2016 |
| Hillabee Expansion | CP15-16-000 | *Florida Southeast Connection, LLC* , 154 FERC ¶ 61,080 (Feb. 2, 2016) | 3/3/2016 | 3/30/2016 |
| Sabal Pipeline | CP15-17-000 | *Florida Southeast Connection, LLC* , 154 FERC ¶ 61,080 (Feb. 2, 2016) | 3/3/2016 | 3/30/2016 |
| MARC I | CP10-480-000 | *Central New York Oil and Gas Co., LLC* , 137 FERC ¶ 61,121 (Nov. 14, 2011) | 11/18/2011 | 12/19/2011 |

| | | | | |
|---|---|---|---|---|
| Line 1655 North | CP14-99-000 | *Columbia Gas Transmission, LLC* , 148 FERC ¶ 61,138 (Aug. 22, 2014) | 9/19/2014 | 10/20/2014 |
| TEMAX and TIME III Projects | CP09-68-000 | *Texas Eastern Transmission, LP* , 129 FERC ¶ 61,151 (Nov. 19, 2009) | 12/18/2009 | 1/19/2010 |
| NJ-NY Expansion | CP11-56-000 | *Texas Eastern Transmission, LP* , 139 FERC ¶ 61,138 (May 21, 2012) | 6/20/2012 | 7/18/2012 |

| | | | | |
|---|---|---|---|---|
| Cove Point LNG Export | CP13-113-000 | *Dominion Cove Point, LNG, LP* , 148 FERC ¶ 61,244 (Sept. 29, 2014) | 10/15/2014 | 11/13/2014 |
| | | | 10/6/2016 | |
| Minisink Compressor | CP11-515-000 | *Millennium Pipeline Co., L.L.C.* , 140 FERC ¶ 61,045 (July 17, 2012) | 8/15/2012 | 9/13/2012 |

1. Each company uses its own method for providing project status updates to FERC.

| Rehearing Denied | Days Between Request for Rehearing and Denial |
|---|---|
| 10/14/2015 | 267 |

| | |
|---|---|
| 3/3/2016 | 412 |
| 3/9/2016 | 358 |
| 3/9/2016 | 358 |
| 4/7/2016 | 377 |
| 3/8/2016 | 357 |

| | |
|---|---|
| 1/28/2016 | 302 |
| 12/30/2015 | 288 |
| 6/2/2016 | 163 |
| 4/27/2016 | 212 |
| 1/11/2013 | 213 |

| | |
|---|---|
| 10/6/2010 | 154 |
| 9/7/2016 | 188 |
| 9/7/2016 | 188 |
| 9/7/2016 | 188 |
| 2/13/2012 | 87 |

| | |
|---|---|
| 8/18/2015 | 333 |
| 5/20/2010 | 153 |
| 10/18/2012 | 120 |

| | |
|---|---|
| 5/4/2015 | 201 |
| 6/3/2017 | 240 |
| 12/7/2012 | 114 |

| Notices to Proceed Issued Before Rehearing Denied<br>(Accession Number) |
|---|
| 1. January 9, 2015 NTP with construction (20150109-3023).<br>2. January 30, 2015 NTP with construction at the Milford CS (20150130-3008).<br>3. February 19, 2015 NTP with construction of Line 10345 Loop in New Jersey (20150219-3076).<br>4. February 27, 2015 NTP with construction (20150227-3026).<br>5. March 4, 2015 NTP with construction (20150304-3075).<br>6. March 13, 2015 NTP with certain construction activities (20150313-4024).<br>7. March 19, 2015 letter order granting request to use alternate access access to Contractor Yard #3 (20150319-3060).<br>8. March 27, 2015 NTP with construction activities (20150327-3006).<br>9. April 2, 2015 NTP with construction actviities on Line 10345 Loop in New Jersey (20150402-3018).<br>10. April 10, 2015 NTP with non-mechanized tree felling and upland clearing activities (20150410-3017).<br>11. April 16, 2015 letter order granting variance request to use additional acreage at Eagle CS (20150416-3071).<br>12. April 21, 2015 NTP with construction on Line 1278 Loop (20150421-3050).<br>13. April 23, 2015 NTP with construction activities (20150423-3028).<br>14. May 1, 2015 NTP with construction of Line 10345 Loop (20150501-3044).<br>15. May 7, 2015 order granting variance request to use additional workspace (20150507-3024).<br>16. May 13, 2015 NTP with construction on Line 1278 between MP 7.8 and 8.0 (20150513-3020).<br>17. June 2, 2015 order granting request to install rock/culvert bridge crossing of stream (20150602-3050).<br>18. June 12, 2015 NTP with construction on Line 1278 Loop between MP 8.0-8.15 (20150612-3013).<br>19. June 17, 2015 order granting request to use additional acreage for workspace (20150617-3043).<br>20. June 29, 2015 NTP with construction activities on Line 10345 Loop (20150629-3029).<br>21. August 11, 2015 NTP with construction at Rutland CS (20150811-3042).<br>22. August. 27, 2015 NTP with construction in all areas at Rutland CS (20150827-3011). |

20170210-5182 FERC PDF (Unofficial) 2/10/2017 4:51:49 PM

| |
|---|
| 1. January 30, 2015 NTP with construction of certain aboveground facilities (20150130-3009).<br>2. February 5, 2015 NTP with construction of certain facilities (20150205-3003).<br>3. February 26, 2015 order granting request to commence partial path service (20150226-3032).<br>4. March 9, 2015 NTP with non-mechanized tree felling (20150309-3026).<br>5. March 25, 2015 NTP with construction and approval of tree felling and variance request at CS 205 (20150325-3068).<br>6. April 9, 2015 NTP with construction of Skillman and Pleasant Run Loops (20150409-3018).<br>7. April 28, 2015 NTP with construction of Skillman Loop (20150428-3040).<br>8. May 19, 2015 NTP with construction of certain aboveground facilities (20150519-3003).<br>9. May 21, 2015 order granting request to use additional temporary workspace (20150521-3026).<br>10. July 13, 2015 order granting request to use additional temporary workspace (20150713-3015).<br>11. July 23, 2015 NTP with construction of Franklin and Dorrance Loops (20150723-3033).<br>12. October 16, 2015 order approving request to commence service of Pleasant Run Loop facilities (20151016-3023).<br>13. November 25, 2015 order approving request to commence service of Dorrance Loop, CS 520, and |
| 1. March 13, 2015 letter order granting request to begin construction in Chautauqua and Erie Counties, NY and Mercer County, PA (20150310-4020).<br>2. July 8, 2015 letter order granting request to utilize additional temporary work space (20150708-3005).<br>3. July 28, 2015 letter order granting request to widen temporary access road in Chautauqua County, NY (20150728-3025).<br>4. July 31, 2015 letter order granting request to use additional temporary work space (20150731-3021). |
| 1. March 13, 2015 NTP with clearing, grading, and road construction at Hinsdale CS and Concord CS (20150313-4022).<br>2. April 14, 2015 NTP with construction at Hinsdale CS and Concord CS (20150414-3012).<br>3. August 6, 2015 NTP with activities at East Eden M&R Station (20150806-3023). |
| 1. March 11, 2015 NTP with construction (20150311-3020).<br>2. July 8, 2015 order approving request to place into service piping at Chandlersville CS and Hamilton CS (20150708-3041).<br>3. July 30, 2015 order approving request for partial authorization to commence service (20150730- |
| 1. March 10, 2015 NTP with tree felling (20150310-3022).<br>2. March 26, 2015 NTP with construction at Mercer CS (20150326-3031).<br>3. May 14, 2015 NTP with construction (20150514-3061).<br>4. September 1, 2015 order granting request to place into service compressor unit at Mercer CS (20150901-3023). |

20170210-5182 FERC PDF (Unofficial) 2/10/2017 4:51:49 PM

| |
|---|
| 1. April 13, 2015 NTP with use of four ware yards (20150413-3015).<br>2. May 5, 2015 NTP with construction of six meter stations (20150505-3049).<br>3. May 20, 2015 NTP with use of two ware yards (20150520-3092).<br>4. June 11, 2015 NTP with Massachusetts Facilities (20150611-3013).<br>5. June 18, 2015 NTP with modifications at three compressor stations and six meter stations (20150618-3041).<br>6. June 24, 2015 NTP with construction and/or use of construction work areas (20150624-3029).<br>7. July 1, 2015 NTP with Massachusetts and Connecticut Facilities (20150701-3012).<br>8. July 8, 2015 NTP with Connecticut Facilities (20150708-3019).<br>9. July 20, 2015 NTP with Connecticult Facilities and piping investigations (20150720-3010).<br>10. July 28, 2015 NTP with construction of Stony Point CS expansion (20150728-3026).<br>11. August 7, 2015 NTP with construction of Connecticut pipeline (20150807-3016).<br>12. August 18, 2015 NTP with Pipeline and pre-construction investigations at Southeast CS (20150818-3050).<br>13. September 1, 2015 NTP with construction of the E-1 System and Take-up and Relay (20150901-3042).<br>14. September 18, 2015 NTP with construction of Massachusetts and New York facilities (20150918-3028). |
| 1. March 19, 2015 NTP with tree felling (20150319-3079).<br>2. April 21, 2015 NTP with construction (20150421-3006).<br>3. October 22, 2015 order approving request to commence service (20151022-3028). |
| 1. December 19, 2015 NTP with construction (20151209-3041).<br>2. January 6, 2016 NTP with use of pipe/contractor yard (20160106-3037). |
| 1. September 22, 2015 NTP with construction (20150922-3022).<br>2. April 27, 2016 order approving request to place in service the Columbia, Dillsboro, Eunice, and Pineville Compressor Stations (20160427-3043). |
| 1. October 24, 2012 NTP with silt fence installation at stream crossings (20121024-3037).<br>2. November 15, 2015 NTP with utilization of contractor yard (20121115-3034).<br>3. December 14, 2012 NTP with construction and tree clearing for certain portions of project (20121214-3053). |

| |
|---|
| 1. May 13, 2010 NTP with use of contractor yard in Box Elder County, Utah (20100513-3000).<br>2. June 7, 2010 NTP with use of three contractor yards in Lake County, Oregon (20100607-3022).<br>3. July 9, 2010 NTP with use of contractor yard in Lincoln County, Wyoming (20100709-3029).<br>4. July 15, 2010 NTP with use of contractor yard in Klamath County, Oregon (20100715-3001).<br>5. July 16, 2010 NTP with use of contractor yard in contractor yard in Lake County, Oregon (20100716-3029).<br>6. July 28, 2010 NTP with use of contractor yard in Elko, Nevada (20100728-3046).<br>7. July 30, 2010 NTP with construction of authorized facilities along all pipeline spreads (20100730-3045).<br>8. August 5, 2010 order approving certain variances for Wyoming portion of project (20100805-3040).<br>9. August 6, 2010 NTP with use of contractor and pipe yard (20100806-3011).<br>10. August 6, 2010 order approving variances for Utah portions of project (20100806-3027).<br>11. August 10, 2010 order approving extra workspaces, staging areas, and water appropriation sites (20100810-3025).<br>12. August 12, 2010 NTP with use of certain access roads (20100812-3026).<br>13. August 18, 2010 NTP with construction and use of Vya Construction Camp (20100818-3050).<br>14. August 25, 2010 NTP with use of certain access roads (20100825-3050).<br>15. September 3, 2010 NTP with construction of certain portions of ROW (20100903-3004).<br>16. September 3, 2010 NTP with construction of Belle Butte Reroute (20100903-3006).<br>17. September 13, 2010 NTP with use of access road E-1WS access road in Elko County, Nevada (20100913-3012). |
| 1. April 22, 2016 NTP with pre-construction activities at contractor, pipe, and meter yards (20160422-3042).<br>2. June 2, 2016 NTP with construction of contractor yards and Gopher Tortoise relocation (20160602-3049).<br>3. August 4, 2016 NTP with Gopher Tortoise relocation (20160804-3008). |
| 1. May 24, 2016 NTP with use of pipe/contractor yards in Chilton and Coosa Counties, Alabama (20160524-3044).<br>2. June 29, 2016 order granting variance to use temporary access road (20160629-3051).<br>3. July 21, 2016 NTP with construction of modifications at CS 95 and CS 105 in Alabama (20160721-3023).<br>4. August 23, 2016 NTP with construction of CS 84 in Alabama (20160823-3039). |
| 1. April 6, 2016 NTP with Gopher Tortoise mitigation (20160406-3048).<br>2. May 17, 2016 NTP with Gopher Tortoise mitigation (20160517-3027).<br>3. June 28, 2016 NTP with pre-construction activities at contractor yards (20160628-3002).<br>4. August 10, 2016 NTP with pre-construction activities at contractor yards (20160810-3003).<br>5. August 8, 2016 NTP with construction of certain Phase 1 facilities (20160818-3016).<br>6. August 25, 2016 order approving variance request to use new contractor yards (20160825-3044).<br>7. August 25, 2016 NTP with construction of certain Phase 1 facilities (20160825-3045). |
| 1. November 21, 2011 NTP with use of Homer wareyard in Bradford County, Pennsylvania (20111121-3019).<br>2. December 8, 2011 NTP with installation of M1-N compressor at existing NS2 CS in Bradford County, |

| |
|---|
| The Line 1655 North Project was filed under Columbia's 1983 Blanket Certificate. *See Columbia Gas Transmission, LLC* , 148 FERC ¶ 61,138, at P 1, n. 3 (2014). Approval of a project under a company's blanket certificate automatically authorizes the company to proceed with construction. *See* 18 CFR § |
| 1. January 20, 2010 NTP with construction and to make certificated facilities available (20100120-3003).<br>2. January 28, 2010 NTP with construction (20100128-3044).<br>3. February 19, 2010 NTP with construction of certain facilities (20100219-3021).<br>4. February 24, 2010 NTP with construction of certain facilities in Pennsylvania (20100224-3045).<br>5. March 2, 2010 order approving variance request to use Letterkenny Pipeyard and to expand Mount Braddock Pipyard (20100302-3002).<br>6. March 3, 2010 NTP with use of Mount Braddock Pipeyard (20100303-3048).<br>7. March 12, 2010 NTP with construction of certain facilities (20100312-3004).<br>8. March 19, 2010 order approving variance request to use Evergreene Contractor Yard (20100319- |
| 1. June 21, 2012 NTP with use of Contractor Yards 4, 24, and 30 (20120621-3058).<br>2. June 29, 2012 NTP with construction in certain areas (20120629-3004).<br>3. July 19, 2012 NTP (20120719-3042).<br>4. July 25, 2012 NTP (20120725-3021).<br>5. August 2, 2012 NTP (20120802-3015).<br>6. September 14, 2012 NTP with use of additional temporary workspace (20120914-3001).<br>7. September 25, 2012 NTP with construction (20120925-3018).<br>8. October 17, 2012 order approving variance request to use additional temporary workspace (20121017-3000).<br>9. October 17, 2012 NTP with construction (20121017-3001). |

| |
|---|
| 1. October 3, 2014 NTP with activities and use of Offsite Area B and paved/graveled areas (20141003-3002).<br>2. October 16, 2014 NTP with activities and use of Offsite Area A (20141016-3070).<br>3. October 29, 2014 NTP with construction at LNG terminal (20141029-3009).<br>4. November 7, 2014 NTP with modification to existing facilities (20141107-3009).<br>5. November 10, 2014 NTP with temporary sound wall at LNG terminal (20141110-3013).<br>6. November 13, 2014 NTP with construction of underground piping (20141113-3019).<br>7. November 20, 2014 NTP with construction of retaining wall and tie-back wall (20141120-3055).<br>8. November 25, 2014 NTP with construction at LNG terminal (20141125-3032).<br>9. November 26, 2014 NTP with 24-hour construction and temporary noise wall at LNG terminal and Offsite Area A (20141126-3004).<br>10. December 18, 2014 NTP with construction of underground mechanical and electrical services (20141218-4004).<br>11. December 30, 2014 order approving modification of materials to construct sound wall and proceed with grading (20141230-3031).<br>12. January 15, 2015 NTP with certain construction activities (20150115-3014).<br>13. January 16, 2015 NTP with construction of equipment and installation of Tie-Point P2 (20150116-3018).<br>14. January 30, 2015 NTP with construction of fire prevention system and foundations and pilings for fire water tank and 2 gas turbine compressors (20150130-3006).<br>15. February 5, 2015 NTP with construction of pretreatment area (20150205-3024).<br>16. February 10, 2015 NTP with winter construction plan (20150210-3025).<br>17. March 3, 2015 NTP with North Ground Flare Shield Wall (20150303-3003).<br>18. March 4, 2015 NTP with construction of Outside Battery Limit Areas and Spill Containment Systems (20150304-3007).<br>19. March 10, 2015 NTP with construction of aboveground fire protection system (20150310-3041). |
| |
| 1. September 18, 2012 NTP with construction (20120918-3038). |

| Project Status as of Rehearing Denial (Accession Number)[1] | |
|---|---|
| Loop 10345 (100% complete)<br>Loop 1278 (85% complete)<br>(20151009-5107) | |

| |
|---|
| In Service as of 1/5/16<br>(20160301-5437) |
| In service as of 11/1/15<br>(20151202-5061) |
| In service as of 12/3/15<br>(20151203-5042) |
| In Service (multiple facilities/dates)<br>(20150708-3041)<br>(20150730-3045)<br>(20150901-3024) |
| In Service (multiple facilities/dates)<br>(20150917-5026)<br>(20151022-5116) |

| |
|---|
| Multiple loops completed<br>(20160112-5179) |
| In Service<br>(20151104-5101) |
| Work at Compressor Stations mostly complete.<br>Pipeline segments in various stages of completion. |
| In Service (multiple facilities/dates)<br>(20160505-5193)<br>(20160602-5378) |
| |

| |
|---|
| Clearing: 28.8% complete<br>Grading: 23.1% complete<br>Ditch: 2.7% complete<br>String: 4.5% complete<br>Bend: 1.8% complete<br>(20100927-5141) |
| Gopher Tortoise relocation complete between MP 77 and 126<br>ROW clearing ongoing between MP 77 and 84<br>Timber clearing of contractor yards<br>(20160908-5283) |
| Billingsley & Kellyton contractor yards: 65% complete<br>Construction commenced at CS 105, CS 95, and CS 84<br>(20160908-5169) |
| 589 Gopher Tortoises relocated<br>Clearing and grading at CS sites and contractor yards<br>(20160908-5250) |
| |

| |
|---|
| Complete (20150622-5056) |
| Various Stages of Completion (20100520-5108) |
| Various Stages of Completion (20121018-5124) |

| |
|---|
| Engineering: 77.7% Complete<br>Procurement: 78% Complete<br>Construction: ~ 2% complete |
| |
| Mobilization: 100% complete<br>Trenching: 48.5% complete<br>Concrete & Foundations: 27% complete<br>Mechanical: 14% complete<br>Site Restoration: 10% complete<br>(20121204-5029) |

Document Content(s)

Request for Rehearing.PDF..............................................1-48

Ex 1_Cabot Presentation.PDF............................................49-76

Ex 2_FERC tolling orders.XLSX.........................................77-100

# ADDENDUM C

## Request for Rehearing and Motion for Stay by Accokeek, Mattawoman, Piscataway Creeks Communities Council, Inc. (Feb. 24, 2017)

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

Transcontinental Gas Pipe Line Company, LLC    Docket No. CP15-138-000

**REQUEST FOR REHEARING AND MOTION FOR STAY BY ACCOKEEK, MATTAWOMAN, PISCATAWAY CREEKS COMMUNITIES COUNCIL, INC.**

Pursuant to Section 19(a) of the Natural Gas Act ("NGA"), and 18 C.F.R. §385.713, Intervenor Accokeek, Mattawoman, Piscataway Creeks Communities Council Inc. ("AMP Creeks") hereby requests a rehearing of FERC's February 3, 2017 Order Issuing Certificate regarding the Transcontinental Gas Pipe Line Co. ("Transco") Atlantic Sunrise Project ("Project") in the above-captioned proceeding. See *Transcontinental Gas Pipe Line Company, LLC*, 158 FERC 61,125 (Feb. 3, 2017). FERC granted AMP Creeks's motions to intervene in this proceeding, thus it is a party to this proceeding. 18 C.F.R. § 385.214(c). As such, AMP Creeks has standing to file this request for rehearing. *See* 15 U.S.C. § 717r(a); 18 C.F.R. § 385.713(b).

AMP Creeks respectfully request that the Certificate Order and the deficient final environmental impact statement ("FEIS") be withdrawn. AMP Creeks also respectfully requests that FERC conduct a new environmental analysis and a new public convenience and necessity analysis that comply with the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.* and the NGA. All communications regarding AMP Creeks's rehearing request and its motion for stay should be served on:

Joseph Creed Kelly
Law Office of Joseph Creed Kelly
1712 Eye Street NW
Suite 915
Washington, DC 20006
Ph/Fx: (202) 540-9021
jck@jcklegal.com

# I. STATEMENT OF ISSUES

AMP Creeks provides the following statement of issues and errors in the Certificate Order:

1. Transco engaged in impermissible segmentation of the Project, which is an expansion of its existing pipeline network. Accordingly, the environmental review and environmental studies are inadequate and incomplete under NEPA. FERC is required to include connected actions, cumulative actions and similar actions in its environmental assessment of projects. Connected actions include interdependent parts of a larger action that depend on the larger action for their justification. *Delaware Riverkeeper Network v. FERC*, 753 F.3d 1304, 1308 (D.C. Cir. 2014).

2. FERC violated NEPA by failing to ensure that environmental information is available to citizens and public officials before decisions are made and before actions are taken. 40 C.F.R. §1500.1(b). In this case, FERC's approval of the Project constitutes a major decision point. 18 C.F.R. §380.11(a)(1). FERC has failed to ensure that it has adequately considered environmental concerns in its decision-making process. *See Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349 (1989).

3. FERC failed to adequately evaluate the purpose and need for the Project during the NEPA review. 40 C.F.R. §1502.13. Specifically, FERC failed to exercise adequate skepticism toward self-serving statements made by the Project's prime beneficiary in the course of the NEPA review. *Simmons v. U.S. Army Corps of Eng's*, 120 F.3d 664, 669 (7th Cir. 1997).

4. FERC violated NEPA by failing to adequately explore and evaluate all reasonable alternatives, including reasonable alternatives not within its jurisdiction. 40 CFR §1502.14. In the Final EIS, FERC determined that it could consider only a narrow range of alternatives. FEIS, Vol. III, PM-93. This narrow range of alternatives is improper under *Simmons v. U.S. Army Corps of Eng's,* 120 F.3d 664 (7th Cir. 1997).

5. FERC has failed to adequately consider the effects of Project on water resources, including high-quality and exceptional value streams and wetlands in violation of NEPA. *See* 40 C.F.R. 1508.8. FERC failed to substantiate its conclusion with substantial evidence that the proposed mitigation measures would protect water resources during construction of the Project. *See New York v. U.S. Nuclear Reg. Comm'n*, 589 F.3d 551, 555 (2d Cir. 2009).

6. FERC violated NEPA by failing to adequately review and consider the indirect effects of additional shale gas development induced by the Project. *See* 40 C.F.R. § 1508.8(b). The Project and upstream shale gas development constitute two links of a single chain under *Sylvester v. U.S. Army Corps of Engineers*, 884 F.2d 394, 400 (9th Cir 1989). Shale gas development is also a reasonably foreseeable effect of the Project. A person of ordinary prudence would therefore take such development into account before reaching a decision.

*Sierra Club v. Marsh*, 976 F.2d 763, 767 (1st Cir. 1992). FERC is aware of the nature of the effects of shale gas development and must take those effects into account. *See Mid States Coalition for Progress v. Surface Transportation Board*, 345 F.3d 520, 549 (8th Cir. 2003). In this case, NEPA requires FERC to forecast the effects of shale gas development spurred by the project. *See Delaware Riverkeeper*, 753 F.3d at 1310; *Northern Plains Resource Council v. Surface Transportation Board*, 668 F.3d 1067, 1079 (9th Cir. 2011).

7. FERC violated NEPA by failing to adequately consider the cumulative impacts of the Project. *See* 40 C.F.R. 1508.7. Specifically, FERC disregarded numerous existing and reasonably foreseeable shale gas developments. Likewise, FERC failed to consider minor or temporary impacts of the Project that can constitute cumulative significance of such minor or temporary impacts when combined with related developments. *See* 40 C.F.R. § 1508.7. FERC employed a definition of cumulative effects found in the Endangered Species Act that does not apply here. *See Conservation Congress v. U.S. Forest Service*, 720 F.3d 1048, 1055 (9th Cir. 2013). FERC's determination of the "region of influence" for air quality and forested lands appears to be based on FERC's incorrect application of the definition of "cumulative effects." Lastly, FERC must adequately consider inter-regional cumulative effects of the Project, including past, present, and reasonably foreseeable shale gas formations in the Marcellus and Utica Shale formation. *See Natural Resources Defense Council v. Hodel,* 865 F.2d 288, 299 (D.C. Cir. 1988).

8. FERC's application of the Certificate Policy Statement was arbitrary because its Final EIS is deficient. *See Certification of New Interstate Natural Gas Pipeline Facilities*, 88 FERC 61,227 (1999) and subsequent clarification orders.

9. FERC failed to adequately evaluate the public need or the Atlantic Sunrise Project. FERC's determination that the project is "required by the present or future public convenience and necessity" constitutes an arbitrary determination under Section 7 of the NGA. *See* 15 U.S.C.§717f(e).

## II. BACKGROUND

Transco's Atlantic Sunrise Project constitutes an overhaul of its massive pipeline system. The Project is one link in a series of related projects intended to achieve this overhaul. Through the Project, Transco seeks to reconfigure its main line that ships gas from the Gulf Coast to the Northeast region of the United States. The reconfiguration is designed to create a bi-directional pipeline system to transport Marcellus and Utica shale gas from northern Pennsylvania to the Southeast and Gulf Coast regions. Transco states it must construct roughly 200 miles of large diameter pipeline and loops to achieve this reconfiguration. Through this Project, Transco seeks

to provide gas companies in northern Pennsylvania greater access to export facilities located in Cove Point, Maryland and the Gulf Coast. The Project will result in greater access in domestic markets as well.

Both FERC's Draft EIS and Final EIS are flawed and omit substantial information related to the Project's environmental impacts. These flaws were pointed out by AMP Creeks and other commenters, the U.S. Environmental Protection Agency, the U.S. Department of the Interior, and the Pennsylvania Department of Environmental Protection, as well as other regulators. Instead of curing the deficiencies in its environmental review documents, FERC instead rushed to issue the Certificate Order in response to Transco's preferred construction schedule. FERC lost its quorum on February 3, 2017 due to Commissioner Bay's resignation. That same day, FERC unlawfully issued the Certificate Order despite nearly two months remaining in the 90-day federal authorization window. Transco had requested FERC's approval by February 3, 2017 so that it could proceed on the Project.

## III. ARGUMENT FOR REHEARING

In order to avoid duplicative arguments and promote administrative efficiency, AMP Creeks hereby fully adopts and incorporates by reference the arguments for rehearing submitted in this proceeding jointly by Allegheny Defense Project, Clean Air Council, Concerned Citizens of Lebanon County, Heartwood, Lancaster Against Pipelines, Lebanon Pipeline Awareness, and Sierra Club ("ADF *et al*") filed on February 10, 2017. A copy of ADF *et al*'s February 10, 2017 Request for Rehearing And Motion For Stay is attached here as Attachment 1.

## IV. FERC'S ISSUANCE OF AN ORDER GRANTING REHEARING FOR FURTHER CONSIDERATION WILL BE DEEMED A DENIAL OF AMP CREEKS'S REQUEST FOR REHEARING

Under the NGA, FERC has thirty days to acts upon a request for rehearing or it may be deemed to have been denied." 15 U.S.C. § 717r(a). Congress has conferred onto FERC the

authority to grant or deny rehearing or to abrogate or modify its order without an additional hearing. *Id*. A party requesting rehearing may petition the Court of Appeals if FERC fails to take such action upon a party's request within thirty days. *See* 15 U.S.C. § 717r(b).

FERC often issues a tolling order when a party requests rehearing. Where FERC issues a tolling order, FERC is afforded additional time to consider a request for rehearing beyond the statute's thirty day time period. *See e.g.*, *National Fuel Gas Supply Corp.*, Order Granting Rehearing For Further Consideration (Docket No. CP14-70-000, Accession No. 20150416-3002). In some cases, FERC's use of tolling orders in NGA certificate proceedings allows project proponents to begin construction activities or place facilities into service before FERC addresses the issues raised in a timely filed rehearing requests. This effectively deprives parties of judicial review. In this case, a tolling order in response to this request will result in a denial of rehearing due to FERC's lack of quorum discussed above. AMP Creeks and its members will suffer irreparable harm if the Project is implemented. It will therefore seek immediate review of the Certificate Order in the Court of Appeals if FERC issues a tolling order here.

## V. Motion for Stay of Certificate and Construction Pending Decision on the Merits

The Commission's standard for granting a stay is whether "justice so requires." 5 U.S.C. § 705. The interests of justice in this case require that the Certificate and any potential construction be stayed pending the Commission's decision on this request for rehearing.

In considering a motion for stay, the Commission considers "(1) whether the moving party will suffer irreparable injury without the stay; (2) whether issuing the stay will substantially harm other parties; and (3) whether the stay is in the public interest." 98 FERC 61,086. Furthermore, "[t]he key element in the inquiry is irreparable injury to the moving party." *Id*. Courts also take into account the availability of a legal remedy for the harm caused, as well as the likelihood of success on the merits.

Here, justice requires the granting the request for a stay. Absent such a stay, AMP Creeks will be left without an adequate remedy at law to address the irreparable harms inflicted by the construction. Additionally, the public will permanently lose important environmental resources. AMP Creeks will already have suffered irreparable harm if construction is Transco is permitted to proceed with construction activities. The Commission should issue a stay in this case to prevent irreversible, irreparable harm.

### A. Argument for Issuance of a Stay

In order to avoid duplicative arguments and promote administrative efficiency, AMP Creeks hereby fully incorporates by reference the arguments for rehearing submitted in this proceeding by ADF *et al* filed on February 10, 2017. *See* Attachment 1.

## V. CONCLUSION

For the reasons discussed herein, AMP Creeks respectfully requests the following relief: FERC should grant AMP Creeks's request for rehearing; Issue the requested stay; Withdraw its February 3, 2017 Certificate Order; and withdraw its determination that the Atlantic Sunrise Project is an environmentally acceptable action that is required by the present or future public convenience and necessity. Additionally, FERC should withdraw the deficient FEIS and prepare a revised EIS that fully considers the direct, indirect, and cumulative impacts of this project.

Dated: February 24, 2017

Respectfully submitted,

*/s/ Joseph Creed Kelly*
Joseph Creed Kelly
Law Office of Joseph Creed Kelly
1712 Eye Street NW
Suite 915
Washington, DC 20006
Ph/Fx: (202) 540-9021
Washington, DC 20006

*Counsel for AMP Creeks*

**CERTIFICATE OF SERVICE**

The undersigned certifies that a copy of the foregoing request was served on each person designated by the official service list in this proceeding.

Dated: February 24, 2017

Respectfully submitted,

*/s/ Joseph Creed Kelly*
Joseph Creed Kelly
Law Office of Joseph Creed Kelly
1712 Eye Street NW
Suite 915
Washington, DC 20006
Ph/Fx: (202) 540-9021
Washington, DC 20006

*Counsel for AMP Creeks*

# ATTACHMENT 1

20170224-5106 FERC PDF (Unofficial) 2/24/2017 12:31:59 PM

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

Transcontinental Gas Pipe Line Company, LLC Docket No. CP15-138-000

**REQUEST FOR REHEARING AND MOTION FOR STAY OF ALLEGHENY DEFENSE PROJECT, CLEAN AIR COUNCIL, CONCERNED CITIZENS OF LEBANON COUNTY, HEARTWOOD, LANCASTER AGAINST PIPELINES, LEBANON PIPELINE AWARENESS, AND SIERRA CLUB**

Pursuant to section 19(a) of the Natural Gas Act ("NGA"), 15 U.S.C. §717r(a) and Rule 713 of the Federal Regulatory Energy Commission's ("FERC") Rules of Practice and Procedure, 18 C.F.R. § 385.713, the Allegheny Defense Project, Clean Air Council, Concerned Citizens of Lebanon County, Heartwood, Lancaster Against Pipelines, Lebanon Pipeline Awareness, and Sierra Club (collectively, "Intervenors") hereby request rehearing of FERC's "Order Issuing Certificate," issued February 3, 2017, in the above-captioned proceeding ("Certificate Order"). *See Transcontinental Gas Pipe Line Company, LLC*, 158 FERC ¶ 61,125 (Feb. 3, 2017). FERC granted the Intervenors' respective motions to intervene in this proceeding. *See id*. at P 13. Thus, the Intervenors are "parties" to this proceeding, 18 C.F.R. § 385.214(c), and have standing to file this request for rehearing. *See* 15 U.S.C. § 717r(a); 18 C.F.R. § 385.713(b).

We request that the Certificate Order and deficient final environmental impact statement ("FEIS") be withdrawn and the environmental analysis and public convenience and necessity analysis be redone in a manner that complies with FERC's obligations pursuant to the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, and the Natural Gas Act ("NGA"), 15 U.S.C. § 717 *et seq*. All communications regarding this request should be addressed to and served upon:

Ryan Talbott
Executive Director

Allegheny Defense Project
117 West Wood Lane
Kane, PA 16735
(503) 329-9162
rtalbott@alleghenydefense.org

## I. STATEMENT OF ISSUES

Pursuant to Section 713(c) of FERC's Rules of Practice and Procedure, Intervenors provide a statement of issues and alleged errors in the Certificate Order:

1. Transco improperly segmented its expansion projects and evaded a complete, rigorous environmental studies under the NEPA. "Under applicable NEPA regulations, FERC is required to include 'connected actions,' 'cumulative actions,' and 'similar actions' in a project EA. 'Connected actions' include actions that are 'interdependent parts of a larger action and dependent on the larger action for their justification.'" *Delaware Riverkeeper Network v. FERC*, 753 F.3d 1304, 1308 (D.C. Cir. 2014) (citing 40 C.F.R. § 1508.25(a)) (holding that since there was a "clear physical, functional, and temporal nexus between the projects," they should have been considered together under NEPA).

2. FERC violated NEPA by failing to ensure that "environmental information is available to public officials and citizens before decisions are made and before actions are taken." 40 C.F.R. § 1500.1(b); *see also* 18 C.F.R. § 380.11(a) (environmental considerations must be addressed "at appropriate major decision points"). "In proceedings involving a party or parties and not set for trial-type hearing, major decision points are the approval or denial of proposals by the Commission or its designees." 18 C.F.R. § 380.11(a)(1). By rushing to issue the Certificate Order before Transco submitted information critical to FERC's decision and by ignoring comments on the FEIS, FERC failed to ensure that it has adequately "considered environmental concerns in its decisionmaking process." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989); *see also California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982).

3. FERC violated NEPA by failing to properly evaluate the purpose and need for the Atlantic Sunrise Project during its NEPA review. 40 C.F.R. § 1502.13. In particular, with regard to this critically important portion of its review, FERC failed to "exercise a degree of skepticism in dealing with self-serving statements from a prime beneficiary of the project." *Simmons v. U.S. Army Corps of Eng's*, 120 F.3d 664, 669 (7th Cir. 1997) (quoting *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 209 (D.C. Cir. 1991) (Buckley, J., dissenting)).

4. FERC violated NEPA by failing to rigorously explore and objectively evaluate all reasonable alternatives, including reasonable alternatives not within its jurisdiction. 40 C.F.R. § 1502.14; *WildEarth Guardians v. Nat'l Park Serv.*, 703 F.3d 1178, 1184 (10th Cir. 2013); *Milwaukee Inner-City Congregations Allied for Hope v. Gottlieb*, 944 F.Supp.2d 656, 670 (W.D. Wis., 2013); *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 235 F.Supp.2d 1143, 1154 (W.D. Wash., 2002). Instead, FERC defined a narrow

range of alternatives that it determined it could "legitimately consider." FEIS, Vol. III, PM-93. This improperly restricted FERC's alternatives analysis to those "alternative means by which a particular applicant can reach his goals." *Simmons*, 120 F.3d at 669 (quoting *Van Abbema v. Fornell*, 807 F.2d 633, 638 (7th Cir. 1986); *see also Nat'l Parks & Cons. Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1072 (9th Cir. 2009).

5. FERC violated NEPA by failing to take a hard look at the direct and indirect effects of the Atlantic Sunrise Project on water resources, including high-quality and exceptional value streams and wetlands. *See* 40 C.F.R. § 1508.8; *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). FERC failed to support with substantial evidence its conclusion that proposed mitigation measures would protect water resources during construction of the Atlantic Sunrise Project. *See New York v. U.S. Nuclear Reg. Comm'n*, 589 F.3d 551, 555 (2d Cir. 2009). Insufficient mitigation measures, even when longstanding in their use, are still insufficient. *See Summit Petroleum Corp. v. U.S. E.P.A.*, 690 F.3d 733, 746 (6th Cir. 2012).

6. FERC violated NEPA by failing to take a hard look at the indirect effects of additional shale gas development that would be induced by the Atlantic Sunrise Project. *See* 40 C.F.R. § 1508.8(b). The Atlantic Sunrise Project and upstream shale gas development are "two links of a single chain." *Sylvester v. U.S. Army Corps of Engineers*, 884 F.2d 394, 400 (9th Cir 1989). Shale gas development is also reasonably foreseeable and "a person of ordinary prudence would take it into account" before making a decision. *Sierra Club v. Marsh*, 976 F.2d 763, 767 (1st Cir. 1992). FERC is aware of the nature of the effects of shale gas development and cannot simply ignore those effects. *See Mid States Coalition for Progress v. Surface Transportation Board*, 345 F.3d 520, 549 (8th Cir. 2003); *Habitat Education Center v. U.S. Forest Service*, 609 F.3d 897, 902 (7th Cir. 2010). FERC is required to engage in "[r]easonable forecasting" because "speculation is . . . implicit in NEPA." *Delaware Riverkeeper*, 753 F.3d at 1310; *Northern Plains Resource Council v. Surface Transportation Board*, 668 F.3d 1067, 1079 (9th Cir. 2011). FERC's failure to make any attempt to assess the indirect effects of shale gas development "require[s] the public, rather than the agency" to ascertain the effects of the Project. *Te-Moak Tribe of Western Shoshone of Nevada v. U.S. Department of the Interior*, 608 F.3d 592, 605 (9th Cir. 2010). "Such a requirement would thwart one of the 'twin aims' of NEPA – to 'ensure[ ] that the *agency* will inform the *public* that it has indeed considered environmental concerns in its decision making process.'" *Id*. (*quoting Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 97, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983)) (emphasis added by Ninth Circuit).

7. FERC violated NEPA by failing to take a hard look at the cumulative impacts of the Atlantic Sunrise Project. *See* 40 C.F.R. § 1508.7; *Delaware Riverkeeper*, 753 F.3d at 1319-20. This violation stemmed from FERC ignoring thousands of existing and reasonably foreseeable shale gas developments. FERC also refused to investigate that fact that even "minor" or "temporary" Project impacts on natural resources can be cumulatively significant when combined with the other, related developments. *See* 40 C.F.R. §§ 1508.7, 1508.27(b)(7); Council on Environmental Quality ("CEQ"), Considering Cumulative Effects Under the National Environmental Policy Act (1997) (hereinafter "1997 Guidance"); *Klamath-Siskiyou*, 387 F.3d at 993-97. Likewise, FERC's

selection of a "region of influence" for forested lands and air quality was unreasonably restrictive and appears to have been based on the Endangered Species Act's more restrictive definition of "cumulative effects." *See Conservation Congress v. U.S. Forest Service*, 720 F.3d 1048, 1055 (9th Cir. 2013). FERC must consider the "inter-regional" cumulative effects that the Atlantic Sunrise Project will have, including past, present, and reasonably foreseeable shale gas extraction in the Marcellus and Utica Shale formations. *See Natural Resources Defense Council v. Hodel*, 865 F.2d 288, 299 (D.C. Cir. 1988).

8. FERC's application of the Certificate Policy Statement was arbitrary because it was based on a deficient FEIS. *See Certification of New Interstate Natural Gas Pipeline Facilities*, 88 FERC ¶ 61,227 (1999), order clarified, 90 FERC ¶ 61,128, order further clarified, 92 FERC ¶ 61,094 (2000); *South Coast Air Quality Management District v. FERC*, 621 F.3d 1085, 1099 (9th Cir. 2010).

9. FERC's failure to adequately and independently evaluate the public need for the Atlantic Sunrise Project renders arbitrary its determination under Section 7 of the Natural Gas Act, that the project is "required by the present or future public convenience and necessity." *See* 15 U.S.C. § 717f(e).

## II. BACKGROUND

Transco wants to overhaul its massive pipeline system. The Project is a massive link in a chain of related projects aimed at achieving this overhaul. The Project itself is designed to reconfigure Transco's mainline, which has historically shipped gas from the Gulf Coast to the Northeast, so that it can function bi-directionally and transport Marcellus and Utica shale gas from northern Pennsylvania to the Southeast and Gulf Coast regions. To get the shale gas to its mainline, Transco claims it must construct nearly 200 miles of large diameter pipeline and loops. Thus, the Project's express purpose is to provide gas companies operating in northern Pennsylvania new or dramatically increased access to export facilities at Cove Point, Maryland, and along the Gulf Coast, as well as domestic markets.

Instead of performing the detailed analysis required for such a major action, FERC published significantly flawed draft and final environmental impact statements that omitted substantial information related to the Project's environmental impacts. These flaws were pointed out not only by Intervenors and other commenters, but also by co-regulators, including the U.S.

Environmental Protection Agency, the U.S. Department of the Interior, and the Pennsylvania Department of Environmental Protection. Instead of taking the necessary time to fully cure the deficiencies in its environmental review documents, FERC instead rushed to issue the Certificate Order in response to Transco's desired construction schedule. When it became clear on January 26, 2017, that FERC would lose its quorum upon Commissioner Bay's resignation on February 3, 2017, FERC unlawfully issued the Certificate Order even through there were nearly two months remaining in the 90-day federal authorization window and that Transco had yet to make prerequisite information submittals.[1]

## III. ARGUMENT FOR REHEARING

### A. FERC improperly segmented Atlantic Sunrise from other closely related and interdependent projects.

Transco improperly segmented its expansion projects and evaded a complete, rigorous environmental studies under the NEPA. For example, along with the Project, Transco announced the Rock Springs Expansion project, which is a proposed 11.17 mile expansion from Lancaster County to the Wildcat Point facility, about five miles from Rising Sun, Maryland. *See* Rock Springs Expansion Project, Williams Transco Pipeline Expansion Projects, http://rocksprings.wpengine.com/. Transco also proposes to submit a 7(c) application in March 2017 for its Northeast Supply Enhancement Project, which is an expansion project that will run from York County, Pennsylvania (where Atlantic Sunrise ends) to the Rockaway Transfer Point, which is an existing interconnection between the Lower New York Bay Lateral and the Rockaway Delivery Lateral in New York State waters. *See* Letter from Transcontinental Gas Pipe Line Company, LLC to Kimberly Bose, Secretary, FERC (May 9, 2016). Atlantic

[1] FERC also issued orders approving the Rover Pipeline Project, Orion Project, and Northern Access 2016 Project. *See Rover Pipeline LLC*, 158 FERC ¶ 61,109 (Feb. 2, 2017); *Tennessee Gas Pipeline Co., L.L.C.*, 158 FERC ¶ 61,110 (Feb. 2, 2017); *National Fuel Gas Supply Corp.*, 158 FERC ¶ 61,145 (Feb. 3, 2017).

Sunrise appears to be part of this series of projects to expand Transco's system. *See* 149 FERC ¶ 61,258, No. CP13-551-000 (Dec. 18, 2014).

Additional related and interdependent projects, including the Southeast Market Pipelines Project (which includes Transco's Hillabee Expansion) and Magnolia Extension project, were highlighted in Intervenors' request for a revised or supplemental EIS. *See* Intervenors' Comments Requesting Revised or Supplemental DEIS at 4-6. These related and interdependent projects should not be viewed as individual projects under NEPA. "Under applicable NEPA regulations, FERC is required to include 'connected actions,' 'cumulative actions,' and 'similar actions' in a project EA. 'Connected actions' include actions that are 'interdependent parts of a larger action and dependent on the larger action for their justification.'" *Delaware Riverkeeper Network v. FERC*, 753 F.3d 1304, 1308 (D.C. Cir. 2014) (citing 40 C.F.R. § 1508.25(a)) (holding that since there was a "clear physical, functional, and temporal nexus between the projects," they should have been considered together under NEPA). There is a "clear physical, functional, and temporal nexus" between these projects. For example, the three Transco projects on the East Coast connect to each other physically, either directly or through nearby existing pipelines. Functionally, the projects work to bring gas from the Marcellus Shale gas development throughout the East Coast and beyond. Moreover, the three new East Coast projects are scheduled to begin construction from 2017 to 2019, with the goal of completion in order to meet the "increasing demand for natural gas in the northeastern United States for the 2019/2020 winter heating season." Northeast Supply Enhancement, Williams, http://co.williams.com/expansionprojects/northeast-supply-enhancement/. FERC must consider these connected and cumulative actions projects and disclose their environmental impacts together in its environmental review of Atlantic Sunrise.

### B. FERC failed to ensure that substantial environmental information was available before authorizing the Atlantic Sunrise Project.

FERC failed to ensure that its decision to approve the Atlantic Sunrise Project was based on complete and accurate information about the environmental consequences of the project. Agencies must ensure that "environmental information is available to public officials and citizens before decisions are made and before actions are taken." 40 C.F.R. § 1500.1(b). FERC's NEPA regulations require that environmental considerations be addressed "at appropriate major decision points." 18 C.F.R. § 380.11(a). "In proceedings involving a party or parties and not set for trial-type hearing, major decision points are the approval or denial of proposals by the Commission or its designees." *Id*. § 380.11(a)(1).

FERC issued the Certificate Order even though Transco has not submitted substantial, specifically-requested information related to environmental consequences of the project. *See* Certificate Order, Environmental Conditions 13-42, 44-45, 47-50, 52. The lack of information on has been a persistent problem throughout this proceeding. *See* Intervenors' DEIS Comments at 5-8 (Accession No. 20160627-5296); EPA's DEIS Comments at 2 (Accession No. 20160706-0052); Intervenors' Comments Requesting a Revised or Supplemental DEIS at 3-9 (Accession No. 20161011-5075); *and* Intervenors' FEIS Comments at 10-16. Instead of requiring Transco to submit the missing information and allowing the public an opportunity to review that information, FERC rushed to issue the Certificate Order before it lost its quorum on February 3, 2017.[2] FERC's decision to prioritize industry timelines over the public interest underscores the arbitrary and capricious nature of its decisionmaking.

By rushing to issue the Certificate Order, FERC failed to ensure that it "has indeed considered environmental concerns in its decisionmaking process." *Robertson v. Methow Valley*

[2] The email confirming FERC's issuance of the Certificate Order was received at 4:46 p.m. (Eastern) on February 3, 2017, just fourteen minutes before the end of FERC's business day.

*Citizens Council*, 490 U.S. 332, 349 (1989); *see also California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982). As explained in comments on the FEIS, despite the six months that elapsed between the end of the DEIS comment period and the publication of the FEIS, there was still a substantial amount of information missing in the FEIS. *See* Intervenors' FEIS Comments at 10-16. Much of this information is still missing. *See* Certificate Order, Environmental Conditions 13-42, 44-45, 47-50, 52.

This missing information concerns significant environmental matters. For example, FERC identified three active underground fires in coal mines within three miles of the Project. *See* Certificate Order at P 84. One of the mine fires "is about 0.4 mile west of the project in Northumberland County, Pennsylvania." *Id*. As a result of this obvious threat to the environment and human health and safety, FERC is requiring Transco to submit an "Abandoned Mine Investigation and Mitigation Plan" that identifies the depth and extent of coal seams that could pose a risk to project facilities, and mitigation measures that would be implemented to protect the integrity of the pipeline from underground mine fires during the life of the project. *Id*. The specifics of that plan are critical to the assessment of potential environmental impacts that is mandated by the NEPA review process. FERC, however, only required Transco to submit the Abandoned Mine Investigation and Mitigation Plan when it submits its implementation plan, *i.e.*, after issuance of the Certificate Order, thereby circumventing the NEPA process. *See id.*, EC 21 and EC 23.

FERC therefore failed to ensure that "environmental information [was] available to public officials and citizens before decisions are made and before actions are taken." 40 C.F.R. § 1500.1(b). By issuing the Certificate Order without the Abandoned Mine Investigation and Mitigation Plan, FERC acted at a "major decision point" without fully considering significant environmental and human health and safety concerns. 18 C.F.R. § 380.11(a)(1). The same

rationale applies to the other missing information, including missing information that FERC has identified. *See* Certificate Order, Environmental Conditions 13-42, 44-45, 47-50, 52. FERC's failure to ensure that this information was submitted and publicly available during the NEPA review process renders FERC's Certificate Order invalid. FERC should rescind the Certificate Order and prepare a supplemental FEIS after Transco has submitted all of the missing information that FERC identified.

**C. FERC failed to specify the purpose and need and evaluate a reasonable range of alternatives.**

FERC failed to properly identify, disclose, and evaluate the purpose and need for the Atlantic Sunrise Project in the FEIS. NEPA regulations require FERC to "specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action." 40 C.F.R. § 1502.13. FERC must "exercise a degree of skepticism in dealing with self-serving statements from a prime beneficiary of the project." *Simmons v. U.S. Army Corps of Eng's*, 120 F.3d 664, 669 (7th Cir. 1997) (quoting *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 209 (D.C. Cir. 1991) (Buckley, J., dissenting)).

Instead of specifying the need for the Atlantic Sunrise Project or exercising any degree of skepticism with regard to Transco's statements, FERC flatly stated that "it will not determine whether the need for the Project exists" as part of the NEPA process. FEIS at 1-2. Instead, FERC said "[t]he determination of whether there is a 'need' for the proposed facilities . . . will be made in the subsequent Commission Order granting or denying Transco's request for certificate authorization[.]" FEIS, Vol. III, PM-93. This violates the plain language of 40 C.F.R. § 1502.13. The fact that FERC considers need as part of its certification review under the Natural Gas Act does not relieve the agency of its obligation to specify the need for the Project during the NEPA process when the public has the opportunity to comment and potentially influence FERC's

decision. The failure to specify and assess the need for the Atlantic Sunrise Project during the NEPA process renders the FEIS invalid. FERC should rescind the Certificate Order and prepare a supplemental FEIS that fully vets the purpose and need for the Project.

CEQ's regulations also require agencies to "[r]igorously explore and objectively evaluate all reasonable alternatives," including "reasonable alternatives not within the jurisdiction of the lead agency." 40 C.F.R. § 1502.14(a); (c). FERC, however, stated in the response to comment on the FEIS that it defined a range of alternatives that it could "legitimately consider." FEIS, Vol. III, PM-93. This improper approach appears designed to narrow the range of reasonable alternatives, particularly by excluding alternative that include elements that are not within FERC's jurisdiction. For example, FERC acknowledges that it:

> received numerous comments suggesting that electricity generated from renewable energy sources could eliminate the need for the Project and that the use of these energy sources as well as gains realized from increased energy efficiency and conservation should be considered as alternatives to the Project.

FEIS at 3-2. FERC continues, however, that:

> The generation of electricity from renewable energy sources is a reasonable alternative *for a review of power generating facilities*. The siting, construction, and operation of power generating facilities are *regulated by state agencies*. Authorization related to how customers in Transco's service area will meet demands for electricity are not part of the application before the Commission and their consideration is outside the scope of this EIS. Therefore, because the *purpose of the Project is to transport natural gas*, and the generation of electricity from renewable energy sources or the gains realized from increased energy efficiency and conservation are *not transportation alternatives*, they are not considered or evaluated further in this analysis.

*See* FEIS at 3-2 (emphasis added). In other words, in addition to uncritically adopting Transco's stated purpose, FERC used the fact that other agencies and states would have jurisdiction over power generating facilities to impermissibly narrow the range of reasonable alternatives, in direct contravention of 40 C.F.R. § 1502.14(c).

It is well-established that Section 1502.14(c) is "intended to prompt agencies to consider otherwise appropriate alternatives that the agency lacks jurisdiction to authorize." *WildEarth Guardians v. Nat'l Park Serv.*, 703 F.3d 1178, 1184 (10th Cir. 2013). The fact that an alternative is not within the agency's jurisdiction "should not prevent [an] agenc[y] from proposing it or attempting to persuade the appropriate agencies or units of government to get involved in the project[.]" *Milwaukee Inner-City Congregations Allied for Hope v. Gottlieb*, 944 F.Supp.2d 656, 670 (W.D. Wis., 2013). "An agency's refusal to consider an alternative that would require some action beyond that of its congressional authorization is counter to NEPA's intent to provide options for both agencies and Congress." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 235 F.Supp.2d 1143, 1154 (W.D. Wash., 2002); *see also Gottlieb*, 944 F.Supp.2d at 670 ("agencies cannot simply assume that incorporating some form of [non-jurisdictional action] into the project to avoid or minimize adverse social and economic harm is out of the question").

Instead of considering all reasonable alternatives, FERC insisted that renewable energy and conservation alternatives are somehow "outside the scope of this EIS." FEIS at 3-2. That is simply wrong under the authoritative CEQ regulation and case law. Moreover, FERC's position is also inconsistent with its own prior practice of including such alternatives in environmental reviews.

In the FEIS for the Constitution Pipeline, for example, FERC analyzed multiple alternatives that did not involve the transport of natural gas. This included energy conservation and energy efficiency alternatives as well as renewable energy alternatives. *See* Constitution Pipeline FEIS at 3-4 – 3-13 (Docket No. CP13-499-000, Accession No. 20141024-4001). FERC has not explained why such alternatives were within the scope of the Constitution Pipeline FEIS but outside the scope of the Atlantic Sunrise Pipeline FEIS. The failure to consider any renewable energy and energy conservation/efficiency alternatives in the Atlantic Sunrise Pipeline

FEIS was arbitrary and capricious. FERC should prepare a supplemental FEIS that analyzes both the need for the Project and alternatives to determine whether some of all of the purported need for the Project can be met without building new fossil fuel infrastructure. 40 C.F.R. § 1502.9(c)(1).

Finally, it is becoming readily apparent that a major driver of Atlantic Sunrise may be the exportation of northern Pennsylvania shale gas to foreign countries. FERC acknowledges that "the international marketplace represents a potential destination" for gas made available to export terminals through Atlantic Sunrise. FEIS at 1-10. FERC further acknowledges that Cabot Oil & Gas ("Cabot"), the largest shipper on the Project with approximately half of the subscribed capacity, "has publicly announced that it has contracted to sell gas supply to a party that is also a shipper (Sumitomo) in the Cove Point [Export] Terminal." *Id*. FERC, however, appears to take Transco at its word when the company claims that it "anticipates that the vast majority of natural gas transported through the firm capacity under the Project would be consumed domestically in markets along the East Coast[.]" *Id*. The fact that the largest subscriber on Atlantic Sunrise has announced an agreement with a shipper at the nearest export terminal at Cove Point casts doubt on these claims. FERC cites no additional evidence for its statements others than Transco's unsupported claims.

In addition, the reversal of the Transco longhaul pipeline to the Southeast would allow northern Pennsylvania shale gas to reach Gulf Coast export terminals. For example, Kinder Morgan's Elba Island export terminal was approved and is currently under construction. *See* Elba Island LNG Update: Non-FTA Exports Approved, Marcellus Drilling News, Dec. 2016, *available at* http://marcellusdrilling.com/2016/12/elba-island-lng-update-non-fta-exports-approved-dump-truck-city/. Kinder Morgan also "owns and operates the 200-mile Elba Express pipeline, which connects the LNG facility to the Transco [pipeline]." *Id*. Transco's parent

company, Williams, "has been on a mission to send Marcellus gas south – including to Georgia[.]" *Id*. "Marcellus Shale gas will, via the Transco [pipeline], be at least some of, *if not the primary*, source for gas exported from the Elba Island facility." *Id*. (emphasis added).

In January 2017, Cabot said that the "anticipated pricing" for gas transported on facilities made available by Atlantic Sunrise will be based on two market areas: the D.C. market area (where Cove Point is located) and the Gulf Coast market area (where multiple export facilities are located). *See* Cabot, Investor Presentation at 20, Jan. 2017 (Ex. 1). Thus, Cabot anticipates selling its gas based on prices for exporting. As explained above, Cabot has subscribed to approximately half of the capacity on Atlantic Sunrise. Therefore, FERC's assumption that the "vast majority of natural gas transported through the firm capacity under the Project would be consumed domestically" is not supported by the available evidence and is not rational. FEIS at 1-10.

Intervenors raised these issues regarding Cabot in comments on the FEIS. *See* FEIS Comments at 8-10. Nevertheless, FERC issued the Certificate Order without addressing any of these concerns. FERC's refusal to seriously assess whether gas transported by the Atlantic Sunrise pipeline is intended primarily for export is a critical issue going to the heart of the purpose and need for the Project and the alternatives analysis. This is especially important in proceedings such as this where Transco could seize people's land through eminent domain so the gas industry can profit by selling gas to foreign countries. Had Transco announced that Atlantic Sunrise was intended to export northern Pennsylvania shale gas through terminals at Cove Point and along the Gulf Coast, the Project likely would have received greater scrutiny from the public and elected officials. FERC's failure to make any investigation into the true public need for the project renders its EIS deficient and seriously undermines its conclusion pursuant to Section 7 of

the Natural Gas Act that the Atlantic Sunrise Project is "required by the present or future public convenience and necessity."

**D. FERC violated NEPA by failing to take a hard look at the direct and indirect effects of the Atlantic Sunrise Project on waterbodies and wetlands.**

FERC failed to take a "hard look" at the direct and indirect effects of the Atlantic Sunrise Project on waterbodies and wetlands. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). Direct effects "are caused by the action and occur at the same time and place." 40 C.F.R. § 1508.8(a). Indirect effects "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id*. § 1508.8(b).

FERC acknowledges that it received a number of comments regarding potential effects on waterbodies and exceptional value wetlands as a result of construction and operation of the Atlantic Sunrise Project. *See* Certificate Order at PP 86, 89; *see also* Intervenors' DEIS Comments at 9-14. Nonetheless, FERC asserts that implementation of mitigation measures will result in no long-term adverse impacts on surface water resources and will reduce impacts on exceptional value wetlands to less than significant levels. *See* Certificate Order at PP 87, 91. Past experience demonstrates, however, that inclusion of such measures is insufficient to prevent significant adverse impacts to water resources.

FERC must support with substantial evidence its conclusion that proposed mitigation measures would protect water resources during construction and operation of the Atlantic Sunrise Project. *See New York v. U.S. Nuclear Reg. Comm'n*, 589 F.3d 551, 555 (2d Cir. 2009). Insufficient mitigation measures, even if longstanding in their use, are still insufficient. *See Summit Petroleum Corp. v. U.S. E.P.A.*, 690 F.3d 733, 746 (6th Cir. 2012). "[T]o ensure that environmental effects of a proposed action are fairly assessed, the probability of the mitigation measures being implemented must also be discussed." CEQ, Forty Most Asked Questions

Concerning CEQ's National Environmental Policy Act Regulations, 19b (1981), *available at* https://energy.gov/sites/prod/files/G-CEQ-40Questions.pdf. Both the EIS and Record of Decision should indicate "the likelihood that such measures will be adopted or enforced by the responsible agencies." *Id*. "If there is a history of nonenforcement or opposition to such measures, the EIS and Record of Decision should acknowledge such opposition or nonenforcement." *Id*. FERC has failed to satisfy these requirements.

FERC has a history of nonenforcement of mitigation measures in Pennsylvania. For example, in December 2014, the Pennsylvania Department of Environmental Protection ("DEP") announced that it had reached an $800,000 settlement agreement with Tennessee Gas Pipeline Company, LLC for "multiple violations of the [Pennsylvania] Clean Streams Law during the construction of [the 300 Line Project] in 2011 and 2012 through four counties in northeast and north-central Pennsylvania." *See* Allegheny Defense Project's April 29, 2015 Comments, Attachment 1 (Accession No. 20150429-5518). According to DEP's press release:

> During 73 inspections of the "300 Line Project," inspectors with the Potter, Susquehanna, Wayne and Pike County Conservation Districts discovered violations including the discharge of sediment pollution into the waters of the commonwealth, some of which are protected as "High Quality" or "Exceptional Value Waters," and failure to implement required construction best management practices to protect water quality.

*Id*.

FERC has acknowledged that in constructing the 300 Line Project, Tennessee Gas Pipeline Company "violated state clean water laws even through [its] EA had previously determined that the company's environmental construction plan and assurances made in the application would protect the environment during and following construction." *Tennessee Gas Pipeline Co., L.L.C.*, 156 FERC ¶ 61,156, P 74 (2016). FERC insisted, however, that "the fact that issues arose during construction of [the 300 Line Project] is not indicative of a generic

weakness in our general mitigation requirements." *Id*. at P 78. FERC offered no reasoning or evidence to support that conclusion. Moreover, FERC did not address the issue of likelihood of enforcement of its mitigation measures, whether the applicant is Tennessee Gas or Transco.

At no point in the construction of the 300 Line Project did FERC issue a stop work order. *See* Docket No. CP09-444-000. If county conservation districts are issuing notices of violation for impacts to high-quality and exceptional value waterways, it should be apparent that either the approved mitigation measures are insufficient or that FERC is not adequately enforcing mitigation measures (or both). This history of nonenforcement underscores the need for FERC to fully detail proposed mitigation measures and assess the likelihood of success of those measures – and how they will be enforced in a manner that is substantially improved from what occurred during construction of the 300 Line Project. FERC has failed to do so. FERC should rescind the Certificate Order and prepare a revised EIS.

**E. FERC violated NEPA by failing to consider the indirect effects of induced gas production.**

FERC violated NEPA by failing to take a hard look at the indirect effects of the Atlantic Sunrise Project, including induced gas drilling in the Marcellus and Utica shale formations in northern Pennsylvania. FERC claims that:

> [T]he environmental effects resulting from natural gas production are generally neither sufficiently causally related to specific natural gas infrastructure projects nor are the potential impacts from gas production reasonably foreseeable such that the Commission could undertake a meaningful analysis that would aid our determination.

Certificate Order at P 130 (citing *Central New York Oil and Gas Co., LLC*, 137 FERC ¶ 61,121, at PP 81-101 (2011), *order on reh'g*, 138 FERC ¶ 61,104, at PP 33-49 (2012), *petition for review dismissed sub nom. Coalition for Responsible Growth v. FERC*, 485 Fed. Appx. 472, 474-75 (2012) (unpublished opinion)). Contrary to FERC's assertions, the indirect effects of shale gas

development in the Marcellus and Utica shale formations are sufficiently causally related to the Atlantic Sunrise Project and reasonably foreseeable, such that FERC should have taken those impacts into consideration in the FEIS. FERC's failure to do so renders the FEIS invalid.

**1. There is a sufficient causal relationship between the Atlantic Sunrise Project and induced shale gas extraction in the Marcellus and Utica shale formations.**

FERC claims that "the environmental effects resulting from natural gas production" are not "sufficiently causally related to specific natural gas infrastructure projects" such as the Atlantic Sunrise Project. Certificate Order at P 130. Although FERC admits "that natural gas . . . transportation facilities are . . . required to bring domestic natural gas to market[,]" FERC nonetheless insists that this "does not mean, however, that [its] approval of this particular pipeline project will cause or induce the effect of additional or further shale gas production." *Id*. at P 133. FERC relies, in large part, on the Second Circuit's unpublished summary order in *Coalition for Responsible Growth*. *See id*. at PP 130, 134. Under the Local Rules of Civil Procedure from the Second Circuit, such an order has no precedential effect. 2nd Cir. L.R. 32.1.1. Unsurprisingly, for a summary order, that decision offered no independent analysis but merely accepted FERC's rationale on the specific case at issue. *See* 485 Fed. Appx. 472, 2012 WL 1596341 (2d Cir. 2012); *see also Central New York Oil and Gas Co., LLC*, 137 FERC § 61,121, at PP 81-101 (2011), *order on reh'g*, 138 FERC ¶ 61,104, at PP 33-49 (2012).

An examination of the case law reveals why FERC acted arbitrarily when it failed to consider Marcellus and Utica shale gas extraction activities as an indirect effect of the Atlantic Sunrise Project. FERC relies on both *Metropolitan Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766 (1983) and *Department of Transportation v. Public Citizen*, 541 U.S. 752 (2004) in its decision, *see* Certificate Order at P 127, but neither case supports for FERC's position that the Atlantic Sunrise Project and shale gas development are not "sufficiently

causally related." *Metropolitan Edison* was the first case in which the U.S. Supreme Court used the term "reasonably close causal relationship" in the context of NEPA. 460 U.S. 766 (1983). In that case, citizens argued that the Nuclear Regulatory Commission had impermissibly permitted renewed operation at the Three Mile Island Nuclear facility because the agency failed to consider the psychological impact of its action. The Court, however, said that "NEPA addresses *environmental* effects of federal actions," *id*. at 778 (emphasis added), and that the psychological effect from the risk of a nuclear accident "is not an effect on the physical environment." *Id*. at 775. In other words, the Court concluded that threat of psychological harm is outside the zone of interests that NEPA was intended to address. Unlike the psychological harm resulting from the risk of a nuclear accident in *Metropolitan Edison*, the impacts related to reasonably foreseeable Marcellus and Utica shale gas drilling involve harms to the environment.

The Court relied on *Metropolitan Edison* in its decision in *Public Citizen*. *See* 541 U.S. 752, 767. *Public Citizen* involved a challenge to rules promulgated by the Federal Motor Carrier and Safety Administration ("FMCSA"). The plaintiffs claimed that FMCSA failed to consider the increased emissions that would result from the lifting of a presidential moratorium on the cross-border operation of Mexican motor carriers. The Court, however, noted that FMCSA had no discretion to deny registration of motor carriers that met the requirements of 49 U.S.C. § 13902(a)(1), none of which addressed environmental impacts. *Id*. at 779 (agency "ha[d] no ability to prevent a certain effect due to its limited statutory authority"). *See Florida Wildlife Federation v. U.S. Army Corps of Engineers*, 401 F.Supp.2d 1298, 1324-25 (S.D. Fla. 2005). In other words, since Congress mandated that FMCSA register motor carriers that satisfied the requirements of 49 U.S.C. § 13902(a)(1), there was no "reasonably close causal relationship" between FMCSA's actions and increased emissions. *Id*. at 768 (because agency "ha[d] no ability categorically to prevent the cross-border operations of Mexican motor carriers, the

environmental impact of the cross-border operations would have [had] no effect on [agency's] decisionmaking – [and agency] simply lack[ed] the power to act on whatever information might be contained in the EIS"). Here, unlike the agency involved in *Public Citizen*, FERC has discretion and can act on the information regarding these impacts. FERC can attach conditions to a certificate, or deny an application if is not required by the public convenience and necessity, which includes environmental considerations. *See* 15 U.S.C. § 717f(e). Because FERC has statutory authority to deny the certificates or set conditions on them, it is a legally relevant cause of the downstream impacts. *Ctr. for Biological Diversity*, 538 F.3d at 1213 (distinguishing *Department of Transportation v. Public Citizen*, 541 U.S. 752 (2004)). When an agency has authority to prevent the relevant effects, as FERC does here, "*Public Citizen*'s limitation on NEPA does not apply." *Or. Natural Res. Council Fund v. Brong*, 492 F.3d 1120, 1134 n. 20 (9th Cir. 2007).

The Ninth Circuit has said that an agency must consider something as an indirect effect if the agency action and the effect are "two links of a single chain." *Sylvester v. U.S. Army Corps of Engineers*, 884 F.2d 394, 400 (9th Cir. 1989). The Atlantic Sunrise Project and gas extraction in the Marcellus and Utica shale formations are two such links of a single chain. FERC admits as much in the Certificate Order, acknowledging that "[t]he fact that natural gas production and transportation facilities are all components of the general supply chain required to bring domestic natural gas to market is not in dispute." Certificate Order at P 133. Moreover, FERC recently stated that "the availability of pipeline and storage capacity *determines which supply basins are used and the amount of gas that can be transported from producers to consumers.*" FERC, Energy Primer, p. 6 (Nov. 2015) (emphasis added), *available at* https://www.ferc.gov/market-oversight/guide/energy-primer.pdf. Similarly, a recent report by Morningstar stated:

> As long as producers are financing this pipeline build-out and paying for the firm service, *it is likely that pipeline expansions out of the Marcellus will be met with increased production.* Producers are paying for the firm services with incremental revenue from new production.

Morningstar, Marcellus Takeaway Capacity and Utilization Outlook, at 2 (Oct. 1, 2015) (emphasis added), *available at* http://www.morningstarcommodity.com/Research/MarcellusTakeawayUpdatetm_.pdf.

A recent EIS prepared by the Surface Transportation Board ("Board") demonstrates why FERC's logic is incompatible with NEPA. In April 2015, the Board published a DEIS for the Tongue River Railroad Company's ("TRRC") proposal to build a railroad to transport coal to market. *See* Board, Tongue River Railroad DEIS, *available at* https://www.stb.gov/decisions/readingroom.nsf/fc695db5bc7ebe2c852572b80040c45f/e7de39d1f6fd4a9a85257e2a0049104d?OpenDocument. According to the Board, the proposed railroad would "transport low-sulfur, subbituminous coal from proposed mine sites yet to be developed in Rosebud and Powder River Counties, Montana." FEIS Comments, Ex. 2 at C.1-2. The Board continued that, "[b]ecause the Tongue River region contains additional quantities of coal, future rail traffic could also include shipments of coal from other mines whose development could be induced by the availability of a nearby rail line." *Id*. As a result, the Board prepared an analysis of various coal production scenarios in southeastern Montana should the Board approve the railroad. The Board's analysis included consideration of domestic and export markets, coal production costs, transportation routes, and emissions forecasts. The results of the analysis revealed that approval of the railroad was likely to induce the development of at least two additional coal mines in southeastern Montana. *Id*. at C.3-1.

The Board's decision to consider induced coal production in its review of TRRC's proposed railroad is important because, just as FERC has no jurisdiction over gas production, the

Board has no jurisdiction over coal production. Nevertheless, the Board did not completely ignore its obligation under NEPA to consider indirect effects. Rather, it prepared a review of likely coal production scenarios that could occur should it approve TRRC's project.

Here, four of the shippers financing the Atlantic Sunrise Project are gas exploration and production companies.[3] *See* Certificate Order at P 11. These four companies represent over 87% of the Project's subscribed capacity. *Id*. FERC states that "producers who subscribe to firm capacity on a proposed project on a long-term basis presumably have made a positive assessment of the potential for selling gas to end-use consumers and have made a business decision to subscribe to the capacity on the basis of that assessment." *Id*. at P 29. In order to sell that gas, it must first be produced, which requires drilling new wells – and therefore impacting more and more land, water, and air on a routine basis. According to FERC, at the median 30-day initial gas production rate, "about 340 gas wells would be required to provide the 1.7 MMDth of gas required for the Atlantic Sunrise Project." FEIS at 4-283. Due to well production declines over time, however, "the actual number of wells necessary to supply the Atlantic Sunrise Project over many years would be much higher." *Id*. Intervenors highlighted where such production is likely to occur in previous comments. *See* Intervenors' DEIS Comments at 25-27; Intervenors' Comments on Need for Revised or Supplemental DEIS at 12-14. FERC ignored these comments.

FERC relies on the Ninth Circuit's decision in *Morongo Band of Mission Indians v. FAA*, 161 F.3d 569 (9th Cir. 1998), to support its non-compliance with NEPA. *See* Certificate Order at P 130. In that case, the court considered whether the FAA's proposed rerouting of certain flight paths would have "growth-inducing" impacts. 161 F.3d 569, 580. The court likened the case to a previous decision involving similar facts where it emphasized that a plan to reroute flight paths

[3] The four exploration and production companies are Cabot Oil & Gas Corporation, Chief Oil & Gas LLC, Inflection Energy LLC, and Seneca Resources Corporation (a subsidiary of National Fuel Gas Corporation). *See* Certificate Order at P 11.

was focused on "existing air traffic." *Morongo Band*, 161 F.3d 569, at 580 (citing *Seattle Community Council Fed'n v. FAA*, 961 F.2d 829, 835 (9th Cir. 1992)). In other words, the rerouting of flight paths at the airport did not "induce" growth but simply rearranged "existing air traffic." Thus, the "increased" air traffic was not considered to be a growth-inducing effect. *Id*. Here, as explained above, the Atlantic Sunrise and associated projects are not simply a "rearranging" of existing gas production, but a direct stepping stone to further gas development.

FERC also relies on two recent D.C. Circuit decisions in support of its refusal to consider shale gas development as an indirect effect. *See* FEIS at 4-281, n. 41 (citing *Sierra Club and Galveston Baykeeper v. FERC*, No. 14-1275, slip op., at 16 (D.C. Cir. June 28, 2016); *Sierra Club v. FERC*, No. 14-1249, slip op., at 13-14 (D.C. Cir. June 28, 2016)). These cases are inapposite. *Sierra Club and Galveston Baykeeper* involved a unique statutory scheme governing the review and approval of liquefied natural gas export terminals. The Department of Energy ("DOE") has statutory authority over the export of natural gas. 42 U.S.C. § 7151(b). DOE delegated authority to FERC to approve or deny the construction and operation of particular export facilities, but the court found that export decisions remained "squarely and exclusively within the [DOE's] wheelhouse." *See Sierra Club and Galveston Baykeeper*, No. 14-1275, slip op., at 14 (D.C. Cir. June 28, 2016). "[O]bjections concerning the environmental consequences stemming from the actual export of natural gas…, including increased emissions and induced production, [were] raised in [a] parallel challenge to the [DOE's] order authorizing" exports, and the court concluded that "any such challenges to the environmental analysis of the export activities themselves must be raised in a petition for review from [DOE's] decision to authorize exports." *Id.* Here, on the other hand, it is FERC's decision alone whether to approve construction and operation of the Atlantic Sunrise Project for its intended purpose of increasing capacity to transport additional volumes of shale gas. The NGA does not place any portion of

that decision in the "wheelhouse" of any other agency. Because FERC possesses the power to act on whatever information might be contained in this EIS, it must consider these impacts. *Ctr. for Biological Diversity*, 538 F.3d at 1216-17. Moreover, no other agency is in a position to conduct NEPA review of the environmental consequences of these effects. If FERC is relieved of its obligation to evaluate upstream impacts, those impacts will remain unevaluated.

The court rested on similar reasoning to support its decision in *Sierra Club*. *See Sierra Club v. FERC*, No. 14-1249, slip op., at 13-14 (June 28, 2016). Adopting FERC's reading of these cases would eviscerate NEPA's requirement agencies evaluate a project's indirect effects, *see* 40 C.F.R. § 1508.8(b). Finally, FERC argues that other factors "such as domestic natural gas prices and production costs drive new drilling." Order at P 136. The fact that other factors may influence drilling does not mean that additional pipeline capacity does not drive additional shale gas development. *See* Energy Information Administration, Spread between Henry Hub, Marcellus natural gas prices narrows as pipeline capacity grows (Jan. 27, 2016), *available at* http://www.eia.gov/todayinenergy/detail.cfm?id=24712 (shale gas production contingent on price, available infrastructure).

Thus, the Atlantic Sunrise Project and gas drilling in the Marcellus and Utica shale formations are "two links of a single chain." *Sylvester*, 884 F.2d 394, 400 (9th Cir. 1989). Even though 87% of the capacity of Atlantic Sunrise has been subscribed by gas producers, FERC completely ignored indirect effects of induced gas drilling. Because this failure renders FERC's NEPA analysis deficient, FERC should rescind its Certificate Order and prepare a revised EIS.

**2. Induced gas drilling in the Marcellus and Utica shale formations is reasonably foreseeable.**

FERC further violated NEPA by refusing to consider the reasonably foreseeable indirect effects of induced shale gas drilling as reasonably foreseeable. An indirect effect is "reasonably

foreseeable" if it is "sufficiently likely to occur that a person of ordinary prudence would take it into account in reaching a decision." *Sierra Club v. Marsh*, 976 F.2d 763, 767 (1st Cir. 1992). "[W]hen the *nature* of the effect is reasonably foreseeable but its *extent* is not, [an] agency may not simply ignore the effect." *Mid States Coalition for Progress v. Surface Transp. Bd.*, 345 F.3d at 549 (emphasis in original); *see also Habitat Educ. Center v. U.S. Forest Serv.*, 609 F.3d 897, 902 (7th Cir. 2010). Reasonable forecasting and speculation is "implicit in NEPA, and we must reject any attempt by agencies to shirk their responsibilities under NEPA by labeling any and all discussion of future environmental effects as 'crystal ball inquiry.'" *Delaware Riverkeeper*, 753 F.3d at 1310 (quoting *Scientists' Inst. for Pub. Info. v. Atomic Energy Comm'n*, 481 F.2d 1079, 1092 (D.C. Cir. 1973)); *see also Northern Plains Resource Council v. Surface Transp. Bd.*, 668 F.3d 1067, 1078-79 (9th Cir. 2011).

Here, a person of ordinary prudence would take Marcellus and Utica shale gas drilling into account before reaching a decision about whether to approve the Atlantic Sunrise Project. Moreover, FERC is well aware of the nature of the effects of shale gas development and may not simply ignore the effect because it does not know the precise location and timing of future development. Yet, that is precisely what FERC did in the FEIS and Certificate Order.

According to FERC, "even if a causal relationship between our action here and additional production were presumed, the scope of the impacts from any such induced production in this case is not reasonably foreseeable." Certificate Order at P 137. Even if FERC knows "the identity of a producer of gas to be shipped on a pipeline, and the general area where that producer's existing wells are located," FERC claims that "does not alter the fact that the number and location of any additional wells cannot be identified in this proceeding." *Id*. As noted above, however, such reasonable forecasting is implicit in NEPA. *Delaware Riverkeeper*, 753 F.3d at

1310; *Northern Plains*, 668 F.3d at 1078-79 (9th Cir. 2011). And FERC can certainly predict the nature of such effects even if it cannot precisely anticipate their magnitude.[4]

FERC's failure to assess these impacts "require[s] the public, rather than the agency" to ascertain the effects of the Project. *Te-Moak Tribe of Western Shoshone of Nevada v. U.S. Dep't of the Interior*, 608 F.3d 592, 605 (9th Cir. 2010). This "thwart[s] one of the 'twin aims' of NEPA – to 'ensure[ ] that the *agency* will inform the *public* that it has indeed considered environmental concerns in its decision making process.'" *Id*. (*quoting Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983)) (emphasis added by Ninth Circuit). Compliance with NEPA "is a primary duty of every federal agency; fulfillment of this vital responsibility should not depend on the vigilance and limited resources of environmental plaintiffs." *City of Carmel-by-the-Sea v. U.S. Dept. of Transp.*, 123 F.3d 1142, 1161 (9th Cir. 1997) (*quoting City of Davis v. Coleman*, 521 F.2d 661, 671 (9th Cir. 1975). *See also Center for Biological Diversity v. U.S. Forest Serv.*, 349 F.3d 1157, 1166 (9th Cir. 2003) ("The procedures prescribed both in NEPA and the implementing regulations are to be strictly interpreted 'to the fullest extent possible' in accord with the policies embodied in the Act….'[g]rudging, pro forma compliance will not do.'") (citations omitted)).

Finally, FERC should consider former Commissioner Norman Bay's recent statements on the need for FERC to consider the environmental impacts of shale gas development. Commissioner Bay noted that "[d]espite the growing importance of Marcellus and Utica gas production . . . the Commission has never conducted a comprehensive study of the environmental consequences of increased production from that region." *National Fuel Gas Supply Corp.*, 158 FERC ¶ 61,145 at 4-5 (Feb. 3, 2017) (Bay, Commissioner, Separate

[4] Moreover, FERC is aware of the capacity of the pipeline and should be able to make an informed prediction about the number of wells that would produce that amount of gas.

Statement). Commissioner Bay continued that "in light of the heightened public interest and in the interests of good government, I believe the Commission should analyze the environmental impacts of increased regional gas production from the Marcellus and Utica." *Id.* at 5. Commissioner Bay also stated that "the Commission should also be open to analyzing the downstream impacts of the use of natural gas and to performing a life-cycle greenhouse gas emissions study[.]" *Id.* Such information "may be of use to the Commission, the public, and industry in examining the broader issues raised in certification proceedings." *Id.*

Intervenors respectfully request that FERC heed the advice of its most recent Chairman. There is a clear causal relationship between the Atlantic Sunrise Project and shale gas development and that development is reasonably foreseeable. The FEIS failed to consider gas drilling in the Marcellus and Utica shale formations as an indirect effect of the Project and, therefore, violates 40 C.F.R. § 1508.8(b). FERC should withdraw the Certificate Order and prepare a revised EIS that provides an analysis of "the environmental impacts of increased regional gas production from the Marcellus and Utica." *National Fuel Gas Supply Corp.*, 158 FERC ¶ 61,145 at 5 (Feb. 3, 2017) (Bay, Commissioner, Separate Statement).

**F. FERC violated NEPA by failing to take a hard look at the cumulative impacts of the Atlantic Sunrise Project and other past, present, and reasonably foreseeable future actions, including shale gas development.**

FERC violated NEPA by failing to take a hard look at the cumulative impacts of the Atlantic Sunrise Project in conjunction with other past, present, and reasonably foreseeable future actions, including shale gas development in the Marcellus and Utica shale formations. A cumulative impact is the:

> impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions **regardless of what agency (Federal or non-Federal) or person undertakes such other actions**. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7 (emphasis added). "Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts." 40 C.F.R. § 1508.27(b)(7). Cumulative impact analyses that contain "cursory statements" and "conclusory terms" are insufficient. *See Delaware Riverkeeper*, 753 F.3d at 1319-20; *see also Natural Resources Defense Council v. Hodel*, 865 F.2d 288, 298 (D.C. Cir. 1988) (although "FEIS contains sections headed 'Cumulative Impacts,' in truth, nothing in the FEIS provides the requisite analysis," which, at best, contained only "conclusory remarks").

Commenters explained at length in their comments on the DEIS that FERC's cumulative impacts analysis was substantially flawed. *See* DEIS Comments at 41-69. In response, FERC claimed that its cumulative impacts analysis is "consistent with the methodology set forth in relevant guidance (CEQ, 1997b, 2005; EPA, 1999)." FEIS at 4-274. FERC's analysis, however, is anything but consistent with the guidance that FERC cites. In the Certificate Order, FERC addressed cumulative impacts in just two paragraphs about climate change and safety. *See* Certificate Order at PP 147-48. Nowhere in its decision did FERC address cumulative impacts on water resources, vegetation and wildlife, fisheries, land use, or air quality. FERC did not take a "hard look" at the cumulative impacts of the Atlantic Sunrise Project.

Moreover, FERC's cumulative impacts analysis is flawed because it imprperly limited the analysis area. FERC states that "[f]or the most part, the area of potential cumulative impact is limited to the area directly affected by the Project and areas surrounding the Project." FEIS at 4-274. Based on this limited analysis area, FERC concluded that, "as a whole, minimal cumulative effects are anticipated when the impacts of the [Atlantic Sunrise] Project are added to the identified ongoing actions *in the immediate area*." *Id*. at 4-320 (emphasis added). Such a limited

20170224-5106 FERC PDF (Unofficial) 2/24/2017 12:31:59 PM

cumulative impacts analysis is inconsistent with both the Council on Environmental Quality's ("CEQ") and Environmental Protection Agency's ("EPA") guidance on cumulative impacts.

The CEQ guidance recommends significantly expanding the cumulative impacts analysis area beyond the "immediate area of the proposed action" that is often used for the "project-specific analysis" related to direct and indirect effects:

> For a project-specific analysis, it is often sufficient to analyze effects within the immediate area of the proposed action. When analyzing the contribution of this proposed action to cumulative effects, however, the geographic boundaries of the analysis *almost always should be expanded*. These expanded boundaries can be thought of as differences in hierarchy or scale. Project-specific analyses are usually conducted on the scale of counties, forest management units, or installation boundaries, *whereas cumulative effects analysis should be conducted on the scale of human communities, landscapes, watersheds, or airsheds*.

CEQ, Considering Cumulative Effects under the National Environmental Policy Act, p. 12 (1997) (emphasis added). *See Andrus v. Sierra Club*, 442 U.S. 347, 357-58 (1979) (CEQ entitled to substantial deference in interpreting NEPA). CEQ further says that it may be necessary to look at cumulative effects at the "ecosystem" level for vegetative resources and resident wildlife, the "total range of affected population units" for migratory wildlife, an entire "state" or "region" for land use, and the "global atmosphere" for air quality. *Id*. at 15. FERC's selected regions of influence for forested lands, forested and scrub-shrub wetlands, and air quality are not consistent with the requirements of NEPA.

EPA's guidance states that "[s]patial and temporal boundaries should not be overly restrictive in cumulative impact analysis." EPA, Consideration of Cumulative Impacts in EPA Review of NEPA Documents, p. 8 (1999). EPA specifically cautions agencies to not "limit the scope of their analyses to those areas over which they have direct authority or to the boundary of the relevant management area or project area." *Id*. Rather, agencies "should delineate appropriate geographic areas including *natural ecological boundaries*" such as ecoregions or watersheds. *Id*.

(emphasis added). Therefore, FERC's assertion that, "for the most part, the area of potential cumulative impact is limited to the area directly affected by the Project and areas surrounding the Project," is plainly inconsistent with NEPA's requirement to analyze cumulative impacts. As a result, the cumulative impacts analysis is fatally flawed and cannot support FERC's conclusion that there will be "minimal cumulative effects" associated with construction and operation of the Atlantic Sunrise Project.

There are also unexplained inconsistencies between the DEIS and FEIS in FERC's evaluation of natural gas development. In the DEIS, FERC stated that its cumulative impacts analysis included "natural gas well permitting and development projects . . . within 10 miles of the Atlantic Sunrise Project." DEIS at 4-259. In the FEIS, however, FERC removed this language and instead pointed the reader to Appendix Q, where other "major actions" were listed in a 35-page table. While at first glance it seems that FERC used the same 10-mile region of influence for natural gas development projects, FERC added a footnote pointing the reader to Appendix I for further information about these projects. Appendix I indicates that FERC only considered natural gas wells and facilities within 0.25 mile of the Atlantic Sunrise Project, a significant reduction from the (already truncated) 10-mile region of influence in the DEIS. As a result, FERC only included 47 "oil/gas wells" in its cumulative impacts analysis. *See* FEIS, App. I.

This does not constitute a "hard look" at the cumulative environmental impacts of past, present, and reasonably foreseeable natural gas development. The counties[5] in which the CPL North, the northern portion of the CPL South, and the Unity and Chapman Loops would be

[5] The CPL North would be located in Susquehanna, Wyoming, Luzerne, and Columbia Counties. The northern portion of the CPL South would be located in Columbia County. The Unity Loop would be located in Lycoming County. The Chapman Loop would be located in Clinton County. *See* FEIS at 2-6.

located have experienced extensive natural gas development activities over the past decade. Since 2007, gas companies have drilled at least 2,637 unconventional shale gas wells in Susquehanna, Wyoming, Luzerne, Columbia, Lycoming, and Clinton counties. *See* Intervenors' FEIS Comments, Ex. 5. Despite the fact that these counties and the proposed project facilities within them are located within the Susquehanna River watershed, there is no analysis of the cumulative impacts of natural gas development at a watershed, or even subwatershed, level (beyond FERC's arbitrary 0.25-mile region of influence).

FERC claimed elsewhere in the FEIS that it took a broader view of natural gas development in Susquehanna County. *See* FEIS at 4-277. The FEIS contains a map allegedly showing "natural gas development near the Atlantic Sunrise Project in Susquehanna County." *Id*. While this map shows some aspects of Williams' midstream facilities, the map does not identify any gas wells. This is a major oversight considering that at least 1,338 shale gas wells have been drilled in Susquehanna County since 2007. *See* Intervenors' FEIS Comments, Ex. 5; DEIS Comments at 45, Figure 1 (map showing the large number of shale gas wells drilled in Susquehanna County). Nor does the map identify all of the access roads that have been constructed to access these wells.

The construction of new roads and over 1,300 well sites in the same watershed as the Project is highly likely to cumulatively impact the water resources of the watershed. Nevertheless, FERC stated that "impacts from shale gas development outside of the geographic scope of cumulative impacts assessed for the Project [i.e., 0.25-mile], including those related to water quality and tree clearing, are not within the purview of the analysis for the Project." FEIS, Vol. III, CO-82. Thus, FERC failed to take a hard look at the cumulative impacts of the Project and past, present, and reasonably foreseeable shale gas development on the impacted watershed.

FERC also substantially understated the cumulative impacts of the Atlantic Sunrise Project and gas development on wildlife and interior forests. For example, FERC identified "157 migratory bird species [that] are regular breeders in project counties" in Pennsylvania. FEIS at 4-96. According to Transco, the pipeline would cross 44 interior forests along CPL North and South and one interior forest associated with Chapman Loop, affecting over 262 acres of interior forest habitat during construction. *Id*. at 4-83. Of this acreage, over 118 acres of interior forest would be permanently eliminated and converted to forest edge habitat as part of the pipeline right-of-way. *Id*.

Despite these impacts, neither Transco nor FERC have obtained a Migratory Bird Treaty Act ("MBTA") permit from the U.S. Fish & Wildlife Service ("USFWS"). The MBTA prohibits persons, entities or, in some cases, agencies, from pursuing, hunting, taking, capturing, or killing "any migratory bird, . . . nest, or egg of any such bird" without a permit or other exemption. *See* 16 U.S.C. § 703(a). FERC's authorization of Atlantic Sunrise would allow Transco to clear hundreds of acres of interior forests. FERC acknowledged that "[h]abitat removal and/or modification of existing habitats during construction and the long-term or permanent conversion of habitats associated with tree clearing and the maintenance of rights-of-way" will impact migratory birds. FEIS at 4-98. Nevertheless, FERC issued a certificate before either FERC or Transco obtained the proper MBTA permit from the USFWS. Unless Transco acquires a MBTA permit, it would be arbitrary and capricious for FERC to issue a notice to proceed upon a finding Transco acquired all necessary permits.

FERC acknowledged that "Marcellus shale development would also contribute to the cumulative vegetation and wildlife impacts," *see* FEIS at 4-300, but the subsequent analysis falls well short of NEPA's hard look requirement. For example, while FERC estimated that 3,060 acres of land (much of it probably forested) could be cleared in a year as shale gas wells are

constructed to supply Atlantic Sunrise, there is no analysis of past and present cumulative impacts of shale gas development. As stated above, FERC only included 47 oil/gas wells within 0.25-mile of the Project area. *See* FEIS, App. I. This ignores thousands of existing shale gas wells that have been drilled in northern Pennsylvania since 2007. *See* Intervenors' FEIS Comments, Ex. 5. Without a proper baseline of how shale gas development has already impacted interior forest habitat in this region, FERC cannot properly gauge the severity of impacts to these forests and the wildlife that depends on them, such as migratory birds.

FERC also relied on outdated and incomplete data to mischaracterize the current condition of interior forests. For example, FERC cites to a 2013 Forest Service inventory of Pennsylvania's forests to claim that forest losses in the Southern Tier of Pennsylvania "have been offset by gains resulting from agriculture declines in the Northern Tier counties (U.S. Forest Service, 2013)." FEIS at 4-85. While this report was published in 2013, the data range used in the report was from 2004-2009. *See* Intervenors' FEIS Comments, Ex. 6. This is significant because the report did not include the impacts of shale gas development between 2009 and the present, a time period in which thousands of new wells have been drilled in Pennsylvania's Northern Tier. The 2013 Forest Service report, in fact, acknowledged the growing threat that gas development posed to interior forests:

> Forest fragmentation and increased urbanization can create conduits for the introduction and spread of invasive species. Pennsylvania contains abundant roads and other fragmenting features. The exception occurs in the north-central reaches of the State where large blocks of public forests are common. Marcellus shale gas development is contributing to forest fragmentation and could potentially threaten interior forest of this region[.]

FEIS Comments, Ex. 6 at 12. The report, however, contained no analysis of the impacts of shale gas development on these interior forests in northern Pennsylvania. Thus, it was improper for FERC to rely on this report to claim that forest losses in Pennsylvania's Southern Tier "have

been offset by gains resulting from agriculture declines in the Northern Tier counties" because the report on which that claim is based is outdated and contradicted by more recent evidence. Whatever forest gains have resulted from agriculture declines in the Northern Tier counties are themselves being offset by forest clearing for road construction and development of well pads, wastewater pits, pipelines, gathering lines, compressor stations, and other infrastructure associated with gas development. The FEIS, however, contained no analysis of these impacts on interior forests or wildlife, including migratory birds. Therefore, FERC failed to take a hard look at the cumulative impacts of the Project and past, present, and reasonably foreseeable gas development on these resources.

FERC also failed to adequately consider cumulative impacts on land use, recreation, special interest areas, and visual resources. The FEIS addressed cumulative impacts on these resources in just four paragraphs. *See* FEIS at 4-303 – 4-304. While FERC purports to include the "ongoing Marcellus shale development in Susquehanna County," FEIS at 4-304, it did not address that ongoing development in any meaningful way. Nor did FERC include other counties in the Project area where shale gas development is occurring.

As Intervenors explained in their comments on the DEIS, Seneca has specifically identified the areas where it plans to drill wells if the Atlantic Sunrise Project comes online. *See* DEIS Comments at 25-26, 32, 61, 64-65. Seneca's leases are directly connected to Transco's Leidy Line (which would be expanded with the Chapman and Unity Loops). *See* FEIS Comments, Ex. 4 at p. 16. Because Seneca's lease areas are more than 0.25 mile from the Project area, they were not included in the cumulative impacts analysis. This was arbitrary and capricious.

Finally, FERC failed to adequately consider the Project's downstream impacts on greenhouse gas ("GHG") emissions and climate change. According to FERC, "[a]ssuming that

all of the natural gas being transported is used for combustion, downstream end-use would result in about 32.9 million metric tons of $CO_2$ per year." FEIS at 4-318. FERC neither provides a satisfactory explanation for how it arrived at this number nor adequately analyzes the climate change impact of emitting millions of metric tons of carbon dioxide. Instead, FERC maintains that "increased production and distribution of natural gas would likely displace *some* use of higher carbon emitting fuels" such as fuel oil and coal, which "would result in a *potential* reduction in regional GHG emissions." *Id*. (emphasis added). FERC makes no attempt to quantify the potential emission offset. Nor does the agency offer legal authority suggesting that NEPA allows an agency to avoid an in-depth analysis of a reasonably foreseeable effect because it may be partially offset to an unknown degree. *See also* 40 C.F.R. § 1508.27(b)(1) (NEPA requires the agency to take a hard look at all environmental impacts, including beneficial impacts). Moreover, FERC fails to assess whether the gas carried on the Atlantic Sunrise would offset new renewable energy production, thus skewing its analysis in favor of the project. The possibility that *some* emissions *may* be offset to some degree does not excuse FERC's failure to thoroughly analyze downstream greenhouse gas emissions and climate change impacts. FERC's conclusory assertion that "neither construction nor operation of the Project would significantly contribute to GHG cumulative effects or climate change" is unsupported and must be remedied in a revised or supplemental EIS.

FERC's cumulative impact analysis is fatally flawed in its geographic scope and for all but ignoring the substantial impacts of Marcellus and Utica shale gas development and climate change. FERC should withdraw the Certificate Order and prepare a revised EIS that complies with NEPA.

**G. FERC improperly relied on the deficient FEIS to conclude that construction of the Atlantic Sunrise Project will "avoid unnecessary disruptions of the environment."**

FERC violated its Certificate Policy Statement by relying on the deficient FEIS to conclude that construction of the Atlantic Sunrise Project will "avoid unnecessary disruptions of the environment." *See* Certificate Order at PP 20, 33. In implementing the Certificate Policy Statement, FERC balances public benefits against adverse consequences, including consideration of the enhancement of competitive transportation alternatives, the possibility of overbuilding, subsidization by existing customers, the applicant's responsibility for unsubscribed capacity, the avoidance of unnecessary disruptions to the environment, and the unneeded exercise of eminent domain. *See id*. at P 20 (citing *Certification of New Interstate Natural Gas Pipeline Facilities*, 88 FERC ¶ 61,227 (1999), order clarified, 90 FERC ¶ 61,128, order further clarified, 92 FERC ¶ 61,094 (2000)).

FERC's factual determinations under the NGA may be upheld if they are supported by "substantial evidence," which is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *South Coast Air Quality Management District v. FERC*, 621 F.3d 1085, 1099 (9th Cir. 2010) (quoting *Bear Lake Watch, Inc. v. FERC*, 324 F.3d 1071, 1076 (9th Cir. 2003)). As explained above, FERC ignored the indirect and cumulative effects of shale gas development despite the fact that thousands of shale gas wells have been drilled in the area where the Atlantic Sunrise Project is located. Thus, there is insufficient evidence for a reasonable mind to conclude that FERC's authorization of the Atlantic Sunrise Project avoids unnecessary impacts on the environment.

**H. FERC failed to adequately and independently evaluate public need.**

FERC failed to adequately and independently evaluate the public need for the Atlantic Sunrise Project. This renders arbitrary its decision, under Section 7 of the Natural Gas Act, that the project is "required by the present or future public convenience and necessity." *See* 15 U.S.C.

§ 717f(e). FERC should withdraw the Certificate Order and perform a transparent and independent evaluation of public need for the Atlantic Sunrise Project.

Former Commissioner Bay recently explained that FERC's policy for evaluating need in certificate proceedings is outdated and lacking. According to Mr. Bay, while the policy "lists a litany of factors for the Commission to consider in evaluating need . . . in practice, the Commission has largely relied on the extent to which potential shippers have signed precedent agreements for capacity on the proposed pipeline." *National Fuel Gas Supply Corp.*, 158 FERC ¶ 61,145 at 3 (Feb. 3, 2017) (Bay, Commissioner, Separate Statement). By fixating on precedent agreements, Mr. Bay says FERC:

> [M]ay not take into account a variety of other considerations, including, among others: whether the capacity is needed to ensure deliverability to new or existing natural gas-fired generators, whether there is a significant reliability or resiliency benefit; whether the additional capacity promotes competitive markets; whether the precedent agreements are largely signed by affiliates; or whether there is any concern that anticipated markets may fail to materialize.

*Id*. Mr. Bay further warns FERC against aiding industry "boom-and-bust cycles" and overbuilding pipelines, which could leave ratepayers subject to increased costs. *Id*.

These concerns are relevant here. While FERC says it "considers all evidence submitted reflecting on the need for the project," the fact is that FERC "found that long-term commitments serve as 'significant evidence of demand for the project.'" Certificate Order at P 28 (citation omitted). FERC then points to nine project shippers that have "executed binding precedent agreements for firm service using 100 percent of the design capacity of the proposed project" as the overarching demonstration of need for the Project. *Id*.

The only destinations identified for gas to be transported on Atlantic Sunrise facilities are the "Mid-Atlantic and southeastern markets." *Id*. at P 29. The reversal of the Transco longhaul pipeline to the southeast will allow northern Pennsylvania shale gas to reach Gulf Coast export

terminals. For example, Kinder Morgan's Elba Island export terminal was approved and is currently under construction. *See* Elba Island LNG Update: Non-FTA Exports Approved, Marcellus Drilling News, Dec. 2016, *available at* http://marcellusdrilling.com/2016/12/elba-island-lng-update-non-fta-exports-approved-dump-truck-city/. Kinder Morgan also "owns and operates the 200-mile Elba Express pipeline, which connects the LNG facility to the Transco [pipeline]." *Id*. Transco's parent company, Williams, "has been on a mission to send Marcellus gas south – including to Georgia[.]" *Id*. "Marcellus Shale gas will, via the Transco [pipeline], be at least some of, *if not the primary*, source for gas exported from the Elba Island facility." *Id*. (emphasis added).

In January 2017, Cabot said that the "anticipated pricing" for gas transported on facilities made available by Atlantic Sunrise will be based on two market areas: the D.C. market area (where Cove Point is located) and the Gulf Coast market area (where multiple export facilities are located). *See* Intervenors' FEIS Comments, Ex. 1. In other words, Cabot is anticipating to sell its gas based on prices for exporting. As explained above, Cabot has subscribed to approximately half of the capacity on Atlantic Sunrise. Therefore, FERC's assumption in the FEIS that the "*vast majority* of natural gas transported through the firm capacity under the Project would be *consumed domestically* in markets along the East Coast" does not appear to be accurate. *See* FEIS at 1-10.

FERC's refusal to seriously question whether gas transported by the Atlantic Sunrise pipeline is intended primarily for export is a significant issue going to the heart of the public need for the Project. Had Transco announced that Atlantic Sunrise was intended to export northern Pennsylvania shale gas through terminals at Cove Point and along the Gulf Coast, the Project likely would have received greater scrutiny from the public and elected officials. The fact that 87% of the Project's capacity is subscribed to by four gas production companies that, upon

completion of the Project, will have direct access to export facilities, raises serious concerns that the main driver behind the Project is to provide these companies with access to higher priced markets overseas. Thus, it was improper for FERC to place significant weight on the precedent agreements as evidence of a public need for the Atlantic Sunrise Project.

## IV. FERC'S ISSUANCE OF AN ORDER GRANTING REHEARING FOR FURTHER CONSIDERATION WILL BE DEEMED A DENIAL OF INTERVENORS' REQUEST FOR REHEARING

Under the NGA, unless FERC "acts upon" a request for rehearing "within thirty days after it is filed," the request for rehearing "may be deemed to have been denied." 15 U.S.C. § 717r(a). Congress expressly defined the "acts" that FERC may take upon a request for rehearing – FERC "shall have power to grant or deny rehearing or to abrogate or modify its order without further hearing." *Id*. If FERC does not take one of these enumerated actions upon a request for rehearing within 30 days, an aggrieved party may file a petition for review in the appropriate Court of Appeals. *See* 15 U.S.C. § 717r(b).

Instead of "act[ing] upon" a request for rehearing as Congress intended, FERC often issues an "order granting rehearing for further consideration," commonly referred to as a tolling order. Although tolling orders purportedly "grant" rehearing, no such rehearing is actually granted. Rather, tolling orders simply "afford [FERC] additional time" to consider requests for rehearing beyond the statute's 30-day time period. *See e.g.*, *National Fuel Gas Supply Corp.*, Order Granting Rehearing For Further Consideration (Docket No. CP14-70-000, Accession No. 20150416-3002). FERC's use of tolling orders in NGA certificate proceedings has allowed project proponents to engage in extensive construction activities (and in some cases place facilities into service) before FERC addresses the issues raised in timely filed rehearing requests, thus effectively depriving parties of judicial review. *See* Ex. 2.

The issuance of a tolling order in response to Intervenors' request for rehearing in this proceeding will be considered a denial of rehearing. Intervenors' members will suffer irreparable harm from implementation of the Atlantic Sunrise Project. Intervenors must have an opportunity for judicial review of FERC's Certificate Order in a timely manner, as Congress intended. Therefore, if FERC issues a tolling order in response to Intervenors' request for rehearing, it will be deemed a denial of rehearing and intervenors will seek immediate review of the Certificate Order in the Court of Appeals.

## V. Motion for Stay of Certificate and Construction Pending Decision on the Merits

The standard that the Commission uses for granting a stay is whether "justice so requires." 5 U.S.C. § 705. Here, the interests of justice require that the Certificate and any potential construction be stayed pending the Commission's decision on this request for rehearing.

In addressing a motion for stay, the Commission considers "(1) whether the moving party will suffer irreparable injury without the stay; (2) whether issuing the stay will substantially harm other parties; and (3) whether the stay is in the public interest." 98 FERC ¶ 61,086. Furthermore, "[t]he key element in the inquiry is irreparable injury to the moving party." *Id*. Courts also take into account the availability of a legal remedy for the harm caused, as well as the likelihood of success on the merits.

Here, justice requires the granting of Intervenors' request for a stay. Absent such a stay, Intervenors will be left without an adequate remedy at law to address the irreparable harms inflicted by the construction. In addition, the public will permanently lose important environmental resources. If Intervenors prevail on rehearing, or prevail on judicial review, they will have already suffered irreversible harms relating to construction if such activities are

permitted to proceed. Thus, absent a stay by the Commission, meaningful judicial review could be hindered if not foreclosed.

### A. A stay is necessary to avoid irreparable injury

Absent a stay, and if construction of the project is allowed to move forward, this will cause immediate and irreparable injury to Intervenors and their members, including harm to streams, wetland systems, and forests they use, as well as other environmental impacts associated with constructing the pipelines. These environmental harms, and subsequent harms to the recreational and aesthetic interests of Intervenors' members, warrant the requested relief because they are imminent, certain, and irreparable. An injury is "irreparable" if damages are not adequate to compensate the injury. *Greater Yellowstone Coalition v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003); "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Amoco Production Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987); *see also Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 25 (D.D.C. 2009) ("[E]nvironmental and aesthetic injuries are irreparable.")

#### 1. The project impacts would cause irreparable injury

As set forth in the FEIS, there would be permanent, irreparable environmental harm from construction in the right-of-way ("ROW"). *See* FEIS at 2-8 (stating that Transco would maintain a 50-foot-wide permanent ROW along non-collocated greenfield segments of CPL North and CPL South). Clearing the ROW would involve removing topsoil, trees, shrubs, brush, roots, and large rocks, and then removing or blasting additional soil and bedrock to create a trench for the pipeline. Following construction, a permanent ROW would be maintained along the length of the Project. This Project would impact over 3,740 acres temporarily during construction as well as over 1,200 acres permanently throughout operation. *Id.* at 2-8. This easily meets the Supreme

Court's standard for irreparable harm. *Amoco Production Co.*, 480 U.S. at 545 (discussing how environmental harms are "permanent or at least of long duration, *i.e*. irreparable.").

The Project will also contribute significantly to air pollution during both construction and operation. *See* FEIS at 4-218 – 4-233. Operation of the compressor stations is also expected to emit additional tons of air pollutants over the life of the Project. *See id*. at 4-221 – 4-223. These cumulative emissions would have a long-term and therefore irreparable impact on air quality.

**2. Absent a Stay, Intervenors and Their Members Will Suffer Irreparable Injury.**

Intervenors have members who live, work and recreate along the proposed pipeline route. Intervenors members' have also been active in community meetings and protests against the pipeline. Given the nature of this project as set forth in the EIS, Intervenors' injury would be "likely" to occur. *See, e.g., Moussa I. Kourouma d/b/a Quntum Energy,* LLC, 137 FERC ¶ 61,205, 62,142 (Nov. 16, 2011); *see also Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).

**B. A stay will not substantially harm other parties.**

The injury to Intervenors, the public, and the environment outweighs any harm that a stay may cause the applicants or the Commission. If Intervenors' Request is granted, and the Certificate is revoked, applicants obviously could not possibly suffer any harm by a stay pending a final decision in this matter. And to the extent that Intervenors' Request is granted, but construction is merely delayed until applicants comply with all environmental laws and other Commission requirements, any injury from such delay would not be "damages" in a legal sense.

Economic harm is not irreparable and does not provide an adequate basis for denying a stay. *See e.g., Sampson v. Murray*, 415 U.S. 61, 90 (1974) (potential monetary injury is not irreparable). To the extent that pipeline construction is allowed once compliance with all

environmental laws has been achieved, any delays in pipeline operations would be purely temporary economic harms while the undisputed environmental harms in this case are permanent and irreversible. *See, e.g.*, *OVEC v. U.S. Army Corps of Eng's*, 528 F. Supp. 2d 625, 632 (S.D. W. Va., 2007) ("Money can be earned, lost, and earned again; a valley once filled is gone."); *San Louis Valley Ecosystem Council v. U.S. Fish & Wildlife Serv.*, 657 F. Supp. 2d 1233, 1242 (D. Colo. 2009) ("delay in drilling the exploratory wells is not irreparable. . . ."); *Alaska Center for the Env't v. West*, 31 F. Supp. 2d 714, 723 (D. Alaska 1998) (longer permit processing time was "not of consequence sufficient to outweigh irreversible harm to the environment"); *Citizen's Alert Regarding the Env't v. U.S. Dep't of Justice*, 1995 WL 748246, *11 (D.D.C. Apr. 15, 1995) (potential loss of revenue, jobs, and monetary investment that would be caused by project delay did not outweigh "permanent destruction of environmental values that, once lost, may never again be replicated.")

In any event, any injury to applicants due to prematurely proceeding with construction would be "self-inflicted" because they assumed the risk that Intervenors' request for rehearing might be granted. Such self-inflicted harm caused by "jump[ing] the gun" or "anticipat[ing] a pro forma result" in permitting applications makes the pipeline companies "largely responsible for their own harm." *Sierra Club v. U.S. Army Corps of Engineers*, 645 F.3d 978, 997 (8th Cir. 2011); *see also Davis v. Mineta*, 302 F.3d 1104, 1116 (10th Cir. 2002). Under such circumstances, the pipeline companies' assumption of the risk weighs heavily against any harm they might claim based on the issuance of a stay. *Id.*

Thus, in contrast to the irreparable injury that Intervenors and their members would suffer in the absence of a stay, any potential harm to the applicants from delaying construction to ensure compliance with the law is minimal. Granting a stay that prohibits the construction

activities authorized by the Notices to Proceed[6] would only serve to preserve the *status quo* until the parties have fully resolved their claims.

### C. A stay is in the public interest.

Because Intervenors seek to compel compliance with federal laws designed by Congress to protect the environment, and because a stay would prevent permanent environmental damage, the public interest weighs heavily in favor of granting a stay. The public interest is protected by preventing irreparable harm to the environment that will result from the construction activities. *See Nat'l Wildlife Fed'n v. Burford*, 676 F. Supp. 271, 279 (D.D.C. 1985) ("a preliminary injunction would serve the public by protecting the environment from any threat of permanent damage"). Moreover, the public interest is served by ensuring that federal agencies scrupulously comply with their statutory duties. *See Fund for Animals v. Espy*, 814 F. Supp. at 152 (finding "meticulous compliance with the law by public officials" as relevant to the public interest); *Citizen's Alert,* 1995 WL 748246, *11 (compliance with law "is especially appropriate in light of the strong public policy expressed in the nation's environmental laws" (citation omitted)). The public "has a strong interest in maintaining the balance Congress sought to establish between economic gain and environmental protection." *OVEC*, 528 F. Supp. 2d at 633.

For example, there is a strong public interest in avoiding unnecessary destruction of wetlands. *See, e.g., Utahns For Better Transp. v. U.S. Dept. of Transp.*, 2001 WL 1739458 (10th Cir. Nov. 16, 2001) ("The concern for wetlands expressed by the Clean Water Act and its implementing regulations demonstrates a strong public interest in their preservation and

---

[6] On February 8, 2017, Transco filed a Request for Partial Notice to Proceed "to fell trees prior to March 31, 2017 within 0.25-mile of a known northern long-eared bat hibernaculum in Northumberland County." *See* Request for Partial Notice to Proceed at 1 (Accession No. 20170209-5131). Transco's requests that the Director of the Office of Energy Projects approve its request no later than March 3, 2016. *Id*. at 4. Intervenors intend to supplement its motion for stay upon further requests for notices to proceed.

maintenance…. [and] the public has an interest in ensuring that all alternatives to the destruction of wetlands have been considered and that unavoidable impacts on such areas are minimized."); *Rapanos v. United States*, 547 U.S. 715, 777 (2006) ("Important public interests are served by the [CWA]… and by the protection of wetlands in particular."); 33 C.F.R. § 320.4(b)(1) ("Most wetlands constitute a productive and valuable public resource, the unnecessary alteration or destruction of which should be discouraged as contrary to the public interest.").

Additionally, the Project will cause or contribute to increased upstream fracking and infrastructure development, including all adverse environmental impacts associated therewith, and result in major adverse downstream environmental impacts from combustion of the natural gas. NEPA requires the Commission to consider those adverse impacts, including the effects of burning gas that will produce tons of greenhouse gas emissions ("GHGs"), $NO_x$, VOCs, and HAPs. The pollutants emitted from those plants as a result of burning natural gas are known to cause serious adverse health effects. Thus, there is a strong interest in protecting the public from those effects.

The importance of the Commission properly considering the direct and indirect adverse downstream effects of GHGs is supported by the Council on Environmental Quality's ("CEQ") recent "Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National Environmental Policy Act Reviews" ("Guidance").[7] The Guidance provides that federal agencies should consider the extent to which a proposed action would contribute to climate change through GHG emissions and that agencies should quantify both the reasonably foreseeable direct and indirect GHG emissions from the proposed project. Guidance at 9, 11, 16.

Finally, the Guidance confirms that a wide variety of tools exist to quantify GHG

[7] The guidance document is available at: https://goo.gl/8QUK94.

emissions including emissions from fossil fuel combustion: "Quantification tools are widely available, and are already in broad use in the Federal and private sectors, by state and local governments, and globally. . . . These tools can provide estimates of GHG emissions, including emissions from fossil fuel combustion . . . ." *Id.* at 12. As such, quantification of the GHG emissions from the plants and their effects can and should be determined.

Given the high stakes, a stay of the Certificate and construction pending a final decision on the merits is clearly in the public interest. A stay will help ensure that that a full and complete analysis of the impacts, and potential mitigation, occurs before alternatives are foreclosed by the construction. Furthermore, given the level of interest demonstrated by the public in this controversial pipeline project, the public interest lies in maintaining the *status quo* until the pending request is considered fully on the merits. *See San Luis Valley Ecosystem Council v. U.S. Fish & Wildlife Serv*., 657 F. Supp. 2d 1233, 1242 (D. Colo. 2009) (large volume of public comments submitted indicates a public interest in maintaining the *status quo* pending proper review).

**D. Justice requires that the Certificate and Construction be stayed pending rehearing and judicial review.**

Consideration of the elements described above strongly favors the granting of a stay. Furthermore, where, as here, the parties requesting a stay are likely to succeed on the merits, justice requires granting a stay. The Commission has noted in previous orders that the factors it examines when considering whether to grant a stay do not include the likelihood of success on the merits. However, this inquiry is intertwined with the inquiry regarding whether justice requires a stay. If the party requesting a stay is likely to prevail, this tips the balance in favor of granting the stay. It would be unjust to allow the project proponents to move forward with construction activities that would cause irreversible environmental harm even though Intervenors

are likely to succeed on the merits. *See Found. on Econ. Trends v. Heckler*, 756 F.2d 143, 157 (D.C. Cir. 1985) ("If plaintiffs succeed on the merits, then the lack of an adequate environmental consideration looms as a serious, immediate, and irreparable injury.").

## V. CONCLUSION

For the reasons stated above, FERC should grant Intervenors' request for rehearing and withdraw its February 3, 2017 Certificate Order and determination that the Atlantic Sunrise Project is an "environmentally acceptable action" that is "required by the present or future public convenience and necessity." FERC should also withdraw the deficient FEIS and prepare a revised EIS that fully considers the direct, indirect, and cumulative impacts of the Atlantic Sunrise Project.

Dated: February 10, 2016 Respectfully submitted,

*/s/ Ryan Talbott*
Ryan Talbott
Executive Director
Allegheny Defense Project
117 West Wood Lane
Kane, PA 16735
(503) 329-9162
rtalbott@alleghenydefense.org

*/s/ Elly Benson*
Elly Benson
Staff Attorney
Sierra Club
2101 Webster Street, 1300
Oakland, CA 94612
(415) 977-5723
elly.benson@sierraclub.org

*/s/ Pam Bishop & Doug Lorenz*
Pam Bishop & Doug Lorenz
Principals
Concerned Citizens of Lebanon County

P.O. Box 275
Mt. Gretna, PA 17064
Concernedcitizenslebco@gmail.com

*/s/ Ann Pinca*
Ann Pinca
President
Lebanon Pipeline Awareness
1594 Cumberland St. Ste. 194
Lebanon, PA 17042-4532
(717) 274-0814
lebanonpipeline@gmail.com

*/s/ Joseph Otis Minott*
Joseph Otis Minott
Executive Director & Chief Counsel
Clean Air Counsel
135 South 19th Street, Suite 300
Philadelphia, PA 19103
(215) 567-4004
joe_minott@cleanair.org

*/s/ Ernest Q. Reed Jr.*
Ernest Q. Reed Jr.
President
Heartwood
971 Rainbow Ridge Road
Faber, VA 22938
lec@wildvirginia.org

*/s/ Malinda Clatterbuck*
Malinda Clatterbuch
Lancaster Against Pipelines
(717) 284-4940
lancasteragainstpipelines@gmail.com

20170224-5106 FERC PDF (Unofficial) 2/24/2017 12:31:59 PM

## CERTIFICATE OF SERVICE

Pursuant to Rule 2010 of FERC's Rules of Practice and Procedure, 18 C.F.R. § 385.2010, I hereby certify that I have this day served the foregoing document upon each person designated on this official list compiled by the Secretary in this proceeding.

Dated: February 10, 2016

Respectfully submitted,

*/s/ Ryan Talbott*
Ryan Talbott
Executive Director
Allegheny Defense Project
117 West Wood Lane
Kane, PA 16735
(503) 329-9162
rtalbott@alleghenydefense.org

Document Content(s)

AMP Creeks Request Rehearing and Motion for Stay TBF.PDF..............1-56

# ADDENDUM D

## Order Granting Rehearings for Further Consideration (Mar. 13, 2017)

20170313-3024 FERC PDF (Unofficial) 03/13/2017

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Transcontinental Gas Pipe Line Company, LLC Docket No. CP15-138-001

ORDER GRANTING REHEARINGS FOR
FURTHER CONSIDERATION

(March 13, 2017)

Rehearings have been timely requested of the Commission order issued on February 3, 2017, in this proceeding. *Transcontinental Gas Pipe Line Company, LLC,* 158 FERC ¶ 61,125 (2017). In the absence of Commission action within 30 days from the date the rehearing requests were filed, the request for rehearing (and any timely requests for rehearing filed subsequently)[1] would be deemed denied. 18 C.F.R. § 385.713 (2016).

In order to afford additional time for consideration of the matters raised or to be raised, rehearing of the Commission's order is hereby granted for the limited purpose of further consideration, and timely-filed rehearing requests will not be deemed denied by operation of law. Rehearing requests of the above-cited order filed in this proceeding will be addressed in a future order. As provided in 18 C.F.R. § 385.713(d), no answers to the rehearing requests will be entertained.

Kimberly D. Bose,
Secretary.

[1] *See San Diego Gas & Electric Company v. Sellers of Energy and Ancillary Services into Markets Operated by the California Independent System Operator and the California Power Exchange, et al.*, 95 FERC ¶ 61,173 (2001) (clarifying that a single tolling order applies to all rehearing requests that were timely filed).

Document Content(s)

CP15-138-001.DOC.....................................................1-1

# ADDENDUM E

## Motion for Leave to Answer and Answer of Transcontinental Gas Pipe Line Company, LLC to Requests for Rehearing (Mar. 10, 2017)

20170310-5099 FERC PDF (Unofficial) 3/10/2017 1:05:40 PM

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

Transcontinental Gas Pipe Line Company, LLC Docket No. CP15-138-001

**MOTION FOR LEAVE TO ANSWER AND ANSWER OF TRANSCONTINENTAL GAS PIPE LINE COMPANY, LLC TO REQUESTS FOR REHEARING**

Pursuant to Rules 212 and 213 of the Rules of Practice and Procedure of the Federal Energy Regulatory Commission (the "Commission"),[1] Transcontinental Gas Pipe Line Company, LLC ("Transco") respectfully submits its Motion for Leave to Answer and Answer to Requests for Rehearing in the above-referenced proceeding for the Atlantic Sunrise Project (the "Project").[2] Specifically, Transco respectfully requests permission to respond to: (1) the Request for Rehearing filed on February 10, 2017 by Allegheny Defense Project, Clean Air Council, Concerned Citizens of Lebanon County, Heartwood, Lancaster Against Pipelines, Lebanon Pipeline Awareness, and Sierra Club (collectively, "ADP"); and (2) the Request for Rehearing filed on February 24, 2017 by Accokeek, Mattawoman, Piscataway Creeks Communities Council, Inc. ("AMP Creeks"). AMP Creeks' Request for Rehearing raises the same issues as ADP's Request for Rehearing and incorporates by reference the arguments made by ADP in support of rehearing.

---

1 18 C.F.R. §§ 385.212 and 385.213.

2 By Certificate Order, issued February 3, 2017, the Commission authorized construction and operation of the Project, subject to conditions. *See Transcontinental Gas Pipe Line Company, LLC*, 158 FERC ¶ 61,125 (2017) ("Certificate Order").

## **Motion For Leave To File An Answer**

Although the Commission's procedural rules generally do not provide for answers to rehearing requests unless otherwise ordered,[3] the Commission nevertheless may, for good cause, permit such an answer.[4] The Commission has accepted answers when they help to ensure a complete and accurate record in the case and where, as here, the information provided will aid in the Commission's decision-making process.[5] Transco's Answer responds to mischaracterizations of the law and factual record and, thereby, assists the Commission in its decision-making process. Thus, Transco respectfully requests that the Commission exercise its discretionary authority to waive the prohibition on answers and permit Transco to respond to ADP's and AMP Creeks' Requests for Rehearing of the Certificate Order issued by the Commission in this proceeding.

## **Answer To Requests For Rehearing**

### **I. Transco Has Not Improperly Segmented Its Projects and the Scope of the Commission's Review of the Project Is Fully Consistent with NEPA**

ADP's arguments that Transco improperly segmented certain of its projects and that the Commission's review was too narrow under the National Environmental Policy Act ("NEPA")

---

3 *See* 18 C.F.R. §§ 385.213(a)(2), 385.713(d).

4 *See id.* § 385.101(e).

5 *See, e.g.*, *Southern Natural Gas Company*, 126 FERC ¶ 61,246, P 24 (2009) (accepting answers where such filings assisted the Commission's decision-making); *Dominion Cove Point, LNG, LP*, 126 FERC ¶ 61,036, P 30 (2009) (same); *Idaho Power Co.*, 95 FERC ¶ 61,482, 62,717-18 (2001) (recognizing that an answer may be permitted when it assists in creating a complete record); *Delmarva Power & Light Co.*, 93 FERC ¶ 61,098, 61,259 (2000) (allowing answers to ensure a complete and accurate record); *Jordan Cove Energy Project*, 157 FERC ¶ 61194, P 11 (2016) ("The Commission finds good cause to waive Rule 213(a)(2) and admit these answers because doing so will not cause undue delay and the pleadings may assist the Commission in its decision-making process.").

have no merit. The Northeast Supply Enhancement and Magnolia Extension[6] projects are not yet "proposals" under NEPA and therefore are not yet subject to NEPA review. However, even if all of the projects cited by ADP were "proposals," none of them are connected to the Project for purposes of NEPA because the Project alone has independent utility. Moreover, the other projects do not share common timing or geography with the Project such that they should be considered together as similar actions. Finally, the Commission appropriately considered the cumulative impacts related to the Rock Springs Expansion Project and declined to speculate about the others. Thus, there has been no segmentation of the environmental review for the Project.

### A. The Northeast Supply Enhancement and Magnolia Extension Projects Are Not "Proposed" Actions Under NEPA

Section 102(2)(C) of NEPA applies only to "proposals" for major federal actions significantly affecting the quality of the human environment. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.3. A "proposal" exists "at that stage in the development of an action when an agency . . . has a goal and is actively preparing to make a decision . . . and the effects [of that action] can be meaningfully evaluated." 40 C.F.R. § 1508.23. NEPA "speaks solely in terms of Proposed actions; it does not require an agency to consider the possible environmental impacts of less imminent actions when preparing the impact statement on proposed actions. Should contemplated actions later reach the stage of actual proposals, impact statements on them will take into account the effect of their approval upon the existing environment; and the condition of that environment presumably will reflect earlier proposed actions and their effects." *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.20 (1976). The Commission has consistently concluded that a

6 Moreover, the Magnolia Extension is not one of Transco's projects, but instead is sponsored by American Midstream Partners, LP.

project is first proposed when its certificate application is filed with the Commission, and that the initiation of the pre-filing process does not rise to the level of a "proposal."[7] Courts have confirmed that the Commission need not analyze potential projects for which the project proponent has not yet filed an application. *See Minisink Residents for Envtl. Pres. & Safety v. FERC*, 762 F.3d 97, 113 & n.11 (D.C. Cir. 2014); *Weinberger v. Catholic Action of Haw./Peace Educ. Project*, 454 U.S. 139, 146 ("[A]n EIS need not be prepared simply because a project is *contemplated*, but only when the project is *proposed*.") (emphasis in original); *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1318 (D.C. Cir. 2014) ("NEPA, of course, does not require agencies to commence NEPA reviews of projects not actually proposed.").

The Northeast Supply Enhancement and Magnolia Extension projects are in the preliminary planning phases. Certificate applications for the Northeast Supply Enhancement and Magnolia Extension projects have not been filed. The Northeast Supply Enhancement project is in the pre-filing process; no request to use the pre-filing process has been filed for the Magnolia Extension project. Because these projects are not yet "proposals" as defined by the Commission,

[7] *See, e.g., Algonquin Gas Transmission, LLC*, 158 FERC ¶ 61,061, at P 83-86 (2017) ("A project at the pre-filing stage is not a proposal, but is in its early stages of development and the NEPA process. . . . As projects before and in the pre-filing stage are uncertain, without an application, the Commission cannot meaningfully evaluate the potential environmental effect of those future projects."); *Algonquin Gas Transmission, LLC*, 150 FERC ¶ 61,163, at P 110 (2015) (finding that when a project was in the pre-filing review process, and no application had been filed, "the Commission cannot actively prepare to make a decision on the projects and the effects of the projects cannot be meaningfully evaluated. Therefore, the Atlantic Bridge and Access Northeast Projects are not fully defined 'proposals' and cannot be segmented by the Commission from its environmental review of the AIM Project under NEPA."); *Dominion Cove Point LNG, LP*, 148 FERC ¶ 61,244, at P 252 (2014) ("[N]either the Atlantic Sunrise Project nor any other upstream transportation project is a 'connected action' here within the meaning of NEPA. . . . [T]he Atlantic Sunrise Project . . . is not yet fully developed enough for the Commission to consider it in its EA in this case: Transco has yet to file an application for the project.").

the Commission is not required to consider these projects as part of the NEPA review for the Atlantic Sunrise Project.

### B. The Project Has Substantial Independent Utility and Is Not "Connected" or "Similar" to the Other Projects Identified by ADP

"An agency impermissibly 'segments' NEPA review when it divides connected, cumulative, or similar federal actions into separate projects and thereby fails to address the true scope and impact of the activities that should be under consideration." *Del. Riverkeeper Network*, 753 F.3d at 1313. Actions are "connected," and "therefore should be discussed in the same impact statement," when they "[a]utomatically trigger other actions which may require environmental impact statements," "[c]annot or will not proceed unless other actions are taken previously or simultaneously," and "[a]re interdependent parts of a larger action and depend on the larger action for their justification." 40 C.F.R. § 1508.25(a)(1). In evaluating whether connected actions are improperly segmented, courts apply a "substantial independent utility" test, which asks "whether one project will serve a significant purpose even if a second related project is not built."[8] For proposals that connect to or build upon an existing infrastructure network, this standard distinguishes between those proposals that are separately useful from those that are not. Similar to a highway network, "it is inherent in the very concept of" the interstate pipeline grid "that each segment will facilitate movement in many others; if such mutual benefits compelled aggregation, no project could be said to enjoy independent utility."[9]

---

8 *Coal. on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 69 (D.C. Cir. 1987); *see also O'Reilly v. U.S. Army Corps of Eng'rs*, 477 F.3d 225, 237 (5th Cir. 2007) (defining independent utility as whether one project "can stand alone without requiring construction of the other [projects] either in terms of the facilities required or of profitability").

9 *Coal. on Sensible Transp.*, 826 F.2d at 69; *see also Algonquin Gas Transmission, LLC*, 158 FERC ¶ 61,061, at P 90 (2017) ("The fact that some of the projects' facilities will

20170310-5099 FERC PDF (Unofficial) 3/10/2017 1:05:40 PM

"Similar actions," which "have similarities that provide a basis for evaluating their environmental consequences together, such as common timing or geography," need not be analyzed in the same impact statement, but may be analyzed together if an agency determines that is the best way to assess their impacts. 40 C.F.R. § 1508.25(a)(3); *see also Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1305-06 (9th Cir. 2003).

Allegheny Defense Project made similar segmentation arguments with respect to the Constitution Pipeline Project, which the Commission rejected on rehearing, just as it should here. As the Commission explained in its Order Denying Rehearing in Constitution:

> The fact that certain projects may transport gas from the Utica and Marcellus Shale formations does not make them connected, cumulative, or similar actions for NEPA purposes. The Constitution Pipeline Project is in no way connected with or dependent upon the 46 other projects that Allegheny references. The Constitution Pipeline Project can go forward regardless of whether any of these other pipeline projects are authorized by the Commission. To the extent that any of these projects could cumulatively affect the same resources affected by the Constitution Pipeline Project, they were included and discussed in the cumulative analysis section of the final EIS. The Commission will separately consider each of the other non-connected, jurisdictional actions on its own merits, based on the facts and circumstances specific to each proposal.

*Constitution Pipeline Company, LLC*, 154 FERC ¶ 61,046, P 98 (2016).

The same is true here. The Project is not connected with or dependent upon any other project, especially those which are still in preliminary planning stages, simply because another project may "bring gas from the Marcellus Shale gas development throughout the East Coast and beyond." ADP Request for Rehearing at 6. The Project has substantial independent utility and is fully subscribed by shippers who have immediate needs for the capacity to be created by the

overlap does not mean that the projects are interdependent. Connectivity by itself does not equate to interdependence.").

Project—needs that exist, and will be satisfied, independently of any other project. *See* Certificate Order ¶ 23, 28-30. In sum, the Project does not depend on any other project for its justification.

Nor are the various projects "similar" for purposes of NEPA. "An agency *may* wish to analyze [similar] actions in the same impact statement. It *should* do so when the *best way* to assess adequately the combined impacts of similar actions or reasonable alternatives to such actions is to treat them in a single impact statement." 40 C.F.R. § 1508.25(a)(3) (emphasis added); *see also, e.g.*, *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 1000-01 (9th Cir. 2004) (emphasizing that agencies are only required to assess similar actions programmatically when such review is necessarily the *best way* to do so).

The regulations point to "common timing or geography" as similarities that may provide a basis for evaluating multiple projects in a single impact statement, 40 C.F.R. § 1508.25(a)(3), and ADP appears to argue that the various projects overlap temporally and geographically. *See* ADP Request for Rehearing at 6. The other projects ADP references, however, do not overlap in time or location with the Project such that the Commission was required to analyze them together in a single environmental impact statement. With respect to timing, and as noted in the preceding section, certificate applications for the Northeast Supply Enhancement and Magnolia Extension projects have not even been filed, and thus those projects do not constitute "proposals" under NEPA. With respect to geography, the Southeast Market Pipelines—which would be

located in Alabama, Georgia, and Florida[10]—is geographically distant from the facilities associated with the Project. *See* Certificate Order ¶¶ 1-8.[11]

Although the Rock Springs Expansion Project was placed into service in August 2016 and bears some geographic proximity to the Project,[12] it bore independent utility at the time it was certificated and the Commission appropriately considered that project in performing the cumulative impacts analysis for the Project. *See generally* FEIS at 4-279 to 4-315.

### C. The Scope of the Commission's Consideration of Other Projects in Its Cumulative Impacts Analysis Was Proper Under NEPA

The Commission considered the Rock Springs Expansion Project throughout its analysis of cumulative impacts in the Final Environmental Impact Statement ("FEIS"), but appropriately declined to consider the Southeast Market Pipelines, Northeast Supply Enhancement and Magnolia Extension projects. "[I]dentification of the geographic area within which [cumulative impacts] may occur, is a task assigned to the special competency of the appropriate agencies." *Kleppe*, 427 U.S. at 414. The Commission should reject ADP's self-serving attempt to re-draw that line. *See Coal. on Sensible Transp.*, 826 F.2d at 66 ("The NEPA process involves an almost endless series of judgment calls," decisions that are vested with the agency). The Commission acted well within its discretion in apparently determining that the Southeast Market Pipelines

---

10 *See* FERC, *Final Environmental Impact Statement on Southeast Market Pipelines Project*, Dec. 18, 2015, https://www.ferc.gov/industries/gas/enviro/eis/2015/12-18-15-eis.asp.

11 The locations of the Northeast Supply Enhancement and Magnolia Extension projects need not be addressed in this Section because those projects are not yet "proposals." Section C, below, discusses why the Northeast Supply Enhancement and Magnolia Extension projects, as well as the Southeast Market Pipelines, do not fall within the geographic region of influence with respect to cumulative impacts.

12 *See* Final Environmental Impact Statement at 4-286.

project—which would be located in Alabama, Georgia, and Florida[13]—and the Magnolia Extension project—which would be located in Alabama and Mississippi[14]—are not located within the region of influence or geographic scope of the Project. *See* Certificate Order ¶¶ 1-8 (describing facilities associated with the Project). Additionally, although the preliminary pre-filing information for the Northeast Supply Enhancement project indicates that the project would include a short section along Transco's existing mainline, the Northeast Supply Enhancement project would serve a different market (New York). *See* FEIS at 2-6. Thus, unlike the projects at issue in *Delaware Riverkeeper Network*, a decision upon which ADP heavily relies, none of these projects are part of a "linear and physically interdependent" pipeline through which "gas enters . . . at one end, and passes through each of the new pipe sections . . . on its way to extraction points," as part of a "unified whole." *See Del. Riverkeeper Network*, 753 F.3d at 1308-09.

Furthermore, contrary to ADP's request for the Commission to further consider a plethora of alleged impacts, NEPA does not require that an agency consider "speculative" impacts. *City of Shoreacres v. Waterworth*, 420 F.3d 440, 453 (5th Cir. 2005) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 356 (1989)); *see also Inland Empire Public Lands Council v. U.S. Forest Service*, 88 F.3d 754, 764 (9th Cir. 1996) ("NEPA does not require the government to do the impractical.") (citing *Kleppe*, 427 U.S. at 414 (noting that "practical considerations of feasibility might well necessitate restricting the scope of comprehensive statements")). Environmental effects are speculative if they pertain to actions

---

13 *See* FERC, *Final Environmental Impact Statement on Southeast Market Pipelines Project*, Dec. 18, 2015, https://www.ferc.gov/industries/gas/enviro/eis/2015/12-18-15-eis.asp.

14 *See* AMID, *Magnolia*, http://www.americanmidstream.com/segments/gathering-and-processing/magnolia/ (last visited Mar. 9, 2017).

that still could change substantially, may not occur, or are too far in the future to be reasonably foreseeable. Indeed, the impacts of actions that are speculative cannot legitimately be evaluated because the precise nature, scope, and timing of such impacts are unknown. Evaluating the impacts of such actions would be little more than guesswork and would result in a meaningless analysis. *See Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 513 (D.C. Cir. 2010) (noting that a reasonably foreseeable action does not need to be finalized, but cannot be so preliminary as to make determining its cumulative impact meaningless).

In addition to having no geographic proximity to the Project, the Magnolia Extension project is not "reasonably foreseeable" within the meaning of NEPA because it is speculative whether that project will materialize as a proposal capable of meaningful analysis before the Commission. *See* 40 C.F.R. § 1508.25; 40 C.F.R. § 1508.23; *Florida Southeast Connection, LLC*, 156 FERC ¶ 61,160, P 55 (2016). In fact, the Commission determined last September that it was "speculative . . . as to whether the Magnolia Extension will materialize as a proposal before the Commission," in rejecting a rehearing request raising similar issues regarding the Southeast Market Pipelines projects. *See Florida Southeast Connection, LLC*, 156 FERC ¶ 61,160, P 55 (2016).

## II. The Commission's Decision to Approve the Project Was Based on Sufficient Information

The Commission considered more than adequate information in reaching its conclusion that the Project "if constructed and operated as described in the application and the final EIS, is an environmentally acceptable action." Certificate Order ¶ 172. The EIS is a *concise* summary document intended to disclose and discuss the potential impacts of a proposed action. *See* 40 C.F.R. § 1502.2. "The text of final environmental impact statements . . . shall normally be less

than 150 pages and for proposals of unusual scope or complexity shall normally be less than 300 pages." 40 C.F.R. § 1502.7.

The Commission's discussion and consideration of environmental impacts in its approximately 500-page FEIS was more than adequate to discharge its duty under NEPA. Additionally, the EIS incorporates by reference all of the material filed in support of the permits and other regulatory clearances required to construct the facilities. As such, the presentation of potential impacts provided in the EIS is more than sufficient for the public and decision makers to assess the potential impacts of the Project. *See Nat'l Comm. for the New River v. FERC*, 373 F.3d 1323, 1328 (D.C. Cir. 2004) (EIS not deficient where the Commission imposed mitigation measures to be developed and approved and description in EIS was "sufficient to provide a 'springboard for public comment'") (quoting *Robertson*, 490 U.S. at 349); *Fuel Safe Wash. v. FERC*, 389 F.3d 1313, 1331 (10th Cir. 2004) (the Commission appropriately discharges its duty under NEPA by making "'a reasonable, good faith, objective presentation of [] impacts sufficient to foster public participation and informed decision making'") (quoting *Colo. Envtl. Coal. v. Dombeck*, 185 F.3d 1162, 1176 (10th Cir. 1999)).

ADP cites *Robertson* in support of its argument that the Commission lacked adequate information to issue the Certificate Order and deprived the public of an opportunity to comment on information by allowing Transco to submit certain documents after issuing the Certificate Order, but even in *Robertston* the Court found that "it would be inconsistent with NEPA's reliance on procedural mechanisms—as opposed to substantive, result-based standards—to demand the presence of a fully developed plan that will mitigate environmental harm before an agency can act." 490 U.S. at 353 (citing *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 100 (1983) ("NEPA does not require agencies to adopt any particular internal

decisionmaking structure.”)). Similarly, the Courts of Appeals have rejected the notion that an agency must have all information bearing on a Project prior to taking action. *See U.S. Dep’t of Interior v. FERC*, 952 F.2d 538, 546 (D.C. Cir. 1992) (holding that the Commission need not have “perfect information” before acting and need not definitively resolve all environmental concerns); *Nat. Res. Def. Council, Inc. v. Callaway*, 524 F.2d 79, 88 (2d Cir. 1975) (an agency “cannot be expected to wait until a perfect solution of environmental consequences of proposed action is devised before preparing and circulating an EIS”); *LaFlamme v. FERC*, 945 F.2d 1124, 1130 (9th Cir. 1991) (the Commission did not err in permitting post-order monitoring and studies of environmental impacts); *Nat’l Comm. for the New River*, 373 F.3d at 1328. Indeed, in some instances it is not possible to obtain information prior to issuance of the Certificate Order because, without the Certificate Order, Transco is not guaranteed access to properties to conduct field surveys. *See* FEIS, Vol. III, Part 1, at PM-306.

By way of example, ADP acknowledges that the Commission identified mine fires in conducting its review for the Project, but claims that the Commission failed to analyze them before issuing the Certificate Order. ADP Request for Rehearing at 8. ADP, however, fails to acknowledge that, in fact, the Commission did consider mine fires both in the FEIS and in the Certificate Order. *See* FEIS at 4-23 to 4-25, 5-1 to 5-3; Certificate Order ¶¶ 83-85. The Commission found no evidence suggesting that any mine fires are actively migrating. *See* FEIS at 4-23; Certificate Order ¶ 84. Furthermore, the Commission already reviewed an Abandoned Mine Investigation and Mitigation Plan prepared by Transco and analyzed it in the FEIS. *See* FEIS at 4-23. Nevertheless, the Commission is requiring Transco to file with the Commission a ***final*** Abandoned Mine Investigation and Mitigation Plan before construction. Certificate Order ¶ 84; *id.* at Appendix C, Environmental Conditions.

The Commission specifically noted that it "has the ongoing authority during construction and through the life of the project to impose any additional mitigating measures to ensure the protection of all environmental resources during construction and operation of the Project." Certificate Order ¶ 84. Thus, although the Commission required Transco to submit an Abandoned Mine Investigation and Mitigation Plan following issuance of the Certificate Order, the Commission already adequately considered mine fires and a previous Abandoned Mine Investigation and Mitigation Plan before issuing the Certificate Order authorizing the Project, and in doing so fully complied with its responsibilities under NEPA.

### III. The Commission Complied with NEPA's Purpose and Need Requirements

The Commission adequately specified the Project's purpose and need as required by 40 C.F.R. § 1502.13 in Section 1.1 of the FEIS. ADP's argument that the Commission failed to address the need for the Project in the FEIS elevates form over substance. *See* ADP Request for Rehearing at 9-10. In the Certificate Order, the Commission discussed the significant factors leading to its conclusion that there is a need for the Project, including the fact that nine shippers had executed long-term, binding precedent agreements for 100 percent of the design capacity of the Project. *See* Certificate Order at ¶¶ 28-30. ***This same evidence of Project need was specifically referenced in the FEIS under the heading "Project Purpose and Need."*** *See* FEIS at 1-2 to 1-3. This evidence comports with the Commission's long-standing policy that "long-term commitments serve as 'significant evidence of demand for the project.'" Certificate Order at ¶ 28 (citing Certificate Policy Statement, *Certification of New Interstate Natural Gas Pipeline Facilities*, 88 FERC ¶ 61,227, 61,748 (1999)).

NEPA, and its requirements regarding preparation of environmental impact statements, apply to a wide range of proposed agency actions. *See generally* 40 C.F.R. § 1502.1. Interstate

natural gas pipeline projects are only one of many types of projects subject to NEPA's requirements. In addition to complying with NEPA's requirements, the Commission also is called upon under Section 7(c) of the Natural Gas Act ("NGA") to make a determination as to the public convenience and necessity of a project before it may issue a Certificate. *See* 15 U.S.C. § 717f(c). Thus, the Commission must proceed in a fashion that allows it to satisfy its responsibilities under both NEPA and the NGA.

Courts "evaluate an agency's statement of purpose under a reasonableness standard," and in consideration of "the statutory context of the federal action at issue." *HonoluluTraffic.com v. Fed. Transit Admin.*, 742 F.3d 1222, 1230 (9th Cir. 2014). For this reason, "[c]ourts have 'afforded agencies considerable discretion to define the purpose and need of a project.'" *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 866 (9th Cir. 2004) (quoting *Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1066 (9th Cir .1998)); *see also Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991) ("[W]e review an agency's compliance with NEPA's requirements deferentially.").

ADP's argument that the Commission failed to comply with NEPA's requirements to specify purpose and need ignores the discretion afforded to agencies in this regard and unfairly seeks to capitalize on the Commission's efforts to comply with its dual obligations under NEPA and the NGA. The Commission simply deferred its final determination of need until it made its decision on Transco's application for a Certificate of Public Convenience and Necessity under the NGA. *See* FEIS at 1-3.[15] Nevertheless, the FEIS sets forth one of the most significant facts

[15] "A project's need is established by FERC when it determines whether a project is required by the public convenience and necessity (i.e., when the Commission's decision is made). FERC's Certificate Policy Statement provides guidance as to how the Commission evaluates proposals for new construction, as discussed below, and establishes criteria for determining whether there is a need for a proposed project and

that the Commission identified in its Certificate Order as supporting a public need for the project—namely the fact that nine shippers had signed long-term, binding precedent agreements subscribing to all of the Project's capacity. *Compare* FEIS at 1-2, *with* Certificate Order at ¶¶ 28-30. This information was available to the public during the EIS process, and ADP's argument, which self-servingly elevates form over substance and denies the Commission the discretion it is due in sequencing the timing by which it carries out its statutory responsibilities, should be rejected.

## IV. The Commission Appropriately Specified the Project's Purpose and Considered Reasonable Alternatives

The Commission appropriately specified the Project's purpose and considered reasonable, non-speculative alternatives to the Project, including system alternatives, a no-action alternative, alternative routes, route variations, and alternative aboveground facility sites. *See* FEIS at 3-1 to 3-70. This is all that NEPA requires. *See Fuel Safe*, 389 F.3d at 1323-24; *see also Nat'l Comm. for the New River*, 373 F.3d at 1331-32. ADP complains that the Commission "uncritically adopt[ed] Transco's stated purpose," which impermissibly narrowed its consideration of alternatives, such as renewable energy sources, but ADP's position mischaracterizes the Commission's analysis and is not supported by law. ADP Request for Rehearing at 10.

The Commission explained that it "analyzes the applicant's filed application and stated purpose in order to disclose the impacts resulting from the proposed action to inform the Commission, which will make the eventual decision on whether or not to approve the Project." FEIS at 1-3. This does not violate NEPA. *See Theodore Roosevelt Conservation P'ship v.*

---

whether it would serve the public interest. The FERC environmental staff and hence this EIS does not make that determination." FEIS at 1-3.

*Salazar*, 661 F.3d 66, 73 (D.C. Cir. 2011) (finding that purpose and need statement permitted a reasonable range of alternatives where it expressed an intent to "act upon" an applicant's stated proposal). While an agency may not define the objectives of a proposed action in terms so narrow that only one alternative could accomplish its goal, an agency also may not "'frame its goals in terms so unreasonably broad that an infinite number of alternatives would accomplish those goals and the project would collapse under the weight of the possibilities.'" *Citizens for Smart Growth v. Sec'y of Dep't of Transp.*, 669 F.3d 1203, 1212 (11th Cir. 2012) (quoting *Citizens Against Burlington*, 938 F.2d at 196). For this reason, "[c]ourts have 'afforded agencies considerable discretion to define the purpose and need of a project,'" *Westlands Water Dist.*, 376 F.3d at 866, which is judged under a reasonableness standard. *HonoluluTraffic.com*, 742 F.3d at 1230. After an agency "establishes the objective of the proposed action—which it has considerable discretion to define—the agency need not provide a detailed study of alternatives that do not accomplish that purpose or objective, as those alternatives are not 'reasonable.'" *Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1244 (10th Cir. 2011) (citations omitted). Where an agency has considered but eliminated alternatives from a detailed analysis, it is only required to "briefly discuss the reasons for their having been eliminated." *Id.* at 1247 (citing 40 C.F.R. § 1502.14(a)).

The Courts of Appeals have upheld the use of similar purpose statements in environmental impact statements for natural gas pipeline projects. *See Fuel Safe*, 389 F.3d at 1323-24. In *Fuel Safe*, the Tenth Circuit upheld the Commission's purpose statement for a natural gas pipeline that was described as: "provid[ing] a transportation system for natural gas to supply the growing demand for natural gas on Vancouver Island [and][i]n particular . . . [to] transport natural gas . . . to two new electric-generation facilities on Vancouver Island." *Id.* at

1324 (alterations in original). The petitioner complained that this purpose statement compelled the Commission to ignore alternative ways to meet the need for electrical power on Vancouver Island, such as through renewable energy sources, but the court disagreed. *Id.* Although the court noted that the Commission did consider—but ultimately rejected—several alternative sources of renewable energy, the court explained that:

> FERC had before it a particular project proposal by a private natural gas company, involving the building of a natural gas pipeline as a means to provide electrical power on Vancouver Island. "***Where the action subject to NEPA review is triggered by a proposal or application from a private party, it is appropriate for the agency to give substantial weight to the goals and objectives of that private actor***." *Citizens' Comm. to Save Our Canyons*, 297 F.3d at 1030. FERC was not obligated to reject that project in favor of a non-natural gas alternative which was purely hypothetical and speculative. ***Given that the agency is only obligated to consider reasonable, non-speculative alternatives, we cannot say that its review of non-natural gas pipeline alternatives, and rejection of them in favor of the GSX project, was arbitrarily and improperly restricted by its definition of the scope and purpose of the project.***

*Id.* (emphases added).

The Commission's stated purpose for the Atlantic Sunrise Project is very similar to the one the court upheld in *Fuel Safe*: "to provide an incremental 1.7 million dekatherms per day (MMDth/d) of year-round firm transportation capacity from the Marcellus Shale production area in northern Pennsylvania to Transco's existing market areas, extending to the Station 85 Pooling Point in Choctaw County, Alabama." FEIS at 1-2; *cf. Fuel Safe*, 389 F.3d at 1324. With this purpose in mind, the Commission appropriately exercised its judgment and discretion in determining that alternative energy sources fell outside the range of alternatives that could fulfill the Project's purpose. *See Wyoming*, 661 F.3d at 1244 ("We have held that '[o]nce an agency appropriately defines the objectives of an action, NEPA does not require agencies to analyze the

environmental consequences of alternatives it has in good faith rejected as too remote, speculative, or . . . impractical or ineffective.'") (quoting *Citizens' Comm. to Save Our Canyons v. U.S. Forest Serv.*, 297 F.3d 1012, 1030 (10th Cir. 2002)).

In considering the "no-action alternative," the Commission acknowledged that "customers of the Project Shippers could seek to use alternative fuel or renewable energy sources, which could require new facilities," but explained that such projects "would not fulfill the purpose and need of the project, which . . . is to provide enhanced access to Marcellus Shale gas supplies and incremental, firm natural gas transportation capacity between Marcellus Shale producing areas and Transco's existing markets." FEIS at 3-2. The Commission also noted that construction of "other non-natural gas energy infrastructure would result in environmental impacts that could be equal to or greater than those of the Project." *Id.* The Commission acknowledged that the generation of electricity from renewable energy sources would be a reasonable alternative for a review of power generating facilities, but noted that because the purpose of the Project is to transport natural gas, and the generation of electricity from renewable energy sources are not transportation alternatives, those alternatives would not be considered further in the FEIS. *See id.* Thus, the Commission acted appropriately and well within its discretion in addressing alternative energy sources and determining that they did not warrant further consideration.

**V. The Commission's Mitigation Measures Regarding Water Resources Is Sufficient**

The Commission prescribed sufficient mitigation measures with respect to water resources. Citing a violation of state water laws by another pipeline company several years ago, ADP argues that the mitigation measures are insufficient because "[p]ast experience demonstrates . . . that inclusion of such measures is insufficient to prevent significant adverse

impacts to water resources." ADP Request for Rehearing at 14-15. ADP's attenuated argument that this shows that "FERC has a history of nonenforcement of mitigation measures in Pennsylvania," and requires preparation of a revised EIS deserves no weight. *Id.* at 14-16.

ADP stretches NEPA's procedural requirements beyond their limits. "[A] mitigation plan need not be legally enforceable, funded or even in final form to comply with NEPA's procedural requirements." *Nat'l Parks & Conservation Ass'n v. U.S. Dep't of Transp.*, 222 F.3d 677, 681 n.4 (9th Cir. 2000) (citing *Robertson*, 490 U.S. at 352-53 (requiring an EIS to include a complete mitigation plan would conflict with the principle that NEPA does not compel an agency to reach a particular substantive result); *Laguna Greenbelt, Inc. v. U.S. Dep't of Transp.*, 42 F.3d 517, 528 (9th Cir. 1994) ("NEPA does not require a fully developed plan that will mitigate all environmental harm before an agency can act . . . .")); *see also Sierra Club v. U.S. Dep't of Agric. Rural Utils. Serv.*, 234 F.3d 1269, *3 n.1 (6th Cir. 2000) ("These requests involve enforcement issues. NEPA, on the other hand, involves a process of information gathering and dissemination that must take place *before* a project is implemented.") (citing 40 C.F.R. § 1500.1(b) (emphasis in original)).

Not only is ADP's argument legally unsupported, but also as a factual matter it offers no evidence suggesting that Transco will not comply with the prescribed mitigation measures. Instead, ADP speculates that Transco will not comply because a different pipeline company entered into a settlement with the Pennsylvania Department of Environmental Protection involving *alleged* state clean water law violations several years ago. The Commission should reject this irrelevant, factually inaccurate argument.

## VI. The Commission Was Not Required to Consider Purported Indirect Effects of Induced Gas Production

The Commission complied with the requirements of NEPA by, among other things, examining the Project's potential indirect impacts and considering whether natural gas production was an appropriate subject for such analysis. 40 C.F.R. § 1508.25(c); *see* FEIS 4-280 to 4-282, 5-23 to 5-24; Certificate Order ¶¶ 124-146. Indirect impacts "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.8(b). While indirect impacts may sometimes "include growth inducing effects," *id.*, here, ADP's claimed induced increases in gas production are neither sufficiently causally related to the Project, nor reasonably foreseeable to warrant further analysis. In both the FEIS and the Certificate Order, the Commission explained, at length, that environmental effects from natural gas production are generally neither caused by a proposed pipeline nor are they reasonably foreseeable consequences of the Commission's approval of a pipeline. *See* FEIS 4-280 to 4-282, 5-23 to 5-24; Certificate Order ¶¶ 124-146. The Commission ultimately concluded that there is not "the requisite reasonably close causal relationship between the [Project] and the impacts of future natural gas production to necessitate further analysis," but that even if there were, "the scope of the impacts from any such induced production in this case is not reasonably foreseeable." Certificate Order ¶¶ 133, 137. Indeed, the Commission considered comments purporting to identify with some specificity areas where gas production is believed likely to occur, but explained that "even if the Commission knows the shippers and general source area of gas likely to be transported on the [Project], a meaningful analysis of production impacts would require more detailed information regarding the number, location, and timing of wells, roads, gathering lines, and other appurtenant facilities, as well as details about production methods, which can vary . . . ." FEIS, Vol. III, Part 2, at CO-62. Further, although the Commission did

not find gas production to be suited for further examination of indirect impacts, the Commission did evaluate the environmental impacts of gas production in the region of influence around the Project facilities, and included this analysis in its cumulative impacts analysis. *See* FEIS 4-280 to 4-284, 5-23 to 5-24. "[A]s long as the agency's decision is 'fully informed' and 'well-considered,' it is entitled to . . . deference." *Natural Res. Def. Council, Inc. v. Hodel*, 865 F.2d 288, 294 (D.C. Cir. 1988) (quoting *N. Slope Borough v. Andrus*, 642 F.2d 589, 599 (D.C. Cir. 1980)).

The Commission's conclusions are consistent with recent decisions of the United States Courts of Appeals for the Second and the District of Columbia Circuits, including in cases brought by one of the parties here, Sierra Club. *See Sierra Club v. FERC*, 827 F.3d 36, 47, 50 (D.C. Cir. 2016); *Sierra Club v. FERC*, 827 F.3d 59, 68-70 (D.C. Cir. 2016); *Coal. for Responsible Growth & Res. Conservation v. FERC*, 485 F. App'x 472, 474-75 (2d Cir. 2012). In each case, the Second and D.C. Circuits affirmed the Commission's determination that the projects at issue, pipeline facilities and LNG (liquefied natural gas) liquefaction and export facilities, were not sufficiently causally-related to a potential increase in natural gas production to warrant further analysis of that production as an indirect or cumulative impact. *E.g.*, *Coalition*, 485 F. App'x at 474; *see also Wilderness Workshop v. U.S. Bureau of Land Mgmt.*, 531 F.3d 1220, 1231 (10th Cir. 2008) (development of additional natural gas wells was entirely speculative); *Sierra Club v. Clinton*, 746 F. Supp. 2d 1025, 1044 (D. Minn. 2010) (oil sands would be extracted regardless of pipeline).

Although ADP cites former-Commissioner Norman Bay's recent statement that "in light of the heightened public interest and in the interests of good government, I believe the Commission should analyze the environmental effects of increased regional gas production from

the Marcellus and Utica," ADP Request for Rehearing at 26, as former-Commissioner Bay readily acknowledged, "there is no legal requirement for the Commission to do such a review of gas production from shale formations." *Nat'l Fuel Gas Supply Corp.*, 158 FERC ¶ 61145 (Feb. 3, 2017) (Bay, Commissioner, Separate Statement).

## VII. The Commission's Cumulative Impacts Analysis Fully Complies with NEPA

The Commission's analysis of cumulative impacts fully complies with NEPA's requirements. ADP's arguments that the Commission should have expanded the analysis area and further considered the effects of shale gas development, greenhouse gas emissions and climate change reflect disagreement with the Commission's expert determinations, but do not demonstrate a violation of NEPA's procedural requirements.

"[I]dentification of the geographic area within which [cumulative impacts] may occur is a task assigned to the special competency of the appropriate agencies." *Kleppe*, 427 U.S. at 414. The Commission should reject ADP's attempt to re-draw that line. *See Coal. on Sensible Transp.*, 826 F.2d at 66 ("NEPA process involves an almost endless series of judgment calls," decisions that are vested with the agency). The Commission explained that its "analysis of cumulative impacts is based on a geographic scope within which [the Commission] believe[s] there is a potential for cumulative impacts on specific resources. Analyzing potential impacts on resources beyond this distance does not provide meaningful information regarding the potential for cumulative impacts associated with the Project. As described in the revised text of [FEIS] section 4.13, we evaluated other past, present, and proposed road, electric transmission line, and pipeline crossings within 10 miles of the Project." FEIS, Vol. III, Part 2, at CO-80; s*ee also* FEIS, Vol. III, Part 1, at PM-19 ("[W]e considered the cumulative impacts of the Atlantic Sunrise Project using an approach consistent with the methodology set forth in relevant guidance

(Council on Environmental Quality [CEQ], 1997b, 2005; U.S. Environmental Protection Agency [EPA], 1999).").

Additionally, the Commission appropriately considered the effects of shale gas development, greenhouse gas emissions and climate change. The Commission's consideration of the cumulative impacts of shale gas development within the region of influence is described in Section VI, above. *See* FEIS 4-280 to 4-284, 5-23 to 5-24.

ADP claims that the Commission only considered natural gas wells and facilities within a 0.25 mile region of influence, ADP Request for Rehearing at 29, but the record belies this claim. Appendix Q to the FEIS shows that the Commission looked well beyond 0.25 miles—indeed, even beyond a 10-mile region—in considering more than 2,600 natural gas wells in Clinton, Columbia, Lackawanna, Sullivan, Susquehanna, and Wyoming Counties in Pennsylvania. *See* FEIS, Vol. II, Appendix Q, at Q-3. Although the Commission provided additional detail in Appendix I for mineral resources (including wells) within 0.25 miles of the Project, that does not in any way negate the Commission's consideration of wells and shale development in Appendix Q.

The Commission also considered and analyzed cumulative impacts related to downstream greenhouse gas emissions and climate change. *See* FEIS at 4-316 to 4-319; Certificate Order ¶¶ 142-143, 146-147. As noted in the Certificate Order, the FEIS "includes a discussion of climate change impacts in the region, the regulatory structure for GHGs under the Clean Air Act, and the quantified GHG emissions from Atlantic Sunrise project construction . . . ." Certificate Order ¶ 142. "With respect to downstream GHG emissions, Commission staff used an EPA-developed methodology to estimate the downstream GHG emissions from a project, assuming all of the gas to be transported is eventually combusted." Certificate Order ¶ 143.

The Commission's reasoned and thoughtful analysis of each of these issues satisfies NEPA's "hard look" requirements. "[A]s long as the agency's decision is 'fully informed' and 'well-considered,' it is entitled to . . . deference." *Natural Res. Def. Council, Inc.*, 865 F.2d at 294 (quoting *N. Slope Borough*, 642 F.2d at 599). ADP contends that the Commission should have devoted further discussion to various issues, but the Commission's determinations as to "'how much discussion to include on each topic, and how much data is necessary to fully address each issue'" are owed "substantial deference." *Town Of Winthrop v. FAA*, 535 F.3d 1, 10 (1st Cir. 2008) (quoting *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1361 (11th Cir. 2008)). Although it is "always possible to explore a subject more deeply," the decision regarding the level of detail needed on each of these subjects is vested with the Commission. *Coal. on Sensible Transp.*, 826 F.2d at 66; *see also Kleppe*, 427 U.S. at 412-14 (determination of cumulative impacts is not to be disturbed "[a]bsent a showing of arbitrary action"); *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 376-77 (1989). Once an agency has taken a "hard look" at the environmental factors involved, courts "do not take issue with particular conclusions reached by an agency." *Town of Huntington v. Marsh*, 859 F.2d 1134, 1143 (2d Cir. 1988). If the "environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." *Robertson*, 490 U.S. at 350. Here, the Commission appropriately discharged its duty under NEPA by making "'a reasonable, good faith, objective presentation of [] impacts sufficient to foster public participation and informed decision making.'" *Fuel Safe*, 389 F.3d at 1331 (quoting *Colo. Envtl. Coal.*, 185 F.3d at 1176).

## VIII. The Commission Appropriately Considered the Effects of Shale Gas Development and Therefore Did Not Rely on a Deficient FEIS in Approving the Project

As described in Sections VI and VII, above, the Commission appropriately considered the effects of shale gas development in the FEIS and in the Certificate Order authorizing the Project. As a result, ADP's assertion that the Commission "ignored the indirect and cumulative effects of shale gas development," and in doing so violated the Certificate Policy Statement, is contradicted by the record, lacks merit and should be rejected. ADP Request for Rehearing at 35.

## IX. The Commission Adequately Evaluated the Public Need for the Project

The Commission adequately evaluated the public need for the Project in reaching its determination that the public convenience and necessity requires approval of the Project. *See* Certificate Order ¶ 33. ADP's argument that the Commission failed to adequately and independently evaluate the public need for the Project by purportedly declining to seriously consider ADP's concerns that gas transported by the Project may be exported is without merit. The Commission considered these concerns during the course of its NEPA review, *see* FEIS at 1-10 to 1-11, and further analyzed market demand in the Certificate Order. *See, e.g.*, Certificate Order ¶¶ 26-31. ADP's disagreement with the Commission's conclusion of public need does not constitute a violation of NEPA. "[A]s long as the agency's decision is 'fully informed' and 'well-considered,' it is entitled to . . . deference." *Natural Res. Def. Council, Inc.*, 865 F.2d at 294 (quoting *N. Slope Borough*, 642 F.2d at 599).

## X. Conclusion

For each of the foregoing reasons, Transco respectfully requests that the Commission deny the Requests for Rehearing.

Respectfully submitted,

TRANSCONTINENTAL GAS PIPE LINE COMPANY, LLC

By: ________________________________

**Daniel L. Merz**
Senior Counsel
Transcontinental Gas Pipe Line Company, LLC
2800 Post Oak Blvd. (77056)
P.O. Box 1396
Houston, Texas 77251
Telephone: (713) 215-2427
Fax: (713) 215-2229
dan.merz@williams.com

**Elizabeth U. Witmer**
Saul Ewing LLP
1200 Liberty Ridge Drive, Suite 200
Wayne, PA 19087
Telephone: (610) 215-5062
Fax: (610) 408-4400
ewitmer@saul.com

**John F. Stoviak**
Saul Ewing LLP
1500 Market Street, 38th Floor
Philadelphia, PA 19102
Telephone: (215) 972-1095
Fax: (215) 972-1921
jstoviak@saul.com

Dated: March 10, 2017

20170310-5099 FERC PDF (Unofficial) 3/10/2017 1:05:40 PM

**CERTIFICATE OF SERVICE**

I hereby certify that I have this day served, in accordance with the provisions of Rule 2010 of the Commission's Rules of Practice and Procedure, the foregoing document upon each person designated on the official service list compiled by the Secretary in this proceeding.

Dated at Houston, Texas this 10th day of March, 2017.

William H. Hammons

William H. Hammons
Regulatory Analyst, Lead
713-215-2130
713-215-3483 (fax)

20170310-5099 FERC PDF (Unofficial) 3/10/2017 1:05:40 PM

Document Content(s)

Transco_ASR_Motion_for_Leave_to_Answer_and_Answer.PDF.................1-27

# ADDENDUM F

## Certificate of Parties and Amici Curiae and Disclosure Statement

## CERTIFICATE OF PARTIES AND AMICI CURIAE

Pursuant to Circuit Rule 27(a)(4), Transcontinental Gas Pipe Line Company, LLC, the movant for leave to intervene, states the following:

**1. Parties and Amici**. The petitioners are Allegheny Defense Project, Clean Air Council, Concerned Citizens of Lebanon County, Heartwood, Lancaster Against Pipelines, Lebanon Pipeline Awareness, and Sierra Club. The United States Federal Energy Regulatory Commission ("FERC") is the respondent. If intervention is granted, Transcontinental Gas Pipe Line Company, LLC, Anadarko Energy Services Corporation, Chief Oil & Gas LLC, ConocoPhillips Company, and Southern Company Services, Inc. will become respondents. At this time, to the knowledge of undersigned counsel, there are no other intervenors or *amici curiae* in this case. This case is a petition for review of an agency order issued by FERC and was filed directly in this Court. Accordingly, the requirement of Circuit Rule 28(a)(1)(A) to list the parties, intervenors, and amici that appeared below does not apply.

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Circuit Rule 26.1 of the Rules of this Court, Transcontinental Gas Pipe Line Company, LLC, the movant for intervention, makes the following disclosure:

Transcontinental Gas Pipe Line Company, LLC is a natural gas pipeline company engaged in the transportation of natural gas in interstate commerce, which owns and operates an interstate natural gas transmission system that extends from Texas, Louisiana and the offshore Gulf of Mexico area to a terminus in the New York City metropolitan area. Its parent corporation is Williams Partners Operating, LLC. Williams Partners, L.P. owns 10% or more of the limited liability company interest of Williams Partners Operating LLC. In addition, The Williams Companies, Inc. owns 10% or more of the publicly-held limited partner interest in Williams Partners, L.P.

Respectfully submitted this 12th day of May, 2017.

By: *__/s/ John F. Stoviak__*

John F. Stoviak
(D.C. Circuit Bar No. 54582)
Saul Ewing LLP
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102-2186
Phone: (215) 972-1095
Fax: (215) 972-1921
jstoviak@saul.com

Elizabeth U. Witmer
(D.C. Circuit Bar No. 55961)
Saul Ewing LLP
1200 Liberty Ridge Drive, Suite 200
Wayne, PA 19087-5569
Phone: (610) 251-5062
Fax: (610) 408-4400
ewitmer@saul.com

Pamela S. Goodwin
(D.C. Circuit Bar No. 54566)
Saul Ewing LLP
650 College Road East, Suite 4000
Princeton, NJ 08540-6603
Phone: (609) 452-3109
Fax: (609) 452-3129
pgoodwin@saul.com

Patrick F. Nugent
(D.C. Circuit Bar No. 55948)
Saul Ewing LLP
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102-2186
Phone: (215) 972-7134
Fax: (215) 972-4157
pnugent@saul.com

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1. This motion complies with the type-volume limit of Fed. R. App. P. 27(d)(2)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and 27(a)(2)(B), this response contains 4,769 words.

2. This motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this motion has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman.

Dated: May, 12, 2017

*/s/ John F. Stoviak*
John F. Stoviak
(D.C. Circuit Bar No. 54582)
Saul Ewing LLP
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102-2186
Phone: (215) 972-1095
Fax: (215) 972-1921
jstoviak@saul.com

*Attorney for Movant-Intervenor Transcontinental Gas Pipe Line Company, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on May 12, 2017, the foregoing Motion of Movant-Intervenor Transcontinental Gas Pipe Line Company, LLC to Dismiss the Petition for Review has been filed and served electronically through the Court's CM/ECF system on all registered counsel, as follows:

Benjamin Alan Luckett
Appalachian Mountain Advocates
PO Box 507
Lewisburg, WV 24901
bluckett@appalmad.org

Elizabeth Benson
Sierra Club
2101 Webster Street
Suite 1300
Oakland, CA 94612
elly.benson@sierraclub.org

Derek Owen Teaney
Appalachian Mountain Advocates
Suite 3
PO Box 507
Lewisburg, WV 24901
dteaney@appalmad.org

Beth Guralnick Pacella
Federal Energy Regulatory Commission
888 First Street, NE
Washington, DC 20426
beth.pacella@ferc.gov

Robert H. Solomon
Federal Energy Regulatory Commission
888 First Street, NE
Washington, DC 20426
robert.solomon@ferc.gov

Kevin M. Sweeney
John & Hengerer LLP
1730 Rhode Island Avenue, NW
Suite 600
Washington, DC 20036
ksweeney@jhenergy.com

Scott Borden Grover
Jesse Stuart Unkenholz
Balch & Bingham LLP
1901 Sixth Avenue North, Suite 1500
Birmingham, AL 35203
sgrover@balch.com
junkenholz@balch.com

*/s/ John F. Stoviak*
John F. Stoviak
(D.C. Circuit Bar No. 54582)
Saul Ewing LLP
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102-2186
Phone: (215) 972-1095
Fax: (215) 972-1921
jstoviak@saul.com

*Attorney for Movant-Intervenor Transcontinental Gas Pipe Line Company, LLC*